UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZURICH AMERICAN INSURANCE COMPANY, as
subrogee of Vinmar International Limited, Inc., and
VINMAR INTERNATIONAL LIMITED, INC.

                        Petitioners,

                        v.

TEAM TANKERS A.S., EITZEN CHEMICAL USA, *in
persona,* and the M/V SITEAM EXPLORER, her engines,
tackle, apparel, etc., *in rem,*

                        Respondents.

Case No. 13-cv-8404 (WHP)

**MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTION TO
VACATE, AND IN SUPPORT OF RESPONDENTS' CROSS-MOTION TO CONFIRM,
AN ARBITRATION AWARD DATED 26 AUGUST 2013**

Holland & Knight LLP
31 West 52nd Street
New York, New York 10019
Tel: (212) 513-3200
Fax: (212) 385-9010
*Attorneys for Respondents*

*Counsel:*
Michael J. Frevola, Esq.
F. Robert Denig, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

BACKGROUND FACTS ...................................................................................................... 1

ARGUMENT ........................................................................................................................ 7

I.     THE PANEL CORRECTLY APPLIED COGSA'S LATE NOTICE PRESUMPTION AND BURDEN SHIFTING SCHEME, HENCE PETITIONERS CANNOT SATISFY THE "VERY HIGH" BURDEN REQUIRED TO SHOW MANIFEST DISREGARD OF THE LAW ............................. 7

      A.    The Manifest Disregard of Law Standard ............................................................ 8

      B.    The Panel Correctly Applied the COGSA Late Notice Presumption and Burden Shifting Scheme ........................................................................ 11

      C.    Petitioners' Arguments Only Challenge the Panel's Factual Findings, And Intentionally Misrepresent the Record to Create the Appearance of a Misapplication of Law ........................................................................ 15

II.    THE PANEL'S ALTERNATIVE HOLDINGS REGARDING DUE DILIGENCE AND DAMAGES LIKEWISE WERE DECIDED CORRECTLY UNDER COGSA .......................................................................................................... 19

      A.    Due Diligence ................................................................................................ 19

      B.    Damages ........................................................................................................ 21

III.   CONFIRMATION OF THE AWARD IS APPROPRIATE BECAUSE THE AWARD IS FINAL AND ENFORCEABLE .............................................................. 24

IV.   RESPONDENTS SHOULD BE AWARDED THEIR FEES AND EXPENSES INCURRED IN OPPOSING PETITIONERS' APPLICATION AND CROSS-MOVING FOR RECOGNITION OF THE AWARD ...................................................... 27

      A.    The Charter Provides for Respondents Recovery of Fees and Expenses ............. 27

      B.    28 U.S.C. § 1927 ............................................................................................ 28

      C.    Conclusion ...................................................................................................... 32

CONCLUSION ...................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L. Holden v. S.S. Kendell Fish,*
   395 F.2d 910 (5th Cir. 1968) ...................................................................................23

*Allied Signal Tech. Serv. Corp. v. M/V DAGMAR MAERSK,*
   234 F. Supp. 2d 526 (D. Md. 2002) ..........................................................................13

*Asoma Corp. v. M/V LAND,*
   46 Fed. Appx. 34 (2d Cir. 2002) ..........................................................................13, 14

*Bally, Inc. v. M.V. ZIM AMERICA,*
   22 F.3d 65 (2d Cir. 1994) ..........................................................................................13

*Caemint Food, Inc. v. Lloyd Brasileiro,*
   647 F.2d 347 (2d Cir. 1981) .................................................................................12, 15

*D.H. Blair & Co. v. Gottdiener,*
   462 F.3d 95 (2d Cir. 2006) ...........................................................................................8

*DigiTelCom, Ltd. v. Tele2 Sverige AB,*
   No. 12 Civ. 3082 (RJS), 2012 WL 3065345 (S.D.N.Y. July 25, 2012) ........................ *passim*

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,*
   33 F.3d 383 (2d Cir. 2003) .............................................................................8, 21, 30

*Eatoni Ergonomics, Inc. v. Research In Motion Corp.,*
   No. 08 Civ. 10079, 2011 WL 2437416 (S.D.N.Y. June 1, 2011) .......................9, 11

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.,*
   403 F.3d 85 (2d Cir. 2005) .........................................................................................26

*Exportkhleb v. Maistros Corp,*
   790 F. Supp. 70 (S.D.N.Y. 1992) ....................................................................9, 10, 11

*F. Hoffmann-La Roche Ltd. v. Qiagen Giathersburg, Inc.,*
   730 F. Supp. 2d 318 (S.D.N.Y. 2010) .......................................................................20

*Ferrostaal, Inc. v. M/V TUPUNGATO,*
   230 Fed. Appx. 11 (2d Cir. 2007) ...................................................................12, 13, 15

*Finkelstein v. UBS Global Asset Mgmt. (US) Inc.,*
   No. 11-cv-00356, 2011 WL 3586437 (S.D.N.Y. Aug. 9, 2011) ...........................8, 11

*Folkways Music Publishers, Inc. v. Weiss,*
  989 F.2d 108 (2d Cir. 1993)...............................................................................8

*Internatio, Inc. v. M/S TAIMYR,*
  602 F.2d 49 (2d Cir. 1979)................................................................................23

*J.R.J. Enterprises, Inc. v. M/V DUNCAN ISLAND,*
  No. 10 Civ. 6496 (RWS), 2012 WL 1450421 (S.D.N.Y. Apr. 23, 2012)..........16, 17

*Manning v. Smith Barney Haris Upham & Co.,*
  822 F. Supp. 1081 (S.D.N.Y. 1993)...................................................................28

*New York Tele. Co. v. Commc'n Workers of America Local 1100,*
  256 F.3d 89 (2d Cir. 2001).................................................................................10

*Page Int'l Ltd. v. Adam Maritime Corp.,*
  53 F. Supp. 2d 591 (S.D.N.Y. 1999)...................................................................28

*ReliaStar Life Ins. Co. of N.Y v. EMC Nat. Life Co.,*
  564 F.3d 81 (2d Cir. 2009).................................................................................26

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,*
  157 F.3d 174 (2d Cir. 1998)...............................................................................26

*Santiago v. Sea-Land Service, Inc.,*
  366 F. Supp. 1309 (D.P.R. 1973)........................................................................22

*Serguros Banvenez, S.A. v. S/S OLIVER DRESCHER,*
  761 F.2d 855 (2d Cir. 1985)...............................................................................22

*Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.,*
  548 F.3d 85 (2d Cir. 2008)...............................................................................9, 15

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*
  592 F.3d 329 (2d Cir. 2010)..............................................................................8, 9

*U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.,*
  No. 04 Civ. 2504, 2004 WL 2823038, at *9 (S.D.N.Y. Dec. 1, 2004)...................28

*Wallace v. Buttar,*
  378 F.3d 182 (2d Cir. 2004)..........................................................................8-9, 30

*Westerbeke Corp. v. Daihatsue Motor Co, Ltd.,*
  304 F.3d 200 (2d Cir. 2002)........................................................................1, 9, 29

*Willemijn Houdstermaatschappig, BV v. Standard Microsystems Corp.,*
  103 F.3d 9 (2d Cir. 1997)..................................................................................25

*Yusuf Ahmed Alghanim & Sons, W.W.L. v. Toys "R" Us, Inc.*,
    126 F.3d 15 (2d Cir. 2007) .................................................................................26

**STATUTES**

9 U.S.C. § 1 .................................................................................................24, 25

9 U.S.C. §§ 10, 11 ................................................................................................8

9 U.S.C. § 202 .............................................................................................24, 25

9 U.S.C. § 207 .....................................................................................................25

28 U.S.C. § 1927 .....................................................................................28, 29, 32

29 U.S.C. § 186 ............................................................................................10, 11

46 U.S.C. § 1304(5) ............................................................................................22

46 U.S.C. § 1312 .................................................................................................13

T. 2517, 330 U.N.T.S. 38, Chapter Two of the Federal Arbitration Act, 9 United States
    Code §§ 201-208 .........................................................................................24

**OTHER AUTHORITIES**

Fed. R. Civ. P. 11 ...............................................................................................29

## PRELIMINARY STATEMENT

Respondents respectfully submit this Memorandum of Law (1) in opposition to Petitioners' Motion to Vacate or Modify an Arbitration Award dated 26 August 2013 (the "Motion") filed with this Court on November 26, 2013, and (2) in support of Respondents' Cross-Motion to Confirm an Arbitration Award dated 26 August 2013 (the "Award"). Petitioners' Motion is a flagrant attempt to re-litigate factual disputes in federal court which have previously been decided in arbitration. They seek to dress up their factual arguments with misrepresentations of the record, complemented by misstatements of the controlling legal standard, to make it appear as though their argument is based on a manifest disregard of law. Yet when the misrepresentations and misstatements are unveiled, it becomes clear that the Panel correctly applied the controlling law, the Panel's factual findings were well supported by the evidence, and Petitioners' Motion is a dilatory and vexatious act of delay and desperation.

## BACKGROUND FACTS[1]

The underlying dispute in this matter involves Petitioners' claim against Respondents for the contamination of a cargo of approximately 3,500 metric tons of Acrylonitrile ("ACN")[2]

---

[1] Unlike Petitioners' recitation of "facts" in their Motion, which cite to their submissions in the arbitration and seek to argue Petitioners' version of the factual record, the facts cited herein are those set forth in the Award. As this Court's job is not to re-examine facts decided by the arbitration panel, the Award's recitation of facts is the one that should be referenced (rather than one party's view of the evidence not accepted by the arbitration panel). *Westerbeke Corp. v. Daihatsue Motor Co, Ltd.*, 304 F.3d 200, 214 (2d Cir. 2002).

[2] The Panel adopted the Petitioners' description of ACN, which we reproduce here for the Court's convenience:

> Acrylonitrile is a clear, colorless liquid that contains both olefinic (carbon-carbon double bond) and nitrile (cyano) groups, which give the molecule its unique and varied reactivity, making it a versatile raw material. While ACN is designed for its reactive versatility, that reactivity must be stabilized to facilitate its transport and handling in liquid form while preventing unintended polymerization (a highly exothermic reaction) pending ACN's final use in one of its applications.

> Today, ACN is normally stabilized against premature polymerization during storage, transport and handling by adding 0.2 to 0.5 weight percent of water and 35-45 ppm of the inhibitor Methyl Hydroquinone ("MEHQ"). Water and MEHQ interrupt potential polymerization by consuming trace reactive intermediates before polymerization begins or becomes uncontrolled. Water inhibits

carried by the *M/V SITEAM EXPLORER* (the "Vessel") on a voyage from Houston to Ulsan, Korea pursuant to a voyage charter dated June 10, 2008 between Respondent Team Tankers A.S. (as owner) and Petitioner Vinmar International Limited, Inc. (as charterer/cargo owner) (the "Charter").

The two tanks of the Vessel used to carry the ACN were inspected internally twice by Vinmar's appointed inspectors in Houston, Award, at 10-11, and were "found to be clean and fit to load the intended ACN cargo." *Id.* at 2. Loading of the ACN on board the Vessel from the Houston shore tanks commenced on June 30, 2008. *Id.* Samples of ACN drawn from the Vessel's tanks during loading and contemporaneously tested showed that the ACN was on specification when loaded aboard the Vessel. *Id.* Upon loading, Vinmar's appointed inspectors submitted a Cargo Inhibitor Report to the Vessel indicating that the ACN had been inhibited with 37.56 ppm of MEHQ inhibitor and stating as follows: "90 F Maximum – Higher temperatures will destroy the inhibitor" and "Duration of Effective Inhibition: 90 Days." *Id.* at 2-3.

The voyage to Ulsan was uneventful, but the Vessel passed through tropical zones where sea temperatures regularly approached the 90°F breakdown limit shown in the Cargo Inhibitor Report. *Id.* at 2. The Vessel arrived in Ulsan on August 12, 2008 and pre-discharge samples of ACN were drawn from the Vessel on August 14, 2008. *Id.* at 3. Some of these samples were tested contemporaneously, which tests showed the ACN to be on specification as to all specifications including color (less than 10 APHA) and inhibitor; other samples were retained by Vinmar's inspectors. *Id.* at 3. The ACN from both Vessel tanks was discharged and commingled

---

ionic polymerization by trapping basic or acidic intermediates, and MEHQ inhibits free-radical polymerization by trapping free radical intermediates.

Award, at 6.

into shore tanks in Ulsan on August 15-16, 2008. *Id.* After completion of discharge, the ACN now in the shore tanks was sampled and tested and found to on specification. *Id.*

Vinmar had purchased the ACN in the U.S. with the hopes of repositioning it to the Far East and reselling it for a profit. *Id.* Vinmar did not have a committed buyer for the ACN. *Id.* From the time when Vinmar purchased the ACN to when the Vessel arrived in Ulsan, the Far East market for ACN decreased significantly. *Id.* Vinmar could not find a buyer of the ACN and was forced to keep it in the shore tanks in Ulsan far longer than anticipated. *Id.* Throughout the remainder of 2008, however, "the market for ACN continued its downward spiral." *Id.*

On September 26, 2008, at or beyond the 90 days effective period of the inhibitor as noted in the Cargo Inhibitor Report, Vinmar arranged to have the ACN in the Ulsan shore tanks sampled and tested. *Id.* Those test results stated that the ACN remained on specification for inhibitor content, but that its color had increased from a rating of 3 APHA to 13 APHA. *Id.* It was at this point, some six weeks after discharge, that Vinmar first put Respondents on notice of a claim for cargo damage. *Id.*

Petitioners initiated arbitration pursuant to the Charter's arbitration clause and the arbitration Panel was constituted on April 18, 2011. *Id.* The Panel held ten formal hearings in which it heard evidence from two Vinmar employees, three chemical experts on behalf of Petitioners, one chemical expert on behalf of Respondents, and the Vessel's master. *Id.* at 4. Petitioners also submitted to the Panel declarations and materials from the manufacturer of the ACN. *Id.* The Panel also received and considered extensive main and reply briefs from the parties, with final submissions submitted on June 3, 2013. *Id.* The Panel issued its Award in favor of the Respondents on August 26, 2013. *Id.* at 13-14. Respondents' appointed arbitrator,

Mr. Louis P. Sheinbaum, submitted a dissenting opinion as to liability. *See id.* (dissenting opinion of Louis P. Sheinbaum).

In the Award, the Panel noted that "[a]lthough both parties agree that COGSA governs this dispute, each interprets the evidence differently and, as such, holds a different but earnest view of the other's responsibilities and burdens of proof." *Id.* at 5. In the Panel majority's view, Petitioners were unable to overcome the presumption of delivery of the cargo in sound condition that arises if notice of cargo damage is not provided by the cargo interests within 3 days of discharge of the cargo (known as the "COGSA late notice presumption"). *See id.* at 10.

Petitioners had argued that the ACN "was 'contaminated' while in the custody of the Vessel." *Id.* at 5. According to Petitioners, the disparity between subsequent test results of ACN load port samples (which showed little color formation) and discharge port samples (which showed much greater color formation) was evidence that overcame the COGSA late notice presumption of clean delivery. *Id.* Petitioners further argued that the considerable scientific evidence offered by their experts showed that the cargo was "contaminated" by the remains of the Vessel's prior cargo of pygas. *Id.* Petitioners then argued that they were entitled to damages resulting from the degradation of the ACN, which they claimed caused Petitioners to have to sell the ACN at a below-market price. *See id.* at 12

Respondents argued that Petitioners failed to show that the cargo was "damaged" while in the custody of the Vessel, and that Petitioners had not produced verifiable proof that the cargo was in sound condition when delivered to the Vessel. *Id.* at 5. Respondents also argued that the scientific evidence offered by their expert disproved the scientific evidence offered by Petitioners' expert. *Id.* Additionally, Respondents argued even if the ACN did absorb some quantity of pygas residue while aboard the Vessel, the extensive tank cleaning operations carried

out prior to loading the ACN (introduced by the testimony of the Vessel's master) met the COGSA "due diligence" standard to make the Vessel seaworthy and fit to receive and carry the cargo. *Id.* Furthermore, due to the falling market conditions during and directly after the voyage, Respondents argued that Petitioners grossly overstated their damages and instead sold the ACN at or near the then-prevailing market price for sound ACN. *Id.*

The Panel described the arbitration as "a classic case of well-qualified experts interpreting the results of highly technical test evidence differently." *Id.* at 6. The Panel found, however, that "neither expert could do more than offer his informed speculation as to what ***may*** have caused the ACN to go ever so slightly yellow," noting that the difference between on-spec color and the off-spec color in this case was barely noticeable to the naked eye. *Id.* (emphasis in original). The Panel found that the ACN was loaded in Houston in apparent good order and condition, but that it likewise was discharged in Ulsan in the same apparent good order and condition. *Id.*

Emphasizing that the Petitioners' only complaint was "that six weeks after its discharge, the cargo was found to exceed Vinmar's color specification of Maximum 10 APHA," the Panel held that "the cargo was also found to be 'on-spec' for color at discharge and that finding precludes [Petitioners from] benefiting from the usual presumptions of fault associated with a *'prima facie'* claim presentation." *Id.* at 7. The Panel explained:

> Since the cargo was not noted to have been damaged or "off spec" at the time of discharge and Owner was not timely notified of any damage, it becomes [Petitioners'] burden to overcome the presumption of sound delivery and persuade the triers of fact that the cargo was in fact damaged while in the custody of the Vessel. [Petitioners] have attempted to do so by pointing to additional tests on the retained load port samples carried out more than a year later. Although testing of those samples did indicate that some further color had developed, none experienced the same level of color deterioration as did the cargo carried by the Vessel and discharged into the UTT tanks [in Ulsan].

***The majority considers those additional tests to be among the strongest evidence
in support of [Petitioners'] position, but they are not dispositive that the cause
for increased color took place aboard the ship***.  Clearly the conditions under
which those samples were retained did not replicate those actually experienced by
the cargo carried by the Siteam Explorer.  Here, the ACN was subjected to "a
stressful voyage" that in terms of duration and temperature brought the cargo to
the edge of its stated stability.  Moreover, the uncontested testimony of
[Respondents' expert] Mr. Jones was that given sufficient time, "all acrylonitrile"
will yellow.

*Id.* at 7-8 (emphasis added).  The Panel further doubted the integrity and chain of custody of the
samples tested by Petitioners, which called into issue the credibility of the test results relied
upon by Petitioners' experts for the purpose of trying to prove that residues of the prior cargo of
pygas was present in the ACN and caused the observed color increase.  *Id.* at 8-9.  Indeed, the
Panel noted that "[a]fter years of testing the pre-discharge 'composite' and 'replicate' samples
with progressively more sophisticated equipment, [Petitioners'] experts did not actually find
remnants of pygas." *Id.* at 8.

Furthermore, in evaluating the Petitioners' evidence, the Panel expressed serious doubts
as to Petitioners' alleged contamination theory.  *Id.* at 9.  The Panel found, based on the
scientific evidence presented to it, that if the ACN had been contaminated with the 33 gallons of
pygas alleged by the Petitioner during the voyage, the cargo would be expected to have
demonstrated a higher color upon discharge at Ulsan.  *Id.*  After considering and weighing all of
the evidence, the Panel ultimately found:

that [Petitioners] have not shown, by a preponderance of the evidence or
otherwise, that the alleged contamination took place while the cargo was in the
custody of the Siteam Explorer.  Nor have [Petitioners] shown that the nature of
the alleged damage is so unique that it could only have occurred while still aboard
the Vessel.  Other plausible scenarios such as those suggested by [Respondents'
expert] Mr. Jones are possible, if not probable.  It follows that [Petitioners] have
not overcome the COGSA statutory presumption of clean delivery imposed by

their late notice of damage. Accordingly, the majority is obliged to deny the [Petitioners'] claim in its entirety.

*Id.* at 10.

After concluding that the Petitioners had failed to overcome the COGSA late notice presumption, the Panel found additional grounds for Respondents to prevail. The Panel went on to discuss that, even if Petitioners had established their *prima facie* case, Respondents had carried their burden of showing that they exercised the requisite statutory 'due diligence' to make the Vessel seaworthy and avoid liability under COGSA section 4(1). *Id.* at 10-12. Furthermore, independent from its finding in favor of Respondents on the liability issues, the Panel found the Petitioners' measure of damages to be faulty. After reviewing market data evidence, documentary evidence, and the testimony of Vinmar's representatives, the Panel found that Vinmar's ultimate sales of the ACN were not at prices below the prevailing prices for sound ACN of the same grade in the region. *Id.* at 12.

## ARGUMENT

**I. THE PANEL CORRECTLY APPLIED COGSA'S LATE NOTICE PRESUMPTION AND BURDEN SHIFTING SCHEME, HENCE PETITIONERS CANNOT SATISFY THE "VERY HIGH" BURDEN REQUIRED TO SHOW MANIFEST DISREGARD OF THE LAW**

The Panel correctly applied COGSA burden shifting scheme and reached the correct result. Even if this Court were persuaded to disagree with the Panel's conclusion, however, this would not constitute grounds for vacatur of the Award. Vacatur under the manifest disregard of the law standard is inappropriate unless Petitioners can show that the Panel's decision did not even have a ***barely colorable justification*** for the outcome reached. Here, as discussed below, the Panel correctly applied the governing law and had ample factual grounds for holding that Respondents were not liable to Petitioners for three separate reasons. As such, Petitioners have failed to meet their very high burden to demonstrate that the Panel committed a manifest

disregard of law, and this Court accordingly should deny Petitioners' Motion and grant Respondents' Cross-Motion.

## A. The Manifest Disregard of Law Standard

An arbitration award is subject to very limited review in order to avoid undermining the twin goals of arbitration of settling disputes efficiently and avoiding long and expensive litigation. *See Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993). "A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 111 (2d Cir. 2006). The Federal Arbitration Act provides certain limited statutory grounds for vacating an award. *See* 9 U.S.C. §§ 10, 11. In addition to these statutory grounds, none of which are claimed by Petitioners to be present here, a court may vacate an award where the award was reached by a manifest disregard of law.

The manifest disregard of law doctrine has been described by the Second Circuit as a "doctrine of last resort," with "its use ... limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 33 F.3d 383, 389 (2d Cir. 2003); *see also T.Co Metals, LLC v. Dempsey Pipe & Supply. Inc.* 592 F.3d 329 (2d Cir. 2010) (to warrant vacatur the "impropriety" on the part of the arbitrator(s) must be "more than error or misunderstanding with respect to the law, or an arguable difference regarding the meaning or applicability of the laws ..."). "Awards are not vacated because of a simple error in law or a failure by the arbitrators to understand or apply it or because an arguable difference regarding the meaning or applicability of law urged upon an arbitrator." *Finkelstein v. UBS Global Asset Mgmt. (US) Inc.*, No. 11-cv-00356, 2011 WL 3586437, *4 (S.D.N.Y. Aug. 9, 2011). Rather, awards should be enforced "despite a court's disagreement with it on the merits, if there is a ***barely colorable justification for the outcome***

*reached*." *Id.* at \*3 (emphasis added) (citing *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004)); *see also T.Co Metals, LLC*, 592 F.3d at 339; *Eatoni Ergonomics, Inc. v. Research In Motion Corp.*, No. 08 Civ. 10079, 2011 WL 2437416, \*4 (S.D.N.Y. June 1, 2011).

A court should vacate an arbitration award under the manifest disregard of the law standard only in the rare instance in which "the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Westerbeke Corp. v. Daihatsue Motor Co, Ltd.*, 304 F.3d 200, 217 (2d Cir. 2002). Courts in the Second Circuit have employed a three-part inquiry when evaluating claims of manifest disregard, "asking (1) whether the law allegedly ignored was clear and explicitly applicable to the matter before the arbitrator; (2) whether the law was improperly applied and that application led to an erroneous outcome; and (3) whether the arbitrator possessed actual knowledge of the law and its applicability to the dispute." *Eatoni Ergonomics*, 2011 WL 2437416 at \*4 (citing *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 548 F.3d 85, 93 (2d Cir. 2008)). Put more succinctly, as this Court has noted, "to justify vacatur under the three part test advanced by Petitioners, the arbitrator must appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it." *Id.* at \*4 (internal quotations and citation omitted).

For example, in *Exportkhleb v. Maistros Corp*, 790 F. Supp. 70 (S.D.N.Y. 1992), a vessel owner sought to vacate an arbitration award against it in favor of a cargo owner alleging that the arbitrators improperly applied COGSA's one year statute of limitations. *Id.* at 74. The cargo owner had filed a claim against the vessel owner in a Limitation Act proceeding commenced by the vessel owner, but then the cargo owner withdrew its claim without prejudice. *Id.* The vessel owner commenced arbitration on general average claims against the cargo owner 5 months later,

but the cargo owner did not assert its counterclaim for cargo damage in the arbitration until two years after withdrawing that cargo claim from the limitation proceedings. *Id.* The arbitration panel held that the cargo owner's counterclaim was brought within a year from the withdrawal in the limitation proceeding and that the cargo owner had "complied with the letter and spirit of the COGSA time bar provision." *Id.* In refusing to vacate this obviously incorrect decision, the district court noted:

> It may be that the arbitrators misunderstood the law or the facts since in fact [the cargo owner] did not assert its counterclaim until over two years after it withdrew its claim from the limitation proceeding. However, "mere error" does not suffice to establish "manifest disregard of the law;" "[T]he arbitrator [must have] appreciate[d] the existence of a clearly governing legal principle, ***but decided[d] to ignore or pay no attention to it.***"

*Id.* (emphasis in original) (quoting *Merrill Lynch, Pierce, Fenner & Smith v. Bobker*, 808 F.2d 930 (2d Cir. 1986)). The district court upheld the arbitration award, finding that there was no evidence that "the arbitrators' ruling, even if in error, was in manifest disregard of the law." *Id.*

The situations in which a court will vacate an award for manifest disregard are rare, and usually they involve some element of impropriety or a blatant refusal by the arbitrators to apply legal principles which the arbitrators acknowledge should apply. For example, in *New York Tele. Co. v. Commc'n Workers of America Local 1100*, 256 F.3d 89 (2d Cir. 2001), the employer/petitioner sought to vacate an arbitration award requiring the employer to pay a union a monthly sum equal to dues the union would have received if the employer had not used non-union workers. *Id.* at 91. The employer had agreed to pay the monthly equivalent of dues to the union in a settlement agreement, but then questions arose as to whether the payments would violate 29 U.S.C. § 186 (which prohibits payments by an employer to a union subject to certain exceptions, including allowing payments in settlement of a dispute). *Id.* The parties presented the issue to an arbitrator on stipulated facts to decide the limited issue of whether the payments

violated Section 186. *Id.* The arbitrator concluded that the payments fell under the exceptions to Section 186, but in doing so the arbitrator expressly disregarded a 1964 Second Circuit decision ("*Seatrain*") which that arbitrator recognized in his decision was controlling. *Id.* In his award, the arbitrator stated: "As for the argument that the law of the 2nd Circuit is different and controlling, that can be tested, if need be, by this decision. *Seatrain* was decided 34 years ago . . . . Perhaps it is time for a new court decision." *Id.* Because the arbitrator (1) correctly identified the law, (2) correctly identified how he was supposed to decide under that law, but (3) then – in his written decision – expressly choose to disregard what he understood to be controlling law, the district court vacated the award for manifest disregard. *Id.* at 92. The Second Circuit upheld the district court's vacatur of the arbitrator's award. *Id.* at 93.

The juxtaposition of *Exportkhleb* and *New York Telephone Co.* helps to demonstrate the exacting standard that courts apply to the manifest disregard analysis. Vacatur only is justified when, as in *New York Telephone Co.*, the arbitrator appreciated the existence of a clearly governing legal principle but decided to ignore or pay no attention to it. *See, e.g., Eatoni Ergonomics*, 2011 WL 2437416 at *4. Vacatur is not justified, as in *Exportkhleb*, because of a simple error in law or "a failure by the arbitrators to understand or apply it or because an arguable difference regarding the meaning or applicability of law urged upon an arbitrator." *Finkelstein*, 2011 WL 3586437 at *4. And, to be sure, vacatur certainly is not justified when (as here) the arbitrators correctly applied the applicable law.

### B. The Panel Correctly Applied the COGSA Late Notice Presumption and Burden Shifting Scheme

The parties agreed, both in the Charter's choice of law provisions and in their submissions to the Panel, that COGSA applies to Petitioners' cargo damage claims. As such, the Panel (correctly) recognized COGSA as the applicable law and applied it to Petitioners' claims. *See*,

*e.g.*, Award, at 2 (noting that "the charter was subject to COGSA . . . ."). Under COGSA, a cargo owner, such as the Petitioners, claiming that a vessel damaged its cargo has the ultimate burden of showing that the cargo was damaged while in the care and custody of the vessel:

> In order to bring itself within [COGSA's] provisions, plaintiff has the burden, which remains with it throughout the case, of proving that "the goods were damaged while in the carrier's custody." *Pan-American Hide Co. v. Nippon Yusen (Kabushiki), Kaisha*, 13 F.2d 871 (S.D.N.Y. 1921) (L. Hand, J.). If Plaintiff carries this burden, it establishes a *prima facie* case for recovery and will thus be entitled to prevail unless the carrier brings itself within one of the exceptions set forth in [section] 1304.

*Caemint Food, Inc. v. Lloyd Brasileiro*, 647 F.2d 347, 351-52 (2d Cir. 1981) (Friendly, J.). In other words, if a cargo claimant meets its initial burden under COGSA of establishing a *prima facie* case, the burden then shifts to the defendant shipowner to prove that it falls within one of the COGSA exceptions. This is the COGSA burden shifting scheme.

To meet their initial burden under COGSA of establishing a *prima facie* case, Petitioners were required to prove by a preponderance of the evidence that the ACN was damaged while in the Vessel's care. *Ferrostaal, Inc. v. M/V TUPUNGATO*, 230 Fed. Appx. 11, 13 (2d Cir. 2007) (citing *Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir. 1983)). Under COGSA, therefore, Petitioner had the burden of showing that: (1) the ACN was delivered to the Vessel in good condition, and (2) the ACN was discharged in damaged condition. *See id.*

In applying COGSA, the Panel first held that the Petitioners established that the cargo was delivered to the Vessel in good condition. Award, at 7 ("Respondents have challenged [Petitioners] to prove that the cargo was in good order and condition when loaded, but we are inclined to accept the several load port tests showing the cargo to have been 'on spec' at that time."). The Panel then found, however, that Petitioners had not presented sufficient evidence to overcome the COGSA late notice presumption of discharge in good condition:

Consequently, the majority finds that [Petitioners] have not shown, by a preponderance of the evidence or otherwise, that the alleged contamination took place while the cargo was in the custody of the Siteam Explorer. Nor have [Petitioners] shown that the nature of the alleged damage is so unique that it could only have occurred while still aboard the Vessel. Other plausible scenarios such as those suggested by [Respondents' expert] Mr. Jones are possible, if not probable. ***It follows that [Petitioners] have not overcome the COGSA statutory presumption of clean delivery imposed by their late notice of damage.*** Accordingly, the majority is obliged to deny the [Petitioners'] claim in its entirety.

*Id.* at 10 (emphasis added).

In order to succeed on its claim Petitioners had to show, by a preponderance of the evidence, that the ACN was damaged while aboard the Vessel prior to delivery. *See Allied Signal Tech. Serv. Corp. v. M/V DAGMAR MAERSK*, 234 F. Supp. 2d 526, 528 (D. Md. 2002) (finding to meet second element of the *prima facie* case under COGSA, plaintiff must establish by a preponderance of the evidence that the cargo was damaged while aboard the vessel) (citing *U.S. v. Afram Lines*, No. 90 Civ. 6850, 1995 WL 224616, at *7 (S.D.N.Y. Apr. 14, 1995)). As the Panel recognized and applied, under COGSA a cargo claimant is required to give notice of cargo damage to a vessel owner within three days, after which time COGSA provides for a presumption of delivery in good order. Award, at 5 (citing COGSA section 12 (46 U.S.C. § 1312)); *see also Asoma Corp. v. M/V LAND*, 46 Fed. Appx. 34, 36 (2d Cir. 2002); *Bally, Inc. v. M.V. ZIM AMERICA*, 22 F.3d 65, 71 (2d Cir. 1994). While a cargo claimant can overcome this presumption, it must provide sufficient evidence that the cargo was damaged ***during shipment***. *See, e.g., M.V. ZIM AMERICA*, 22 F.3d at 71. If "the 'damage sustained [is] not sufficiently unique that it can be causally linked to [defendant's negligence],'" then the cargo claimant will not overcome the late notice presumption of sound delivery. *M/V LAND*, 46 Fed. Appx. at 36.

The Panel recognized and correctly applied the COGSA burden shifting scheme and late notice presumption of sound delivery. The Panel (correctly) acknowledged that in order for

Petitioners to meet their initial burden and shift the burden to Respondents, Petitioners were required to show that the ACN damage took place while the ACN was onboard the Vessel. Award, at 10. As part of this initial inquiry, the Panel (correctly) identified that the COGSA late notice presumption was applicable because Respondents were not put on notice of the claimed damage until 42 days after the Vessel discharged the ACN. *Id.* at 7.

Having set forth the proper law in the Award, the Panel then examined whether the Petitioners' evidence was sufficient to meet their initial burden of showing that the ACN was damaged while in the Vessel's custody. The Panel examined the Petitioners' evidence, including cargo samples, experiments, and expert testimony, *see* Award, at 10, but ultimately determined that even the Petitioners' "strongest" evidence was not sufficient to overcome the late notice presumption of sound delivery by showing that the ACN was damaged while in the Vessel's custody. *Id.* Simply put, the Panel questioned the means and methods by which Petitioners' experts reached their conclusion that a pygas contamination had caused the color formation and found that, because of ACN's natural tendency to form color with age, the nature of the alleged damage was not so unique that it was more likely than not that the color formation occurred because of pygas contamination aboard the Vessel. *Id.* at 10.[3]

As such, the Panel held that Petitioners failed to establish a *prima facie* COGSA claim. *Id.* Not only is there **barely colorable justification** for the Panel's decision, but taking the finding of facts undisturbed, the outcome is consistent with COGSA and relevant precedent. Therefore, this Court should deny Petitioners' Motion and grant Respondents' Cross-Motion.

---

[3] Petitioners argue that "pre-discharge samples were **contaminated** with 'reactive species suspect [*sic*] to be associated with pygas and many others . . . .'" Petitioners' Memo, at 14 (quoting Award, at 8). This characterization of "contamination" is Petitioners' position as to the evidence. The Panel made clear that *color formation*, not the possible presence of trace residues of prior cargo, was the only damage claim asserted by Petitioners: "It is important to note that [Petitioners'] only complaint is that six weeks after its discharge, the cargo was found to exceed Vinmar's color specification of Maximum 10 APHA." Award, at 7.

**C.** **Petitioners' Arguments Only Challenge the Panel's Factual Findings, But Intentionally Misrepresent the Record to Create the Appearance of a Misapplication of Law**

Petitioners suggest that the three-prong test originally established by the Second Circuit in *Stolt-Nielsen*[4] compels this Court to vacate the Award because: (1) the Panel expressly "recognized that COGSA is clearly and explicitly applicable to this matter," (2) the Panel majority "improperly applied COGSA's burdens of proof" which led to an "erroneous conclusion," and (3) the "Majority possessed actual knowledge of COGSA's burdens of proof." Petitioners' Memo, at 11. Tellingly, the Petitioners do not cite to a single case in which an arbitration award was vacated merely because the arbitrators, having recognized the applicable law and possessing knowledge of the applicable law, simply improperly applied or misinterpreted that law. In fact, Petitioners do not cite to any case vacating an arbitration award at all. Rather, after invoking an oversimplified version of the manifest disregard standard, Petitioners then embark on a disguised attack on the Panel's finding of fact cloaked in a manifest disregard of the law argument.

The Petitioners argue that the Panel manifestly disregarded COGSA by impermissibly using the late notice presumption of sound delivery to preclude the application of COGSA's burden shifting regime. Burdens do not shift under COGSA, however, until after a claimant establishes a *prima facie* case. *See Caemint Food*, 647 F.2d at 351-52. As explained above, a *prima facie* COGSA claim is established by showing that (1) the cargo was delivered to the vessel in good condition, and (2) the cargo was discharged in a damaged condition. *See Ferrostaal*, 230 Fed. Appx. at 13.

The late notice presumption creates a rebuttable presumption that the cargo was sound at discharge. Petitioners acknowledge that the Panel correctly invoked the late notice presumption,

---

[4] *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 548 F.3d 85, 93 (2d Cir. 2008).

but suggest that the presumption "'is conclusive only where there is no other evidence on the disputed point.'" Petitioners' Memo, at 15 (citing *Socony Mobil Oil Co. Inc. v. Texas Coastal & Int'l, Inc.*, 559 F.2d 1008, 1012 (5th Cir. 1977)). The presumption of good delivery, according to Petitioners, "'falls . . . once the [claimant] adduces *any credible evidence* tending to show that the cargo was damaged prior to delivery.'" Petitioners' Memo, at 15 (emphasis in original) (citing *Ferrostaal Corp. v. M.V. SINGA WILGUARD*, 838 F. Supp. 757 (S.D.N.Y. 1993)).[5]

Employing this "any credible evidence" argument, Petitioners then argue as follows:

> By recognizing that "strong[ ] evidence . . . support[ed] [Petitioners'] position," the Majority necessarily found "credible evidence tending to show that the cargo was damaged prior to delivery."

---

[5] Petitioners made this same argument to the Panel, in response to which Respondents noted case law in which the same argument was made and rejected. *See, e.g., J.R.J. Enterprises, Inc. v. M/V DUNCAN ISLAND*, No. 10 Civ. 6496 (RWS), 2012 WL 1450421, at *6 (S.D.N.Y. Apr. 23, 2012) (claimant argued that the evidence regarding the initial showing of discoloration of fruit sufficed as *some* evidence to show, by the nature of the damage, that it occurred while in the carrier's custody). In the *M/V DUNCAN ISLAND*, the claimant tried to use the line of cases cited by Petitioners to the Panel to avoid the late notice presumption of delivery in good order. The court in *M/V DUNCAN ISLAND* rejected this argument, however, stating:

> [w]hile [claimant's argument] may be true in cases where the damage *clearly occurred* in the carrier's custody, where the nature of the damage is unclear, the Plaintiff cannot rely upon this line of cases to prove good order.
>
> *       *       *
>
> In addition, the Plaintiff stored the mangoes in a storage unit for eight days and did not record the temperature during that period. While both parties agree that the fruit damage is typical of chilling, *it is unclear that the damage occurred while in the carrier's custody or in [claimant]'s buyer's warehouse*. In fact, [an] expert opinion [provided as to the cause of the damage] suggests the latter. Accordingly, the *Plaintiff has not discharged its burden* of making out a *prima facie* case under COGSA.

*Id.* at *6, *7 (emphasis added).

Judge Sweet rejected the claimant's argument that the COGSA late notice presumption was neutralized merely because some possibility existed that the damage claimed *could have* occurred in the carrier's custody. Rather, the evidence must suggest that the damage *clearly occurred* in the carrier's custody. Otherwise, of what use would be the presumption? Merely showing degraded or damaged cargo always could avoid the presumption. Petitioners made the same argument to the Panel as the claimants did before Judge Sweet, and they cited the same line of cases. *See* Charterers' Panel Submission No. 1, p. 69 (citing *Sogem-Afrimet, Inc. v. M/V IKAN SELAYANG*, 951 F. Supp. 429 (S.D.N.Y. 1996) (citing in turn, *inter alia*, *C. Itoh & Co. v. Hellenic Lines*, 470 F. Supp. 594 (S.D.N.Y. 1979) and *Ferrostaal Corp. v. M.V. SINGA WILGUARD*, 838 F. Supp. 757 (S.D.N.Y. 1993) as grounds for not employing COGSA late notice presumption to Charterers' claims in this dispute)).

Petitioners' Memo, at 17. Petitioners suggest that this was all they had to show to overcome the late notice presumption of sound delivery under COGSA, and that the Panel manifestly disregarded COGSA by not finding that Petitioners had overcome the late notice presumption of sound delivery. *Id.* at 17-18. But the Petitioners grossly misstate what the Panel actually held.

Contrary to Petitioners' out of context quote provided above, the Panel did not find that the Petitioners presented "***credible evidence*** tending to show that the cargo was damaged prior to delivery." Reviewing the entirety of the Panel's analysis following Petitioners' selective – and paraphrased – quotation shows that Petitioners' argument was considered ***and rejected*** by the Panel because of the ***disparity in conditions*** to which the samples and the cargo were subjected:

> The majority considers those additional [load port sample] tests to be among the strongest evidence in support of [Petitioners'] position, ***but they are not dispositive that the cause for increased color took place aboard the ship. Clearly the conditions under which those [load port] samples were retained did not replicate those actually experienced by the cargo carried by the Siteam Explorer. Here, the ACN was subjected to "a stressful voyage" that in terms of duration and temperature brought the cargo to the edge of its stated stability. Moreover, the uncontested testimony of [Respondents' expert] Mr. Jones was that given sufficient time, "all acrylonitrile" will yellow.***

Award, at 8 (emphasis added). Quite simply, the Panel held that Petitioners' strongest evidence was insufficient to overcome the late notice presumption of sound delivery and did not carry the Petitioners' burden of proving delivery in a damaged condition, because that evidence failed to support the conclusion that the cargo discoloration was caused by the Vessel's prior cargo residues as opposed to other reasons. *Id.* at 8-10. This is precisely the type of analysis employed by Judge Sweet in denying the cargo claimant's claim in the *M/V DUNCAN ISLAND* case (cited in the preceding footnote).

Petitioners then seek to demonstrate how the Panel misinterpreted the evidence with respect to the cause of the color increase and whether that cause was attributable to the Vessel by

rehashing arguments about the interpretation of scientific evidence that Petitioners made during the arbitration. Petitioners' Memo, at 15-19. Petitioners try to present these arguments to this Court as "undisputed facts," yet they not only were disputed by Respondents in the arbitration but also the Panel resolved those disputes in Respondents' favor. Petitioners' arguments are purely factual and challenge only the Panel's finding of facts; they do not raise questions as to whether the Panel correctly applied COGSA.

In this regard, when read carefully, Petitioners' argument is not really that the Panel disregarded COGSA, but rather that the Panel incorrectly weighed the evidence. Petitioners argue now, as they did in the arbitration, that the subsequent testing of load port samples showing that the ACN was on spec, and the subsequent testing of the discharge port samples showing a greater propensity to discolor, is sufficient evidence to overcome the late notice presumption of sound delivery and to establish that the ACN was damaged by prior cargo residues aboard the Vessel, thus establishing a *prima facie* case. Petitioners' Memo, at 18-19. But, while the Panel acknowledged that this was the Petitioners' "strongest evidence," the Panel found that evidence insufficient to show that the alleged damage to the cargo, the increase in color, was caused by something aboard the Vessel prior to delivery. Award, at 8. In other words, the Panel found that Petitioners' best evidence was not sufficient evidence to show discharge in a damaged condition.

In accordance with the overwhelming weight of precedent that proscribes courts from reexamining evidence presented to an arbitration panel, this Court should not disturb the Panel's weighing of the evidence presented in the arbitration, should deny Petitioners' Motion, and should grant Respondents' Cross-Motion.

## II. THE PANEL'S ALTERNATIVE HOLDINGS REGARDING DUE DILIGENCE AND DAMAGES LIKEWISE WERE DECIDED CORRECTLY UNDER COGSA

After deciding that Petitioners had not presented sufficient evidence to overcome the COGSA late notice presumption and thereby failed to establish a *prima facie* cargo damage claim, the Panel majority stated that even if Petitioners had established a *prima facie* claim, it would have been inclined to hold that the Respondents exercised the requisite "due diligence" to make the Vessel seaworthy and exempt from liability under COGSA section 4(1). Award, at 10-12. Furthermore, the Panel criticized the Petitioners' claimed damages, commenting that had they reached the damages issue they would have been inclined to find that the ACN was sold at prevailing market prices. *Id.* at 12-13. Petitioners likewise challenge these findings as a manifest disregard of the law. That challenge again is based on its disagreements with the Panel's factual findings, and Petitioners seek to support their challenge with further misrepresentations of the record and as to the controlling law.

### A. Due Diligence

As discussed above, Petitioners argue that they satisfactorily evidenced a *prima facie* COGSA claim. Claiming that they have, Petitioners argue that Respondents should have been required to prove "(1) what caused the ACN's contamination and (2) that the cause did not related [*sic*] to its negligence or was otherwise excused because it qualified as one of COGSA's 'excepted causes,' § 1304(2)(a)-(q)." Petitioners' Memo, at 20 (citing *EAC Timberlane v. Pisces, Ltd.*, 580 F. Supp. 99, 115 (D.P.R. 1983)). Petitioners argue the Panel could not have found that Respondents satisfied this burden, because "neither [Petitioners' nor Respondents'] expert could do more than offer his informed speculation as to what may have caused the ACN to go ever so slightly yellow." Petitioner's Memo, at 21 (quoting Award, at 6).

The Panel, however, held that Respondents exercised due diligence to make the Vessel seaworthy under COGSA Section 4(1). Even if the Panel had found that Petitioners presented a *prima facie* COGSA claim but then denied that claim because the Panel held that the Respondents had exercised due diligence to make the Vessel seaworthy, Petitioners have not – and cannot – show how the Panel's conclusion constitutes a manifest disregard of the law. The Panel correctly identified the controlling law – COGSA § 4(1) – and correctly acknowledged that it would have been Respondents' burden to show that "the 'damage' was caused by circumstances for which it is legally excused." Award, at 10.

Petitioners do not point to any part of the Award which shows or even suggests that the Panel consciously disregarded Respondents' burden to show due diligence. Even if, however, the Panel had erred in applying this burden, a mere error in applying the law does not constitute the **manifest disregard of law** required to justify vacatur of the Award. *See, e.g., F. Hoffmann-La Roche Ltd. v. Qiagen Giathersburg, Inc.*, 730 F. Supp. 2d 318 (S.D.N.Y. 2010) ("it is not manifest disregard where the arbitrators recognize the appropriate governing standard but then erroneously apply that standard to the facts before them"). Besides, a fair reading of the Award shows that there is more than a **barely colorable justification** for the Panels' conclusion that the Respondents' exercise of due diligence exempts them from liability.

Whether or not Petitioners would have, or could have, established what caused the ACN's color formation is a factual issue. Although the Panel's conclusion was not specific in this regard, the Panel clearly did entertain the notion (for the purpose of their alternative analysis) that there was the "mere presence of minor residues from a prior cargo" in the ACN. Award, at 11. The Panel also made specific factual findings regarding the Respondents' tank cleaning practices and procedures, which practices and procedures were not criticized by

Petitioners, that supported the Panel's conclusion that Respondents had exercised due diligence to make the Vessel seaworthy. *Id.* at 10-11. The Panel therefore concluded that, even if prior cargo residues did cause minor impurities in the ACN, Respondents had acted reasonably in their caring for the ACN and exercised due diligence under COGSA Section 4(1). *See Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 33 F.3d 383, 390 (2d Cir. 2003) (finding that where an arbitral award contains more than one plausible reading, manifest disregard cannot be found if at least one of the readings yields a legally correct justification for the outcome)

### B.   Damages

Once Petitioners discovered in late September 2008 that the ACN had formed color, they considered various options for remediating the cargo before opting to sell the cargo as it was. Award, at 12. The Panel concluded that "it was reasonable for Vinmar to sell rather than attempt to remediate the cargo." *Id.* Relying on market data evidence before it, the Panel found that the ACN market was falling precipitously at the relevant time. *Id.* It further found that Vinmar's sales of the ACN were made at or close to the prevailing market price in the region at the time of the sales, and that there was no evidence that the slight increase in color of the ACN impacted its sale price. *Id.* Further, the Panel noted that while Petitioners' presented testimony in regards to what they described to be "salvage" sales, Petitioners' damages witness admitted that "he did not follow the ACN market and that it was Vinmar's Mr. Mehta, not himself, who negotiated the two self-described 'salvage' sales" and that it was only Mr. Mehta who knew how the cargo was described to buyers. *Id.* The Panel suggested that, if it had to reach the issued of damages, it would have been inclined to draw an adverse inference that had Mr. Mehta given evidence on the ACN market, that evidence likely would have been adverse to Petitioners' claim that the ACN was sold as a distressed product. *Id.* at 13. On these facts,

the Panel concluded that the slight increase in color did not impact Vinmar's ability to sell the ACN or its sales price. *Id*. at 12-13.

The Panel's conclusion as to damages comports with, and is completely justified by, the controlling law regarding damages under COGSA. As the Panel noted, and Petitioners have recognized, the primary objective in awarding damages under COGSA is "to restore the injured party to the same position had no damage occurred." Award, at 12; *see Serguros Banvenez, S.A. v S/S OLIVER DRESCHER*, 761 F.2d 855, 860-61 (2d Cir. 1985) ("[t]he correct measure of damages . . . is the amount necessary to put the injured parties in the exact position they would have been in had there been no breach"). The language of COGSA makes clear that "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained." 46 U.S.C. § 1304(5). It is the plaintiff's burden to prove its COGSA damages. *See, e.g., Santiago v. Sea-Land Service, Inc.*, 366 F. Supp. 1309, 1315 (D.P.R. 1973).

The Petitioners argue, as they did in the arbitration, that the proper measure of damages under COGSA is determined by the "Market Value Rule" whereby damages are equal to the difference between the fair market value of the goods at their destination in the condition in which they should have arrived (the "sound market value") and the fair market value in the condition in which they actually arrived (the "damaged market value"). Petitioners' Memo, at 25-26 (citing *Weirton Steel Co. v. Isbrandtsen-Moller Co.*, 126 F.2d 593, 594 (2d Cir. 1942)). Petitioners argue, without citing to any authority, that under the circumstances at issue the sound market value for the ACN should be determined by the price Vinmar could have sold the ACN in September 2008 (when color formation was first discovered) compared to the prices at which Vinmar sold the ACN in October 2008 and December 2008. *Id.* at 26-28. Petitioners

22

argue that the Panel erred by rejecting this proposed measure of damages, yet they provide no legal authority in support of their position (nor did they offer any legal authority to the Panel).

Rather, controlling legal authority states that the market value measure should not be used if it would result in a recovery greater than the loss actually suffered. *See Internatio, Inc. v. M/S TAIMYR*, 602 F.2d 49 (2d Cir. 1979). Furthermore, in computing COGSA damages, an owner should never be made to be a guarantor of the ups and downs of market prices. *A.L Holden v. S.S. Kendell Fish*, 395 F.2d 910, 912-13 (5th Cir. 1968). The Panel made factual findings that: (1) the ACN market was in a steep and continual decline during the period in which Vinmar sought to sell, Award, at 3; (2) Vinmar was unable to find a buyer for the ACN even before it noticed any increase in color of the ACN, *id.*; (3) there was no evidence to suggest that the slight color increase impacted Vinmar's ability to sell the ACN or the price of the ACN, *id.* at 12; and (4) the sales of the ACN were not below the fair market for ACN in the region at the time of the sales. *Id.* Giving these findings, had the Panel found Respondents liable for the color formation in the ACN, it would have been absurd to calculate Petitioners' damages as suggested by using the market value at start of a declining market (at a time when Vinmar admitted it had no buyers for the ACN, *see* Award, at 12 noting "the inability of Vinmar to sell the cargo before and after the color increase was discovered") and then subtracting an actual sales prices received when Vinmar finally found a buyer weeks later after the market value further deteriorated. The calculation proposed by Petitioners would, in effect, make the Respondents guarantors of the ups and downs of the ACN market in the fall of 2008. The law does not mandate such a result, and it was not a manifest disregard of law for the Panel to reject Petitioners' calculation of damages.

After suggesting that the Panel improperly rejected their proposed measure of damages, Petitioners' attack the Panel's factual findings in regards to the ACN market and the impact the increased color had on its sales price. *See* Petitioners' Memo, at 25-29. Petitioners' delve deep into the same exact market data and testimonial evidence the Panel considered and weighed in issuing the Award. Petitioners make the exact same factual arguments it made during the arbitration, which arguments the Panel rejected. This entire line of argument merely attacks the Panel factual findings and cannot, even if accepted, form a basis for vacating an award for manifest disregard of law. *DigiTelCom, Ltd. v. Tele2 Sverige AB*, No. 12 Civ. 3082 (RJS), 2012 WL 3065345 (S.D.N.Y. July 25, 2012) ("[t]he arbitrator's factual findings . . . are not subject to judicial challenge, particularly on [a court's] limited review of whether the arbitrator manifestly disregarded the law") (quoting *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 214 (2d Cir. 2002)).

## III. CONFIRMATION OF THE AWARD IS APPROPRIATE BECAUSE THE AWARD IS FINAL AND ENFORCEABLE

The Award merits confirmation by the Court as it meets the requirements for confirmation pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, Chapter Two of the Federal Arbitration Act, 9 United States Code §§ 201-208.

The New York Convention, as implemented by the Federal Arbitration Act ("FAA"), applies to the matter at bar because the Award arises out of a commercial relationship, where at least one of the parties is not a citizen of the United States. 9 U.S.C. § 202. Specifically, the party seeking such enforcement must show that the arbitration agreement and award fall within the purview of the FAA. As stated in 9 U.S.C. § 202, arbitration agreements or awards must be commercial to be within the coverage of the FAA. Commerce is broadly defined by 9 U.S.C. § 1

to mean "commerce among the several states or with foreign nations." The arbitration clause contained in the Charter between Respondent Team Tankers A.S. and Petitioner Vinmar International Limited, Inc. arose out of a legal relationship considered to be commercial and covered transactions involving commerce as defined by 9 U.S.C. § 1 and thus falls under the umbrella of the FAA. 9 U.S.C. § 202. Moreover, at least one party to the arbitration is a foreign entity (Respondent Team Tankers A.S.).

9 U.S.C. § 207 provides the procedural mechanism by which the Respondents may enforce the Award. Respondents' Cross-Motion, filed herewith, is filed on December 23, 2013. As the Award was issued on August 26, 2013, Respondents began the process of enforcing the Award well before three years had elapsed.

There are few requirements for confirmation; Article 4(1)(a-b) of the New York Convention requires the party applying for recognition proffer an authenticated original award or a duly certified copy thereof, and the original arbitration agreement or a duly certified copy thereof. Here, lead counsel for Respondents in the New York arbitration has certified in his accompanying declaration the accompanying copies of the Award and the arbitration agreement. *See* Frevola Decl., Exs. 1 & 2.

Finally, under the terms of the New York Convention, recognition of the Award may only be denied if the party against whom recognition and enforcement is sought furnishes proof to one of the few exceptions set forth in Article V. As discussed above, Petitioners have not shown the existence of such an exception. In any event, the burden of proof rests upon a party resisting enforcement. *See, e.g., Willemijn Houdstermaatschappig, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir. 1997) ("the showing required to avoid summary confirmation of an arbitration award is high . . .

and a party moving to vacate the award has the burden of proof") (citations omitted); *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,* 157 F.3d 174, 175 (2d Cir. 1998).

> Furthermore, a federal district court's scope of review in such applications is very narrow:
>
> The confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court. The review of arbitration awards is very limited. . . in order to avoid undermining the twin goals of arbitration, namely setting disputes efficiently and avoiding long and expensive litigation. Accordingly, the showing required to avoid summary conformance is high.
>
> More particularly, this court has generally refused to second guess an arbitrator's resolution of a contract dispute. As we have explained: an arbitrator's decision is entitled to substantial deference, and the arbitrator need only explicate his reasoning under the contract in terms that offer even a barely colorable justification for the outcome reached in order to withstand judicial scrutiny.

*Yusuf Ahmed Alghanim & Sons, W.W.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 23 (2d Cir. 2007) (internal citations omitted); *see also ReliaStar Life Ins. Co. of N.Y v. EMC Nat. Life Co.,* 564 F.3d 81, 85 (2d Cir. 2009) (finding the court's role in reviewing the award is "severely limited"); *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.,* 403 F.3d 85, 90 (2d Cir. 2005) (noting that "[g]iven the strong public policy in favor of international arbitration, review of arbitral awards under the New York Convention is 'very limited . . . in order to avoid undermining the twin goals of arbitration. . .' ") (internal and external citations omitted).

The Award is final, conclusive, and enforceable against Petitioners. Accordingly, Respondents respectfully submit that the Award is subject to recognition, confirmation and enforcement pursuant to the New York Convention and should be recognized and confirmed as a judgment of this Court and enforced against Petitioners.

## IV. RESPONDENTS SHOULD BE AWARDED THEIR FEES AND EXPENSES INCURRED IN OPPOSING PETITIONERS' APPLICATION AND CROSS-MOVING FOR RECOGNITION OF THE AWARD

In light of the very high burden that comes with seeking to vacate an arbitration award, courts will award attorneys fees and expenses to a party prevailing in arbitration where the parties' contract provides for such relief or where the non-prevailing party's objections appear to be nothing more than seeking to re-argue already decided issues. In this case, it is respectfully submitted that grounds under both rationales exist for such an award to Respondents.

### A. The Charter Provides for Respondents' Recovery of Fees and Expenses

Part II, Clause 23 of the ASBATANKVOY Form – which form was used in the Charter here – is entitled "Breach" and provides that "[d]amages for breach of this Charter shall include all provable damages, *and all costs of suit and attorneys fees incurred in any action hereunder*." *See* Charter, Part II, Clause 23 (annexed as Exhibit 2(b) to the accompanying Declaration of Michael J. Frevola dated December 23, 2013) (emphasis added). This exact clause has been construed multiple times by courts of this district to warrant the award of attorneys' fees to the prevailing party in an action to vacate and/or confirm an arbitration award:

> Clause 23 of the charter party agreement between Page and Adam states that "[d]amages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action thereunder." Courts construing language almost identical to Clause 23 have awarded court costs and reasonable attorneys' fees to the prevailing party in arbitration award confirmation proceedings such as the instant matter. *See Elite, Inc. v. Texaco Panama Inc.*, 777 F. Supp. 289, 292 (S.D.N.Y. 1991) ("The language of the charter clearly supports [the claim of the party seeking confirmation] that attorneys' fees and costs are recoverable with respect to any action arising under that agreement."); *Trans–Asiatic Oil Ltd. S.A. v. UCO Marine Int'l Ltd.*, 618 F. Supp. 132, 137 (S.D.N.Y. 1985) (awarding all court costs and reasonable attorneys' fees to the party seeking confirmation of an arbitral award). Thus, the Court here determines that it is appropriate to award costs and reasonable attorneys' fees incurred by Page in this confirmation proceeding against Adam . . . .

*Page Int'l Ltd. v. Adam Maritime Corp.*, 53 F. Supp. 2d 591, 599 (S.D.N.Y. 1999).

Accordingly, assuming that this Court agrees that Petitioners' vacatur application should be denied, it should grant Respondents' application to submit a fee/expense application as to those incurred in opposing the Motion and in making the Cross-Motion.

### B.    28 U.S.C. § 1927

Pursuant to 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be require by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

"To impose sanctions, a court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." *U.S. Ship Mgmt . Inc. v. Maersk Line, Ltd.*, No. 04 Civ. 2504, 2004 WL 2823038, at *9 (S.D.N.Y. Dec. 1, 2004) (internal citations omitted). "[S]anctions are peculiarly appropriate in the context of a challenge to an arbitration award which appears to be a largely dilatory effort." *Manning v. Smith Barney Harris Upham & Co.*, 822 F. Supp. 1081, 1083-84 (S.D.N.Y. 1993). Courts of this district have held that sanctions are appropriate under 28 U.S.C. § 1927 where a petitioner's challenge to an arbitration award based on manifest disregard of the law amounts to "little more than an assault of the Tribunal's factfinding . . . rather than on its actual authority." *DigiTelCom, Ltd.*, 2012 WL 3065345 at *3.

In *DigiTelCom*, the plaintiffs challenged an arbitration award dismissing their breach of contract claims relating to a number of its agreements with various communications companies in Russia. *Id.* at *1. The arbitration tribunal (the "Tribunal") decided the dispute in defendants' favor, which finding plaintiffs challenged on multiple grounds including manifest disregard of the law. *Id.* at *2. Judge Sullivan, after evaluating the record and relative law, quickly dispatched of plaintiffs' manifest disregard of the law challenge, finding that plaintiffs "d[id] not

actually cite to a particular principle of law that the Tribunal is supposed to have ignored; instead, they merely dispute its factfinding and contractual interpretation." *Id.* at \*4. Defendants argued that sanctions were appropriate under 29 U.S.C. § 1927 as plaintiffs, *inter alia*, misrepresented the facts and the record. *Id.* at \*6.

Judge Sullivan sanctioned plaintiffs' counsel and granted defendants' motion for attorneys' fees. *Id.* at \*7-8. He found that plaintiffs, citing virtually no relevant authority, merely identified the standard for vacating an arbitration award and then proceeded to "attack the Tribunal's findings . . . ." *Id.* at \*7. Judge Sullivan noted that "[t]his kind of petition serves only to cause the parties to incur unnecessary expenses and delay the implementation of the Award." *Id.* (citing *Matter of U.S. Offshore, Inc. (Seabulk Offshore, Ltd.)*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) (granting attorneys' fees under Rule 11 where party's arguments "appear[ed] to have been motivated by a desire to forestall complying with the award ... and ... in the main [were] not warranted by existing law or a good faith argument to extend, modify or reverse existing law"))

Similarly, the Petitioners here have attempted to attack the Panel's factual findings under the guise of a grossly understated standard for manifest disregard of the law. In their application, Petitioners rely on a simplified and inaccurate standard for manifest disregard of the law which, according to Petitioners, justifies vacatur if the Panel merely "improperly applied" the controlling law. Petitioners' Memo, at 11. The manifest disregard of law standard, however, clearly requires more. *See infra* Point I(A). To justify vacatur, the Panel must have "[known] of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless ***willfully flouted*** the governing law by refusing to apply it." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 217 (2d Cir. 2002). Vacatur is "limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrator

is apparent." *Duferco*, 33 F.3d at 389. The mere misapplication of law does not justify vacatur. *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004). Petitioners, however, make no effort to examine or analyze the extensive body of case law from this Circuit that precisely defines the contours of the manifest disregard of law standard. In fact, Petitioners do not even cite to a single case in which an arbitration award has been overturned merely because the panel "inappropriately" applied the controlling law.

Rather, after stating their oversimplified and misleading version of the manifest disregard standard, Petitioners go on to re-argue the same issues of fact that were litigated in arbitration and attack the Panel's interpretation and weighing of the evidence. Not once do the Petitioners even attempt to point out a specific example of the Panel acknowledging a controlling legal principle (i.e. COGSA), but then expressly ignoring or otherwise ***willfully flouting*** that principle. Of course, a reading of the Award shows that the Panel earnestly and faithfully undertook to apply COGSA properly. There is nothing in the Award that suggests that the Panel deviated from COGSA's interpretation at all, much less such a deviation was intentional and ***willfully flouted*** COGSA's application. Yet Petitioners have prosecuted this application without any legitimate support for their manifest disregard of the law argument.

In making their poorly disguised factual arguments, Petitioners have employed many of the same tactics that Judge Sullivan found offensive and sanctionable in *DigiTelCom*. For example, in *DigiTelCom*, Judge Sullivan found "disingenuous at best" the plaintiffs' misrepresentation of the record and suggesting that certain facts were "undisputed," when in reality the facts were contested. *Id.* at *7. Petitioners here have attempted the same ruse, rehashing voluminous sample testing data in an attempt to show that that the Panel was wrong in finding that the evidence was insufficient to overcome the COGSA late notice presumption and

contending that that the ACN was discharged in damaged condition. *See*, *e.g.*, Petitioners' Memo, at 5-11, 15-19. In making these assertions, Petitioners have prefaced them with the assertion that their facts "are largely undisputed." *Id.* at 1 n.1. But the reliability of this data was hotly disputed by the Respondents throughout the course of the arbitration, which led the Panel to conclude that "the integrity and chain of custody of those samples taken by SGS in Korea in August 2008 . . . are open to question." Award, at 8. In their application, Petitioners do not once acknowledge these disputes regarding this data and do not address the Panel's finding that this data was unreliable. Rather, Petitioners present the data as "undisputed" and then suggest that Panel manifestly disregarded the law in failing to find that this data was "sufficient evidence" to overcome the COGSA late notice presumption.

Furthermore, in awarding sanctions in *DigiTelCom*, Judge Sullivan also took exception to the plaintiffs' accusing the Tribunal of rewriting the contracts, when in reality the Tribunal merely interpreted them in terms that were unfavorable to plaintiffs. *DigiTelCom, Ltd*, 2012 WL 3065345 at *3. Petitioners here likewise accuse the Panel of issuing a holding that "does not comport with the pricing information the Majority *itself* cited." Petitioners' Memo, at 26 (emphasis in original). In reality, the Panel's interpretation of the information was merely adverse to the Petitioners' position.

Finally, the *DigiTelCom* court took serious issue with the plaintiffs' misrepresentation of the record, and in particular with plaintiffs' "selective quoting of the agreements in question." *DigiTelCom, Ltd.*, 2012 WL 3065345 at *7. Petitioners here, in trying to frame their manifest disregard of law argument, seriously have misrepresented what the Panel actually held by intentionally altering direct quotes from the Award to suggest the Panel disregarded COGSA's burdens of proof. *Compare* Petitioners' Memo, at 17 (quoting the Award as reading "strong[ ]

evidence . . . support[ed] [Petitioners'] position") *with* Award, at 8 ("[t]he majority considers these additional tests to be among the strongest evidence in support of [Petitioners'] position, but they are not dispositive that the cause for increased color took place aboard the ship.").

By changing the Award's quote to read "strong[ ] evidence . . . support[ed] [Petitioners'] position," then arguing that the Panel "necessarily found 'credible evidence tending to show that the cargo was damaged prior to delivery,'" Petitioners' Memo, at 17, Petitioners sought to present a colorable argument that the Panel disregarded COGSA's standard for overcoming the late notice presumption. When the full quote is read without the Petitioners' creative liberties, however, it is clear the Panel properly considered the late notice issue under applicable precedent.

"[A]lthough courts should be careful not to chill parties' good-faith challenges to arbitration awards where there are serious questions of the tribunal's impartiality or authority, *litigants must be discouraged from defeating the purpose of arbitration by bringing such petitions based on nothing more than dissatisfaction with the tribunal's conclusions*." *DigiTelCom*, 2012 WL 3065345 at \*7 (emphasis added). As in *DigiTelCom*, the Petitioners' misrepresentations of law and the record and their meritless attempts to re-litigate factual disputes already decided in arbitration show that the petition brought before this Court is based on nothing more than Petitioners' dissatisfaction with the Panel's decision. Petitioners' baseless application warrants the imposition of sanctions under 28 U.S.C. § 1927.

## C. Conclusion

Here, the Petitioners' arguments were rejected *in toto* by the Panel and the Panel awarded Respondents $250,000 in fees and costs relating to Respondents' defense costs in the arbitration. Award, at 13. No offer to settle the Award was made by Petitioners; instead the meritless vacatur was filed. Because the Petitioners have failed to pay the amounts due and owing under the binding

final Award and seek to avoid payment by filing a baseless vacatur motion which only rehashes factual arguments rejected in the arbitration, Respondents request that the Court award them the attorneys' fees and costs incurred in opposing Petitioners' Motion and filing their Cross-Motion. If granted, Respondents will submit the billing *pro forma* regarding the attorneys' fees and costs that have accrued since Petitioners filed their Motion.

Whether under principles of contract or in accordance with statute, if this Court denies Petitioners' vacatur application it should grant Respondents' application for its fees and costs incurred in opposing Petitioners' vacatur application.

## CONCLUSION

Because Petitioners have failed to meet their "very high" burden of showing that the Panel appreciated the existence of a clearly governing legal principle, but decided to ignore or pay no attention to it, this Court should deny Petitioners' Motion and grant Respondents' Cross-Motion and award Respondents' their attorneys' fees and expenses incurred in opposing the Motion and preparing their Cross-Motion.

Dated: December 23, 2013
     New York, New York

                                   Respectfully submitted,

By:    */s/ Michael J. Frevola*
       Michael J. Frevola
       Christopher R. Nolan
       Robert Denig
       HOLLAND & KNIGHT LLP
       31 West 52nd Street
       New York, NY 10019
       Telephone:  (212) 513-3200
       Facsimile:  (212) 385-9010
       Email: michael.frevola@hklaw.com
            chris.nolan@hklaw.com
            robert.denig@hklaw.com
       *Attorneys for Respondents*

#26898463_v1