Exhibit 2

```
----------------------------------------------------------x
```
**In the Matter of the Arbitration**

- between -

Zurich American Insurance Company
as subrogee of Vinmar International
Limited, Inc. and Vinmar International        **Final Award**
Limited, Inc., Claimants                      **August 26, 2013**

and

Team Tankers A/S, as Owner of the
**MT SITEAM EXPLORER,**
Eitzen Chemical, USA, *in personam* and the
MT Siteam Explorer, *in rem,* Respondents

Under an ASBATANKVOY Form of
Charter Party dated June 10, 2008
```
----------------------------------------------------------x
```

**Before:**
Louis P. Sheinbaum
A. J. Siciliano
Donald J. Szostak (Chairman)


**Appearances:**
For Claimants
Kennedy Lillis Schmidt & English
by John T. Lillis Jr., Esq.
    Nathan T. Williams, Esq.

For Respondents,
Holland & Knight LLP
by Michael J. Frevola, Esq.
    F. Robert Denig, Esq.


## Introduction

This arbitration concerns a claim by Claimants against Respondents for alleged
contamination damage to a part cargo of 3,500 mt of Acrylonitrile (ACN). The cargo was
carried by the MT Siteam Explorer (Vessel) from Houston to Ulsan pursuant to an
ASBATANKVOY Charter Party dated June 10, 2008, between Team Tankers A.S., as

Owner, and Vinmar International Limited, Inc , (Vinmar) as Charterer The Vessel loaded 3,474 090 mts of ACN in apparent good order and condition, as confirmed by pre-loading and post-loading tests at Houston and also discharged that same quantity to shore tanks in the same apparent good order and condition, as confirmed by pre-discharge and post discharge tests at Ulsan However, six weeks after discharge the cargo was again tested and found to have "yellowed" to APHA 13, which was beyond Vinmar's maximum permitted resale specification of APHA 10 It is alleged by Zurich American Insurance Company (Zurich), as subrogee of its insured Vinmar, that the cause of the increased color occurred from an external source while the cargo was still aboard the Vessel Pursuant to the terms of its cargo policy, Zurich paid $4,100,000[1] to Vinmar representing the net difference between Vinmar's costs to acquire and transport the cargo to Ulsan, Korea and the "salvage" sale proceeds for the "distressed" cargo However, the charter is subject to COGSA and by reason of that statute's $500 00 "package" or "customary freight unit" limitation, Zurich now seeks to only recover $1,739 747 00 plus interest and legal fees and for the cost of this proceeding to be charged entirely to Respondents

For the reasons detailed hereinafter, Respondents deny any and all responsibility for the alleged loss Respondents likewise ask for an award of legal fees and for the panel to charge the full cost of this proceeding to Claimants

## Background

On June 10, 2008 Vinmar chartered the MT Siteam Explorer to carry a part cargo of 3 500 mts ACN from Houston to Ulsan Korea Vinmar subsequently purchased that same quantity from its U S supplier Solutia, Inc , at a price of $1,960/mt FOB Odfjell Terminals, Houston Texas The ACN was tested while in Solutia's shore tank 18-47 by Caleb Brett and found to have a color rating of 5 APHA, well below Vinmar's customary resale specification of 10 APHA The cargo was then barged to Odfjell in two separate lots to await the arrival of the MT Siteam Explorer

The Vessel tendered its NOR June 29, 2008 and its tanks 4BP and 8P were inspected internally by Vinmar's appointed inspectors and found to be clean and fit to load the intended ACN cargo The Shore Inspector together with the Vessel's Chief Officer issued a signed CLEAN TANK CERTIFICATE to this effect Loading commenced June 30, 2008 but was interrupted to allow first foot samples to be drawn and tested After receiving laboratory confirmation that the cargo was still on specification, loading into Vessel tanks 4BP and 8P resumed and was completed that same day A single bill of lading No HOU4 was issued that expressly referenced the charter party and confirmed that 3,474 090 mts of ACN destined for Ulsan had been loaded As customary, Caleb Brett also drew and retained ship pre-loading and post loading samples

Although the voyage itself was uneventful, the Vessel was required to pass through tropical zones where the sea temperatures approached but did not actually reach the limit of 90 F degrees shown in the Cargo Inhibitor Report given to the Master by Caleb Brett on behalf of Solutia That same Report goes on to state that the cargo had been inhibited with 37 56 ppm of MEHQ (versus the 36 ppm found by Caleb Brett) and that "90 F

---

[1] Declaration of Joseph Bauer, Claims Adjuster for Zurich American Insurance Company

*Maximum – Higher* temperatures will destroy the inhibitor' and "Duration of Effective Inhibition 90 Days " The purpose of the inhibitor is to stabilize the cargo and prevent ACN's natural tendency to polymerize

On August 12, 2008, the MT Siteam Explorer arrived and tendered NOR at Ulsan Pre-discharge samples taken August 14th by SGS confirmed a 3 APHA color rating, which was below those taken at the load port and an MEHQ content of 37 ppm As planned, the cargo from both ship tanks was discharged and comingled into UTT shore tanks nos 910 and 1106 Post discharge samples of those tanks were tested and found to have the same 3 APHA color and 37 ppm MEHQ factors, as did the ship's pre-discharge samples

### The Plunging ACN Market and Resale Efforts
As it had often done in the past, Vinmar purchased the ACN with the intention of repositioning it to the Far East, where it could be resold at a profit It is important to note that Vinmar did not have a committed buyer for this parcel Unfortunately, since purchasing this particular parcel, the Far East market for ACN had dropped so significantly, that when the Vessel arrived Ulsan Vinmar could not find a ready buyer and was forced to keep the cargo in the UTT shore tanks until it did But rather than improve, the market for ACN continued its downward spiral

Mindful that Solutia had certified its inhibitor for only 90 days and that those 90 days had or were about to expire, Vinmar arranged for SGS to sample and test the ACN in the UTT shore tanks The test carried out on September 26 (42 days after discharge) confirmed the ACN was still properly inhibited with an MEHQ reading at 40 ppm [2] but showed that its color had increased from 3 APHA to 13 APHA It was at this point that Vinmar first put Respondents and its own cargo underwriter on notice of claim Vinmar had also placed the UTT tank terminal on notice but subsequently withdrew that potential claim

### The Proceeding
The arbitration was initiated by Claimants with their appointment of Louis P Sheinbaum and Respondents' appointment of A J Siciliano, as the party appointed arbitrators The panel was completed on April 18, 2011, when the two thus chosen arbitrators selected Donald J Szostak to serve as third arbitrator and panel chairman for procedural matters Shortly thereafter, and despite having granted several extensions of time in which to commence this arbitration, Respondents moved to have Zurich's claim dismissed as time barred After receiving extensive exhibits and briefs from Counsel, Counsel for Zurich requested a hearing to augment his written submissions with oral argument The panel approved the request and on December 20, 2011 conducted an oral hearing by teleconference, during which both attorneys offered oral argument Following the close of that hearing the panel deliberated and later that same day issued the following ruling by email

> "The panel, having reviewed the extensive briefs and after hearing the oral

---

[2] Although higher than the 37 ppm noted at discharge, Claimants insist the ACN was not re-dosed with additional inhibitor

arguments of counsel today, unanimously rules as follows

1) Laches Argument The panel finds there was no unreasonable delay on the part of Claimant in giving notice of claim to Respondent nor has Respondent shown it has suffered sufficient prejudice at the hands of Claimant to justify a dismissal of this claim on grounds of laches

2) Sixth (6th) Extension The panel finds that the language used by Ince & Co in its February 14, 2011 email to Nathan Williams amounted to an unqualified and unconditional extension of Claimant's time to call for arbitration up to and including March 31, 2011 If Ince & Co truly intended its email to be conditional upon Claimant's production of the MTD report and a synopsis of Claimant's legal argument, it should have worded its email more carefully Finally, on that very same day, Mr Williams emailed Ince & Co saying "Thank you for the extension up to and including 31 March 2011 " Although it had ample opportunity to do so, Ince & Co neither objected to nor corrected Mr Williams' understanding that Claimant had, in fact, been granted a further unqualified extension of time within which to call for arbitration This inaction on the part of Ince & Co tends to reinforce our conclusion Claimant's call for arbitration was given timely Its claim is not time-barred "

Including the aforementioned teleconference, the panel held a total of ten formal hearings, at which Claimants presented the testimony of two Vinmar employees (Messrs Pascu and Wells) and three chemical experts (Dr Jonathan Bound, Dr Clifford Bennett and Mr John Minton) from the firm of Minton Treharne & Davis (MTD) Respondents offered the testimony of ship s Master, Captain Damir Tanksek, and chemical expert David R Jones of CWA International Ltd Each of the four experts submitted written and highly technical reports of his findings and conclusions

At the request of third party Ascend Performance Materials Operations LLC (Ascend), formerly Solutia, Inc , the panel agreed and ordered both parties to keep all documentation and testimony provided by Ascend strictly confidential, that all Ascend materials will be used exclusively for purposes of this arbitration and either destroyed or returned to Ascend at the conclusion of this matter The panel hereby confirms that it has taken those Ascend declarations and materials into account but, pursuant to the described confidentiality agreement, has refrained from describing them or their contents in this award Rather than return the materials to Ascend, each member of the panel has opted to destroy them

Following the close of hearings both Claimants and Respondents submitted extensive Main and Reply briefs in support of their respective positions as well as the many authorities upon which each relied The last submission was received June 3, 2013 at which time the proceeding was closed

## The Arguments

Although both parties agree that COGSA governs this dispute, each interprets the evidence differently and, as such, holds a different but earnest view of the other's responsibilities and burdens of proof

Claimants contend that the subsequent tests of the retained ACN load port samples showing no appreciable color change versus those of the pre-discharge and post discharge samples that did are ample evidence that the cargo was "contaminated" while in the custody of the Vessel Claimants, thus, insist they have met their burden to overcome the rebuttable presumption of clean delivery imposed by COGSA's[3] late notice provisions Having done so, Claimants argue they have put forward a *prima facie* case of Vessel fault and the burden now shifts to Respondents to bring themselves within one or more of COGSA's liability exemptions

In addition, Claimants maintain that the considerable amount of scientific evidence submitted and interpretive arguments offered by their experts are persuasive evidence that the cargo was "contaminated" by remains of the Vessel's prior cargo of pygas

Respondents argue that not only have Claimants failed to show that the cargo was "damaged" while in the custody of the Vessel but they have not produced verifiable proof that the cargo was in sound condition when loaded Respondents have questioned the age and composition of the cargo the condition of the barges used to transport the cargo to the Odjfell Terminal as well as the condition and the prior contents of the Odjfell shore tanks Thus, Respondents insist that Claimants have not overcome COGSA s late notice presumption of a clean delivery

Respondents also point to the scientific evidence and interpretive arguments offered by their expert to disprove those advanced by Claimants experts

Additionally, even if the ACN did absorb some quantity of pygas remains while still aboard the Vessel Respondents argue that the extensive tank cleaning carried out prior to loading would have reduced those remains to a trivial residue Indeed, they contend this had to be so for any such remains to go unnoticed and for the ship's tanks to have been approved for loading by Vinmar's cargo inspectors Respondents further maintain they have met the COGSA "due diligence" standard to make the Vessel seaworthy and fit to receive and carry the cargo

Finally, Respondents argue that Claimants have all but ignored the continuing steep market declines for ACN at the time the Vessel arrived Ulsan In doing so Claimants have similarly ignored the "fair market value rule" and have, thus, grossly overstated Vinmar's damages According to Respondents, Claimants cannot recover more than Vinmar's actual loss, which is to be measured against the continuing falling prices rather than Vinmar's out-of-pocket costs or the market price on the day the "contamination" was first discovered When correctly calculated, Respondents maintain that Vinmar sold the cargo at or near the then prevailing market prices for sound non-fiber grade ACN

---

[3] U S Carriage of Goods by Sea Act, 46 U S C Sect 1312

Thus, irrespective of the alleged discoloration, Vinmar suffered no damages attributed to that discoloration, but only those associated with the deeply depressed market for ACN

## Discussion and Decision

This is a classic case of well-qualified experts interpreting the results of highly technical test evidence differently  Those same differences of opinion also resulted in a divided panel  Accordingly, that which follows is the majority opinion and ruling of arbitrators Szostak and Siciliano  The dissenting opinion of Mr  Sheinbaum is attached and made a part of this award as Appendix A

The scientific evidence presented is so extensive and the opinions of the experts so diverse that it is pointless to discuss all of them here  Suffice it to say, those differences ultimately led to the irreconcilable conclusions of Claimants' expert John Minton and Respondents' expert David Jones  However, neither expert could do more than offer his informed speculation as to what *may* have caused the ACN to go ever so slightly yellow  Note that the difference between 10 APHA and 13 APHA is barely noticeable to the naked eye and that Mr  Minton confirmed that MTD had seen specifications as high as APHA 15[4] for ACN

We begin with the description of Acrylonitrile from Claimants' post hearing main brief

> *Acrylonitrile is a clear  colorless liquid that contains both olefinic (carbon-carbon double bond) and nitrile (cyano) groups  which give the molecule its unique and varied reactivity  making it a versatile raw material  While ACN is designed for its reactive versatility  that reactivity must be stabilized to facilitate its transport and handling in liquid form while preventing unintended polymerization (a highly exothermic reaction) pending ACN's final use in one of its applications*

> *Today  ACN is normally stabilized against premature polymerization during storage  transport and handling by adding 0 2 to 0 5 weight percent of water and 35-45 ppm of the inhibitor Methyl Hydroquinone ( MEHQ )  Water and MEHQ interrupt potential polymerization by consuming trace reactive intermediates before polymerization begins or becomes uncontrolled  Water inhibits ionic polymerization by trapping basic or acidic intermediates  and MEHQ inhibits free-radical polymerization by trapping free radical intermediates* [italics added]

Mr  Minton was firm in his testimony that the "contamination ' did not occur prior to or during the loading process  Rather  he opined the contamination took place during the voyage by reason of the ACN coming into contact with and absorbing some 33 gallons of the ship's prior cargo of pygas  In contrast, Mr  Jones testified that, given the tendency for ACN to polymerize and yellow over time, the more likely cause was a deficiency in the MEHQ inhibitor as it was consumed during the stressful summer high temperatures experienced at Houston and during the 47-day sea voyage through tropical zones to Ulsan  Although no deficiency in MEHQ was noted at the time of discharge, Mr  Jones

---

[4] Exhibit 125 at page 2

opined that the weakened inhibitor caused the ACN to slightly polymerize and turn slightly more yellow while stored in the UTT shore tanks

The documents confirm the cargo was loaded in apparent good order and condition and outturned in the same apparent good order and condition When discharged into UTT tanks 910 and 1106 on August 15-16, 2008, the ACN was tested and found to have a color rating of only 3 APHA (less than the 5 APHA noted at the load port) But additional testing on Sept 26, 2008 of a "composite" sample from both those shore tanks showed the cargo to have an APHA rating of 13, as opposed to Vinmar's specification of Maximum 10 APHA

From Oct 6, 2008 thru Dec 2, 2008, SGS tested samples of the ACN from UTT Tanks 910 and 1106 for color with results that ranged from lows of 4 and 5 (Oct 7 and 21) to highs of 15 and 16 Samples from tank 910 (Tank 1106 then empty) on Jan 1 and 6, 2009 showed 17 and 21 respectively It appears that the low readings were only obtained after SGS had purposely filtered those samples through activated carbon to test whether such filtration could restore the cargo to its original specification Although the laboratory tests were promising, there were practical and logistical problems that militated against the cargo interests attempting such remediation

On January 6, 2009, the parties jointly tested the retained Houston load port samples at MTD s Singapore laboratory and found all to be 'on spec' for color SGS Korea then tested the retained pre-discharge and post–discharge Vessel samples and found all to exceed the Vinmar specification of 10 APHA The same result was obtained for UTT shore tank samples

It is important to note that Claimants only complaint is that six weeks after its discharge the cargo was found to exceed Vinmar's color specification of Maximum 10 APHA Respondents have challenged Claimants to prove that the cargo was in good order and condition when loaded, but we are inclined to accept the several load port tests showing the cargo to have been "on spec' at that time However, the cargo was also found to be "on-spec" for color at discharge and that finding precludes Claimants benefiting from the usual presumptions of fault associated with a "*prima facie*" claim presentation

It is common ground that had Vinmar been able to sell the cargo at or about the time of discharge, the end user would not have encountered any quality issues But unfortunately, by the time the Siteam Explorer arrived Ulsan, the ACN market had plunged so sharply that Vinmar was unable to find a buyer As already stated, mindful that Solutia had certified its inhibitor for only 90 days Vinmar had SGS retest the ACN still in the UTT shore tanks Although showing the cargo's color to have increased to 13 APHA, those tests were performed some 42 days after completion of discharge and 39 days beyond the 3 days notification requirement imposed by COGSA Since the cargo was not noted to have been damaged or "off spec' at the time of discharge and Owner was not timely notified of any damage, it becomes Claimants' burden to overcome the presumption of sound delivery and persuade the triers of fact that the cargo was in fact damaged while in the custody of the Vessel Claimants have attempted to do so by pointing to additional

tests on the retained load port samples carried out more than a year later  Although testing of those samples did indicate that some further color had developed, none experienced the same level of color deterioration as did the cargo carried by the Vessel and discharged into the UTT tanks

The majority considers those additional tests to be among the strongest evidence in support of Claimants' position, but they are not dispositive that the cause for increased color took place aboard the ship  Clearly the conditions under which those samples were retained did not replicate those actually experienced by the cargo carried by the Siteam Explorer  Here, the ACN was subjected to "a stressful voyage" that in terms of duration and temperature brought the cargo to the edge of its stated stability  Moreover, the uncontested testimony of Mr Jones was that given sufficient time, "all acrylonitrile" will yellow

After years of testing the pre-discharge "composite" and "replicate" samples with progressively more sophisticated equipment, Claimants' experts did not actually find remnants of pygas  Rather, the gas chromatograms only produced images of reactive species suspected to be associated with pygas and many others that could not be identified  Claimants' experts, however, did agree that those suspect species were not themselves colored nor color forming

Moreover, the integrity and chain of custody of those samples taken by SGS in Korea in August 2008, shipped to Singapore in January 2009 and then to Cardiff in August 2009 for even more testing, are open to question  Dr Bennett (MTD Singapore) testified that rather than 'retest' existing samples  SGS instead opted to open the seals and comingle the contents of those existing samples  Thus Dr Bennett explained that SGS did not test the samples taken at the time of discharge, but rather entirely new  composite" samples created by SGS itself sometime after September 26  2008

When asked by the arbitrators why SGS would opt to test a "composite' sample from the ship's tanks as opposed to individual samples from each cargo tank, Dr Bennett replied "*Sir  I honestly don't know*," and that  *There are risks involved in it* "[5]

Furthermore, the samples shipped by SGS to Dr Bennett in Singapore during January 2009 were found to have been opened and then resealed  According to Dr Bennett, "  the seal numbers didn't tie with the original documentation "[6] Dr Bennett queried SGS for an explanation but the language barrier prevented him from getting a satisfactory answer

We also note that according to MTD's Dr Bound, MTD never obtained a sample of the pygas cargo actually carried by the Vessel [7] Instead, MTD's tests were performed on other pygas samples thought by them to be representative of Korean sourced pygas

---

[5] Tr  Page 401
[6] Tr Page 403
[7] Tr  Page 149, 150

If, as Mr Minton opines, the "contamination" with the residue pygas took place during the 47-day sea voyage, the absorption rate was so slight that no adverse color change was evident in the tests taken at the time of discharge. In fact, despite the stressful temperatures experienced during the 47-day sea passage and the MEHQ nearing the end of its 90-day efficacy certification, the cargo pre-discharge samples taken by SGS from the ship tested at 3 APHA, below that found at loading and significantly less than the Vinmar in-house specification of 10 APHA/max. It should be noted that the Vessel did not carry a pygas cargo during any part of the ACN voyage in question. Rather, the actual cargoes carried totaling 42,462 810 mts, consisted of 30,090 401 mts Mixed Xylene, 4,974 735 mts Para xylene, 3,918 467 mts Styrene Monomer and, of course, the 3,479 207 mts of ACN at issue here

In this regard, we note that the prior cargo carried in tank 4BP was not pygas but benzene. Although a not an uncommon component of pygas, Dr Bound testified that the due to the many variations of what is called "pygas," its benzene concentration can be very low or none at all [8] Nevertheless, the Claimants' witnesses did not focus on benzene as the contaminant, but only upon the ill-defined product called "pygas." That said and assuming Mr Minton's calculation is correct that 33 gallons of pygas were required for the ACN to develop the degree of yellow color shown in his tests, it follows that such contamination" could only have taken place within Tank 8P, which (as per the ship's ullage report) carried only 2 331 958 mts of the ACN cargo. Other than speculating that pygas remains in the cofferdam of the dedicated deep well pump could have gone un-noticed (a condition at odds with the physical in-tank certifications and inspections at Houston and the testimony of Captain Iansek) Mr Minton could not identify a likely source for the contamination. There is no evidence that the ship performed any blending or cargo transfer operations involving Tanks 8P and/or 4BP, nor with the cargoes in any of her other tanks. Indeed, there appears to have been no purpose for doing so. Nevertheless based upon his interpretation of the extensive laboratory testing, Mr Minton concluded that the 'contamination' with some 33 gallons of pygas could only have taken place after loading and while the cargo was still aboard the Vessel

In our view, a quantity of 33 gallons of pygas would not go unnoticed by the ship's officers or cargo inspectors, nor is it consistent with a confirmed outturn of only 3 APHA. Had the 33 gallons actually been in Tank 8P[9] and absorbed during the stressful 47-day sea voyage, we would have expected the cargo to outturn with a higher not a lower APHA factor than was confirmed by Caleb Brett at time of loading

We consider the MEHQ factor of 37 ppm reportedly found by SGS at Ulsan to be in line with expectations. Despite the rigors of the sea passage the Ulsan finding of 37 ppm was slightly higher than the 36 ppm[10] first found by Caleb Brett at Houston but marginally below the 38 ppm[11] found by Caleb Brett on its recheck of the shore tanks on June 24, 2008. The Ulsan MEHQ finding is also in keeping with the 37 56 ppm shown in the

---

[8] Tr page 148
[9] Which Mr Minton first discounted (Tr Page 1145) but later said was a possibility (Tr Pages 1275-1276)
[10] Exhibit 8
[11] Exhibit 22

Cargo Inhibitor Report. Given the expert testimony describing the function of the inhibitor, had the cargo polymerized while aboard the Siteam Explorer, we would have expected the MEHQ noted at Ulsan to be substantially below the 36-38 ppm found at Houston. The fact that the MEHQ outturn readings remained consistent with those confirmed at Houston, is evidence that the inhibitor functioned as intended while the cargo was in the custody of the Vessel. It was only after the cargo had been discharged and remained in the UTT shore tanks for some time that the MEHQ was noted to have increased to 40/41 ppm[12]. Moreover, those SGS tests also detected an increase in the cargo's Non Volatile Matter (NVM), which according to Mr. Jones is strong evidence that the MEHQ inhibitor had briefly stopped working and that polymerization had occurred[13] in the shore tanks.

Consequently, the majority finds that Claimants have not shown, by a preponderance of evidence or otherwise, that the alleged contamination took place while the cargo was in the custody of the Siteam Explorer. Nor have Claimants shown that the nature of the alleged damage is so unique that it could only have occurred while still aboard the Vessel. Other plausible scenarios such as those suggested by Mr. Jones are possible, if not probable. It follows that Claimants have not overcome the COGSA statutory presumption of clean delivery imposed by their late notice of damage. Accordingly, the majority is obliged to deny the Claimants' claim in its entirety.

But had we been persuaded otherwise (which we are not), Claimants would only have succeeded to restore themselves to a "prima facie" claim posture and shift the burden onto the Respondent Owner to show that the "damage" was caused by circumstances for which it is legally excused. In order to do so, Respondents must demonstrate that they exercised the requisite statutory "due diligence" to make the ship seaworthy. In pertinent part, COGSA's Section 4(1), reads:

> Neither the carrier nor the ship shall be liable for loss or damage arising from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy… Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this rule."

At the time of these events, the Siteam Explorer was just one year old.[14] Cargo tanks 4BP and 8P were both coated with Dimecote inorganic zinc and each was fitted with its own segregated piping system and deep well cargo pump. There is ample evidence that ship's crew properly cleaned the two cargo tanks using both seawater and fresh water. In fact the Master testified that the protocol was to clean to a water-white standard and that Owner had supplied the ship with extra fresh water for that purpose. The Master further advised that the prior cargo carried in Tank 8P was ethylene dichloride, a clean product which would discourage residue buildup by the following pygas cargo. In addition, as required by printed Clause 18 of the Asbatankvoy charter party, Vinmar's appointed

---

[12] Exhibits 20, 33, 58
[13] Exhibit Z at page 6
[14] Vessel was delivered from the builder's yard on July 18, 2007

shore inspectors twice examined and approved those tanks as fit to receive and carry the sensitive ACN cargo. Those approvals were given despite the shore inspectors being aware (as confirmed by Caleb Brett's own Tank Inspection Reports) and no doubt taking into account that the last cargoes carried in Tanks 8P and 4BP were pygas and benzene respectively.

The ACN cargoes were loaded through separate dedicated lines connected at the offshore manifold by a ship supplied flexible cargo hose, which the Master testified and Mr. Minton accepted had been properly steam cleaned and drained. Moreover, Claimants' expert Mr. Minton, himself a former ship inspector, agreed that the valve security precautions described by the Master were in keeping with industry standards. Since the Vessel carried no pygas on the same voyage as the ACN, the possibility of post-loading seepage of pygas through inter-connecting cargo lines or valves does not arise.

Pygas is yellow, has a strong odor and is often greasy to the touch, all of which would be readily discernible to ship's officers as well as the tank inspectors specially engaged by Vinmar to determine the fitness of the tanks to carry the ACN. Foot samples and post-loading samples confirmed the ACN to have a reading 5 APHA, well below Vinmar's specification of 10 APHA. Apart from the as yet unsettled (and in our view irrelevant) question of whether the cargo was or was not carried under a nitrogen blanket[15], neither Claimants nor their witnesses have criticized the manner in which the Vessel carried and cared for the cargo. Nor have Claimants explained how a quantity of 33 gallons of pygas could escape the ship's vigorous cleaning and purging processes and also go unnoticed by the cargo inspectors charged with that very responsibility. Had we been required to consider the "due diligence" question (which we are not), the majority would have been inclined to decide that issue in favor of the Respondents.

Furthermore, the majority feels obliged to comment on Claimants' suggestion that the mere presence of minor residues from a prior cargo renders a vessel "unseaworthy" and, therefore, any ill affect suffered by that cargo is to be made good by the "carrier" or vessel owner. However, such a position would effectively elevate the carrier's COGSA burden from one of "due diligence" to that of a guarantor or insurer for the safe and complete outturn of a cargo. But, as argued by Counsel for Respondents, that is not the standard to which the carrier is to be held.

U.S. District Courts have described due diligence as, "a legal term of art designed to enable [the] judge to evaluate various criteria, including community standards, industry custom, human fallibility, and competing interests of other parties. As a general principle, due diligence is that action which would or should be exercised by a reasonably competent carrier,"[16] and, ".. whatever a reasonably competent vessel owner would do under the circumstances."[17]

---

[15] Claimants have questioned Respondents' assertion that the cargo was under a nitrogen blanket
[16] *Pacific Employers Ins Co v M/T IVER CHAMPION* (E D La Jan 31, 1996
[17] Complaint of Tecomar, S A 765 F Supp 1150,1179 (S D N Y 1991)

After careful review of the testimony and other evidence, the majority is satisfied that Respondents did exercise the "due diligence" required by the statute

Independent and separate from our finding in favor of Respondents on the liability issues, we are also obliged to comment on Claimants' method of calculating the claimed damages  Taking the totality of the situation into account, the still plunging market as well as the costs, difficulties and uncertainties associated with attempts to remediate the cargo, we think it was reasonable for Vinmar to sell rather than attempt to remediate the cargo  That said, we do not agree that the measure of loss sought from Respondents is either Vinmar's costs or the market price when the "damage" was first discovered, less the "salvage" sale proceeds

The aim of permitted damages is to restore the injured party to the same position had no damage occurred  Here, Claimants' damages are to be measured against the plunging market for sound ACN, and the inability of Vinmar to sell the cargo before and after the color increase was discovered  Market data for early October 2008 indicated prices for sound ACN as low as $1,700,[18] which approximated the $1,720 per mt offer Vinmar first received for 1,000 mts of the cargo carried by the Siteam Explorer  However, that sale was lost because Zurich was still focused on remediating the cargo  During the second week of October 2008, Vinmar received a second offer for 1,750 mts at $1 500 per mt from Continent International Inc  Due in part to the still falling market, the final terms of sale provided for a price of $1 450 per mt with the cargo to be taken in small truck loads over a period of some 60 days  However we have seen no contemporary evidence that Continent sought or that Vinmar granted a reduced price due to the cargo having an APHA factor greater than 10  In fact the contract of sale to Continent does not describe the cargo as distressed product

Market pricing and demand for ACN continued to spiral downward through October November and December 2008  Market data reports for sound ACN at the start of November 2008 were as low as $1,500 per mt  and at the end of November those prices had fallen below $900 per mt [19] Finally, on December 17  2008 Vinmar was able to arrange a second sale for the remaining 1,650 mts at $750 per mt  That price compares favorably to market data reports for mid-December indicating prices for sound ACN as low as $800 per mt[20] and suggests that increased color did not factor into the price

In summary, the majority is not persuaded that either the first or second sale of the so-called "distressed" cargo fetched prices below those then prevailing for sound non-fiber grade ACN  Rather than present evidence from Mr  Mehta, Claimants twice chose to rely upon the testimony of Vinmar's Thomas Wells  But as Mr  Wells explained, he did not follow the ACN market and that it was Vinmar's Mr  Mehta, not himself, who negotiated the two self-described "salvage" sales  Mr  Wells could not say how the cargo was described to the buyers by Mr  Mehta

---

[18] Exhibit BB
[19] Exhibit CC
[20] Exhibit DD

Assuming we had reached the damages issue (which we did not), the majority would have been inclined to draw the adverse inference that had Mr Mehta given evidence, that evidence would likely have been adverse to Claimants' position that the cargo was advertised and sold as distressed product, rather than at the low market prices then prevailing for sound ACN

Respondents main post hearing brief for the first time objected to Eitzen Chemical USA, *in personam*, and the SITEAM EXPLORER, *in rem*, being named as parties to this arbitration because neither was a party to the governing charter and *in rem* claims may not be adjudicated through arbitration Claimants' post hearing reply brief, pointed out that this very issue was discussed with Respondents' P&I Club which thereafter, on behalf of all the named Respondents, granted Claimants the critical extension of time under which this proceeding was brought Thus, Claimants argued that Respondents not only initially waived those objections, but also continued to do so by failing to raise those objections at the outset of this proceeding Although the point is now moot, the majority considers Claimants to have the better argument Had we decided the main dispute in Claimants' favor, the majority would have been inclined to issue a joint and several award against all named Respondents and leave enforcement of that award to the appropriate courts

### Award
In view of the foregoing the majority consisting of arbitrators Szostak and Siciliano are obliged to deny the claims put forward by Claimants against each and all of the named Respondents Furthermore as the prevailing party we hereby award Respondents, the sum of $250 000 as an allowance against the legal fees and expenses incurred by them for this proceeding The parties are directed to share the cost of the transcript

The amount and allocation and method of payment of the panel's fees and expenses are set forth in the attached Appendix B which forms part of this award Notwithstanding that allocation, those fees and expenses remain the joint and several responsibilities of both Claimants and Respondents and are to be satisfied from the escrow deposits each has made for this purpose with the Society of Maritime Arbitrators, Inc However, the uneven allocation results in a shortfall of $21,537 25 in the funds deposited by Claimants which is to be made good from the funds deposited by Respondents Accordingly, in addition to the $250,000 allowance for legal fees, Respondents are hereby awarded a further $21,537 25 in reimbursement for that portion of the arbitrators' fees and expenses advanced by them on behalf of Claimants

As previously stated, Mr Sheinbaum disagrees with majority and his dissenting opinion is attached and made a part of this award as Appendix A

Unless the $271,537 25 hereby awarded Respondents is paid by Claimants within 30 days, interest at the rate of 3 25 % per annum shall commence and continue to accrue

from the date of this award until such date as the full amount awarded to Respondents is paid or this award is reduced to judgment, whichever first occurs.

We further direct Claimants or their Counsel to inform Ascend that, rather than return their materials, the panel members have opted to destroy them. We also call upon Claimants and Respondents, as well as their respective representatives, to likewise comply with the terms of the Ascend confidentiality agreement.

This award may be reduced to judgment in any court of competent jurisdiction in accordance with the provisions of the United States Arbitration Act, 9 U.S.C., et seq.


Louis P. Sheinbaum  (Dissenting)


A. J. Siciliano


Donald J. Szostak
Chairman


New York, NY
August 26, 2013

```
----------------------------------------------------------X
In the Matter of the Arbitration            X
                                            X
        - between -                         X
                                            X        Appendix A
Zurich American Insurance Company           X
as subrogee of Vinmar International          X
Limited, Inc. and Vinmar International       X        DISSENT
Limited, Inc., Claimants                    X        August 26, 2013
                                            X
        and                                 X
                                            X
Team Tankers A/S, as Owner of the           X
MT SITEAM REXPLORER,                        X
Eitzen Chemical, USA, in personam and the   X
MT Siteam Explorer, in rem, Respondents     X
                                            X
Under an ASBATANKVOY Form of                X
Charter Party dated June 10, 2008           X
                                            X
----------------------------------------------------------X
```

   This is a COGSA case. More specifically, given the record, it is a case the outcome of which is to be decided in large part on the basis of applying the burdens of COGSA – and even more specifically – mainly applying the outcomes/results of the various tests of the samples of the ACN taken and made at several times and places, and the Panel going to where those results and the facts take it in applying the burdens of COGSA and determining the liability and damages issues in the matter.

   It is my view that the test results and facts very clearly (and certainly by a preponderance of evidence) establish that:

1. The ACN (or "the cargo") was delivered to the SITEAM EXPLORER ("the Vessel") at Houston in sound condition;

2. The cargo was delivered or discharged from the Vessel at Ulsan in an unsound and damaged condition;

3. The unsound and damaged condition consisted of a new propensity and changed condition to discolor as it did (between 8/12/08 and 9/25/08) that was acquired on board the Vessel during the voyage, from a cause external to the ACN, and

4. Therefore, Vinmar made out a prima facie case of liability against Team Tankers ("""TT") under COGSA

Thus, it was the burden of TT to show the cause of the damage and the ACN becoming unsound while on board during the voyage – which TT failed to do – and in order to escape from liability attaching, it was the burden of TT to establish that the cause of the unsound and damaged condition was an excepted cause under COGSA – which TT also failed to do

Furthermore, because Vinmar did establish that the ACN was damaged and became unsound during the voyage from an external cause, the late-notice presumption of COGSA was rebutted and inapplicable, and Vinmar did prove that the propensity and condition to discolor that the cargo acquired on board was not the result of time or any aging process or inherent vice

At the same time, in my view, the measure of damages proposed by Vinmar was incorrect, and the proper measure of damages should have resulted in the Panel awarding damages in an amount substantially less than what Vinmar claimed

THE COLOR RESULTS OF THE TESTS ON THE ACN SAMPLES

I. Samples taken at the loadport:

a. ACN samples from shoretank 18-47 at Houston, prior to the cargo being loaded on the Vessel at Houston:

| Date of Test | APHA Color |
|---|---|
| 6/24/08 | 5 |
| 9/28/08 | 4 |
| 1/6/09 | 6 |
| 1/6/09 | 7 |
| 1/17/12 | 10 |

b. Dockline at loading:

| | |
|---|---|
| 6/24/08 | 5 |
| 1/6/09 | 6 |
| 1/6/09 | 7 |

c. Manifold at start of loading Vessel:

| | |
|---|---|
| 1/6/09 | 5 |

d. Vessel first-foot:

| | |
|---|---|
| 6/30/08 | 4 |
| 1/6/09 (tank 4BP) | 6 |
| 1/6/09 (tank 8P) | 5 |

c Vessel after loading:

| | Date of Test | APHA Color |
|---|---|---|
| | 9/29/08 (composite) | 6.9 |
| | 1/6/09 (4BP) | 6 |
| | 1/6/09 (8P) | 6 |

ii. Samples taken at disport at discharge Ulsan:

| | | |
|---|---|---|
| a. Vessel | 8/12/08 (4BP & 8P) | 3 |
| | 9/29/08 (composite) | 10 |
| | 1/6/09 (4BP) | 11 |
| | 1/6/09 (8P) | 21* |
| | 1/6/09 (ship manifold at start discharge) | 22* |
| b. Shoreline | 1/6/09 (to shoretank 910) | 16 |
| | 1/6/09 (to shoretank 1106) | 17 |
| c Shoretanks. | | |
| | 8/14/08 ((910 & 1106) | 3 |
| | 9/29/08 | 10 |
| | 1/6/09 (910) | 17 |
| | 1/6/09 (1106) | 21* |

[* A sample was also taken from shoretank 910 on 1/6/09 and tested. It showed an APHA color of 21, as did these samples that had been taken on 8/12/08.]

III. Samples taken at disport on 9/25/08:

a. Shoretanks (composite)

| | |
|---|---|
| 9/25/08 | 13[1] |

---

[1] I have not included in the above listing the results of about 20 samples and tests taken from the ACN in tanks 910 and 1106 between October and December of 2008 which showed APHA color of 14 to 17.

The test results show that none of the samples (a) taken from ACN at the loadport that were not exposed to the Vessel (i e , those taken from the shoretank, dockline, and manifold of the Vessel), or (b) taken on the Vessel during or at the completion of the loading, prior to the vessel departing from Houston (like the first foot samples and the final vessel tank samples), (1) discolored as of 9/25/08 or 1/6/09 to any appreciable or material degree, and (2) none showed any propensity to improperly discolor  On the other hand, the test results showed that the samples that discolored as of 9/08 and 1/6/09 were all from ACN that was exposed to the Vessel and carried on the voyage to Ulsan  In addition  as of the end of September (when the discoloration of the ACN in the shoretanks was discovered) the extent of the discoloration of the cargo then in the shoretanks was similar to that of the Vessel samples taken at the Vessel's discharge in August, and as of the January  09 tests  the discoloration (at APHA 21) of the ACN then in the shoretanks  was similar to the discoloration of samples taken at discharge prior to the cargo going into 910 and 1106 – showing that the discoloration and the propensity and condition to discolor that was sustained and acquired was not caused or increased by or during the ACN's storage in shoretanks 910 and 1106

Thus, as aforesaid, it is quite clear (witness the samples from the loadport shoretank, dockline, manifold of the Vessel, first foot, and first foot and after-loading tank samples not discoloring) that the cargo was sound on delivery to the vessel, and the cargo's propensity and condition to discolor as it did was acquired while it was on the Vessel  Under these facts, the cargo taking on the propensity and condition to improperly discolor as it did must be considered and found to

constitute damage to the cargo; and the cargo being unsound at outturn - even if it would take some further short time after discharge for the cargo to discolor and be found to have discolored.

In order to establish a prima facie case of liability under COGSA, Vinmar was only obliged to prove delivery to the carrier in sound condition and the cargo being damaged at outturn and while in the custody of the carrier. Bally, Inc. v. CSX Lines, L.L.C., 22 F.3dv65, 68, 69 (2d Cir. 2005); Atlantic Mut. Ins. Co. v. CSX Lines, LLC, 432 F.3d, 428, 433, 434 (2d Cir. 2005); and Vana Trading Co., Inc. v. S.S. Mette Skou, 556 F.2d 100, 104, 105 (2d Cir. 1977).

The Majority's (and Vinmar's) focus and understanding is quite correct when the Majority's Final Award ("the Award") states at p.2:

> It is alleged [by Vinmar] that the cause of the increased color occurred from an external source while the cargo was still aboard the Vessel
> (Emphasis added.)

Vinmar was not obliged to show the cause of the damage to make out a prima facie case. A great deal of time, effort, and testimony was expended by both sides trying to show the cause of the cargo's propensity and condition to improperly discolor as it did, and it is understandable that they did so – to wit – to make their claim or defense stronger. Thus, MTD and Vinmar explained and argued that the foreign substances and compounds in the ACN (clearly proven herein, and found by chromatography of samples, to have become part of or be in the ACN cargo only after the ACN was loaded on the Vessel and proceeded on her voyage) show that the cargo was "contaminated"; and the cause, or the most likely cause, of the eventual improper discoloring, was pygas from the previous voyage getting into the ACN

tanks during the voyage.[2] Reasonable minds could differ as to whether there is a preponderance of evidence in the record that the ACN was contaminated and eventually discolored because of contamination by pygas as contended. However, in order to succeed on liability, it was and is not necessary for Vinmar to succeed on this point; and the underlying and primary thrust (and more significant thrust for the purpose of determining liability) of MTD's evidence, and the preponderance of the overall evidence, is that the cargo was sound on delivery to and loading by the carrier, and was unsound and damaged on arrival at Ulsan; and whatever happened to the cargo to give it the propensity and condition at and on discharge to improperly discolor as it did, took place during the voyage, and on the Vessel.

It is well settled law that with Vinmar making out a prima facie case; and the cause of the damage not having been shown, it was the burden of TT to prove the cause of the damage; and if it did not do so, and did not prove it was an excepted cause, TT is to be held liable under COGSA.[3]

---

[2] Nine of the Vessel's twenty-two cargo tanks (including tank 8P, which carried ACN on the voyage at issue) carried pygas on the previous voyage from two ports in Korea to U.S. ports . Chromatography testing and analysis of ACN vessel tank samples that were taken on arrival at Ulsan on the voyage showed "a mixture of compounds that could only be associated with pygas. Don't have any doubt of that at all. It wasn't in the first foot. It happened sometime after the first foot." (Minton – Tr. 1243.) "Gas chromatography is an analytic technique used to separate a mixture of compounds..." (Minton- Tr. 1055.)

[3] The proposed Final Award states:

> ...neither expert could do more than offer his informed speculation as to what *may* have caused the ACN to go ever so slightly yellow... (p. 6)

This means, at the worst for Vinmar, that neither side showed the cause of the propensity of the cargo to discolor to an off-spec condition as it did [going from APHA 5 to 13] by the preponderance of the evidence.

Under COGSA, once the shipper has shown that the cargo was sound on delivery to the carrier, and was damaged when discharged,

> ...the defendant was obliged to come forward and explain why. Socony Mobil Oil Co, Inc. v. Texas Coastal & Intern., Inc., 559 F.2d 1010, 1011 (5th Cir. 1977).

A shipper having made out his prima facie case,

> ...was not required to prove that [the carrier] was at fault or to explain how the damage might have occurred. Nissho-Iwai v. M/T Stolt Lion, 617 F.2d 907, 912 (2d Cir. 1980).

Once a prima facie case has been made:

> If after all the evidence is presented the carrier leaves doubts as to the cause of the damage, they must be resolved against it. [citing numerous authorities].
> EAC Timberlane v. Pisces, Ltd., 580 F. Supp. 99, 115 (D.C.P.R , 1983)
> (emphasis added)

And finally,

> Once the shipper establishes a prima facie case, under the 'policy of the law' [COGSA] the carrier must 'explain what took place or suffer consequences' '[T]he law casts upon [the carrier] the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability.[citing cases].
> Transatlantic Marine Claims Agency, Inc., v. M/V OOCL Inspiration, 137 F.3d 94, 98 (2d Cir. 1998).

The principal basis of the Majority finding no liability on the part of TT is that:

> ....Claimants have not shown, by a preponderance of evidence or otherwise, that the alleged [pygas] contamination took place while the cargo was in the custody of the SITEAM EXPLORER". (p. 10)

This, however, loses sight of the fact that the overriding and controlling issues are whether the ACN was delivered sound to the Vessel; a cause of the discoloring, external to the ACN, occurred during the voyage, and impacted/damaged the ACN during the voyage; and the ACN arrived in damaged condition.

The defense of TT on liability (leaving aside any due diligence/seaworthiness and late notice presumption issues or arguments for the moment) also included its arguments that the cargo improperly discolored and/or the improper propensity to discolor was caused by (1) an inherent vice (time/aging) – an excepted cause – or (2) alleged excessive temperature or heat experienced on the voyage from Houston to Ulsan. TT's defense fails on both points.

As TT pointed out in its post-hearing papers, in Vana Trading (*supra*), at 104, the Second Circuit noted that

> The Supreme Court has accepted a jury charge defining the latter term [inherent vice] as " 'any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time (emphasis added)

It is clear that time or the lapse of time did not cause the cargo in question to acquire the propensity and condition to improperly discolor. The absence of any discoloration of ALL the loadport samples as of 9/26/08 and 1/6/09 (including the Vessel manifold sample on loading) (plus for that matter, the loadport shoretank sample having a color APHA of 10 some three and one half years after the voyage) proves that time (and therefore, any inherent vice) was not the cause of the discoloration of this cargo as of 9/26/08. Moreover, TT has certainly not sustained any burden to show that by the preponderance of evidence, time or any inherent vice was the cause of the new propensity, or condition, or improper discoloration.[4]

---

[4] As I read the Award, the majority has not found that the cause of the damage/the propensity or condition to rapidly discolor was an inherent vice of the cargo or the MEHQ applied to the cargo. There was a debate in the post-hearing briefs on the question of who (cargo, or the vessel) under Second Circuit law, has the burden to show that inherent vice did not cause the damage, or that an inherent vice of the cargo caused the damage. Since I am of the view that there is, at the least, a

As to alleged excessive heat (which would be an external cause in any event), TT has wholly failed to show (let alone by any preponderance of evidence) that any excessive heat on the voyage was the cause of the damage or propensity or condition for improper discoloring. For the time before departure from Houston, for one thing, there is the sound condition of the loadport samples as of 1/6/09 (and the loadport shoretank sample even meeting the APHA 10 specification 3.5 years after the voyage). Importantly also, there is Exhibit O, tab 23 (the noon reports of the Vessel during the voyage) showing noon seawater temperatures during the voyage. They show the following number of days at the indicated temperatures on the passage to Ulsan:

| Sea Water Temperature | | # of Days at the Temperature |
|---|---|---|
| Degrees Centigrade | Degrees Fahrenheit | |
| 30 | 89.6 | 4 (2 in July and 2 in August) |
| 29 | 84.2 | 8 |
| 28 | 82.4 | 12 |
| 27 | 80.6 | 3 |
| 26 | 78.8 | 2 |
| 25 | 77.0 | 1 |
| 24 | 75.2 | 1 |
| 23 | 73.4 | 1 |
| 19 | 66.2 | 1 |

Mr. Minton credibly and convincingly testified that "...the cargo was properly inhibited, properly shipped, and did not experience untoward conditions " (Tr. 1088); and as follows:

A: Well, the inhibition certificate refers to 30. I disagree with the tone of some of the evidence that has been given in this case. I don't believe 30 to be a temperature which, if matched or exceeded, will lead to any sort of catastrophe. It's a certificate which tells you that if the cargo isn't carried above 30, then the

preponderance of evidence that time and any inherent vice of the ACN and/or the MEHQ did not cause the damage to the ACN, there is no need to decide what the Second Circuit law appears to be on the point.

inhibition applied will last at least as long as identified on the certificate.

It's a legal requirement for ships to be given such certificate before they set off on a voyage, to tell them that it's going to be safe for them to carry the cargo for the length of time they're going to carry it for and at the temperature they're going to carry it. So I see no issue whatsoever with a temperature approaching 30, which is the figure on the inhibition certificate.

Q: And what about with respect to the ambient temperature while the acrylonitrile was on board the SITEAM EXPLORER for her voyage?

A: Well, the ambient temperature of the cargo on voyage, it's not the ambient temperature of the air, it's the ambient temperature of the sea that counts, and the sea between the tropics is remarkably constant in its temperature. If you leave out the big ocean currents, it's always about 28 which makes it so nice to go to the Caribbean for a swim and so on, 28 degrees. And that's exactly the temperature that you would have expected the cargo to be on the voyage. It's the temperature that acrylonitrile and other polymerizing monomers are shipped around the world, and again, it's within the safe limits for the cargo.

(Tr. pp. 1121, 1122.)

The Award (bottom of p. 6, top of p. 7) quite rightly recognizes that Mr. Jones' "more likely" cause of the discoloring being alleged high temperatures consuming the MEHQ, was contradicted by the fact that the MEHQ content of the ACN at loading was the same and was not reduced on arrival at Ulsan, and also recognizes that Mr. Jones' fallback position was that the inhibitor "weakened"[5] from temperatures on the voyage, was the cause.[6]

Thus, the preponderance of evidence is that time and temperature did not do it, but there was an external cause that impacted and damaged the ACN during the voyage. With TT failing to identify and explain the cause of the damage and establish it was due to an excepted cause, TT is liable for the damage under COGSA, its

[5] And therefore damaged.

[6] Prior to coming to his high temperature and/or weakened MEHQ theories Mr. Jones opined that the discoloring was caused by the cargo being re-inhibited after discharge at Ulsan. First, there is no reason to disbelieve Vinmar's evidence that the ACN was not re-inhibited at Ulsan. In addition, it would be absurd to think or believe that the pre-discharge Vessel samples at Ulsan, which improperly discolored like the ACN in the shoretanks as of 9/26//08 and 1/6/09, were re-inhibited when or after the samples were taken off the Vessel.

burdens and the well-settled law that should be applied under the circumstances of this case.

UNSEAWORTHINESS/DUE DILIGENCE/SECTION 1304(1) OF COGSA

The discussion regarding unseaworthiness and due diligence in the Award is misplaced and inappropriate. No unseaworthiness of the Vessel at the commencement of the Voyage (or thereafter) was alleged by Vinmar; and I would add, none has been proven. On the assumption that MTD's pygas contamination theory has not been proven to the Majority by the preponderance of evidence, this is a case of unexplained and unexcepted damage to cargo being sustained by this ACN during the voyage. Under COGSA, the issue of liability ends there. Section 1304(1), and an inquiry into whether the carrier has exercised due diligence to make the Vessel seaworthy under 1304(1) only comes into play if unseaworthiness is an issue and has been shown to be a cause of the cargo damage. This is borne out by the very language of Section 1304(1):

> Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless cause by want of due diligence.... Whenever the loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier...

Section 1304(1) is not a general exculpatory provision which provides that if due diligence to make the Vessel seaworthy is shown, the carrier is not liable for any cargo damage (or unexplained cargo damage) on the voyage. To drive the point home, and state the obvious, if cargo damage is sustained by the carrier's failure to properly handle the cargo, the exercise of due diligence by the carrier to make the

vessel seaworthy does not exonerate the carrier from liability for cargo damage on the voyage. Under COGSA, with a prima facie case of liability for cargo damage being made; and unseaworthiness not being an issue; and neither cargo nor the carrier showing (by a preponderance) the cause of the loss, the exercise of due diligence to make the vessel seaworthy cannot be a successful defense to the carrier's liability. THE IGLOO NORSE, S.M.A. 4021, at p. 9 (2007) makes the point clearly; is correct; and the same rationale is applicable herein.

> Once Charterer establishes its *prima facie* case, the burden shifts to Owner to prove that it exercised **due diligence** to prevent the damage or that the damage was due to one or more excepted causes. Where the cause of damage remains unknown or a "mystery", that is where Owner is unable to prove that the damage was due to an excepted COGSA cause under Section 1304(2), Owner will be held liable. Where Owner relies on COGSA's Section 1304(2)(q) so called "catch-all exception", it is insufficient for Owner to prove that the crew did all it was supposed to do. Owner must prove the cause of the damage in order to show that its fault was not a contributing cause. (Emphasis added)

TT has not shown the cause of the damage in this case on this record by a preponderance of the evidence. Therefore, one never gets to the question of due diligence or seaworthiness under COGSA.

THE LATE NOTICE PRESUMPTION

For the reasons set forth above, Vinmar did prove by a preponderance of the evidence that the ACN was damaged from an external cause during the voyage and prior to delivery at Ulsan. Accordingly, any presumption of delivery in good order at Ulsan under COGSA on the basis of any late notice of damage, disappears. Bally, Inc. v. M.V. Zim America, 22 F.3d 65, 71 (2d Cir. 1994).

DAMAGES

I do not agree with most of the Award's discussion of damages, with one major exception, to wit, I do agree with its selection of the measure of damages to be applied.

As to my disagreements:

The record does not support applying any negative inference against Vinmar for failing to produce Mr. Mehta for his evidence on market conditions or more detail on the sales of the ACN. Mr. Wells, Vinmar's Risk Manager, who testified twice, knew the most about the case at Vinmar, the potential for reconditioning the cargo, the claim against Zurich, and Zurich's payment of the claim (that was shown to be made after MTD and Zurich determined that the damage to the cargo was not the result of any inherent nature of the cargo). Wells' extensive Declaration and his testimony constituted major efforts by Vinmar to present its case forthrightly, fully and in detail. More and most importantly on the question of any negative inference, Vinmar did present the best evidence on market conditions by presenting Exhibit 84 (the market prices – sound market values (SMV) - reported by PCI Acrylonitrile Ltd.), and Exhibit 85 (the market prices/SMV reported by ICIS). This evidence should not be disregarded. To the contrary, they are due the respect and status that even TT gives them by referencing them and their data in their post-hearing papers.[7] These

---

[7]     ....in October, PCI reported a price range for ACN in the Far east region that started at $1700/mt Ex.84. ICIS reported [in Exh.85] a spot price range with a low end of $1800 /mt for October...
                                      (TT main post-hearing brief, p.118.)

    in mid December Vinmar received an offer for the remaining ACN: 1,650 mt for $750/mt...December pricing data [Exh. 85] suggests

exhibits and reports should have been an important basis, and part of, the Panel coming to a fair evaluation of the recoverable damages sustained by Vinmar.

As indicated above, on the issue of the proper measure of damages herein, I do not agree with Vinmar's position that the Panel should arrive at the amount of Vinmar's recoverable cargo damage by deducting the amount of its sales from its C&F Ulsan purchase price (or the market value at Ulsan at the time of delivery), or the sound market value of ACN at Ulsan on 9/26/08, when the cargo was discovered to be discolored. Given the extraordinary unstable and falling market after arrival; the fact that Vinmar purchased and shipped the cargo on speculation, without an intended or actual purchaser in place, and did not sell the cargo (for whatever reason) or know of it being damaged, between arrival in August and September 26; and the substantial uncertainty of when Vinmar would have sold the cargo if it had not been found to be discolored - the proper measure of damage should be the market price at the time of the sales less the price realized for the sales.[8]

---

that $800/mt was the lower end of the price range.
(TT main post-hearing brief, p.121.)

[6] I disagree that there is no evidence that the cargo was sold as "distressed" or off-spec or damaged cargo. There is clear and substantial evidence that it was a distress sale of off-spec cargo. First of all, the specifications of the cargo on the sales by Vinmar included an APHA color maximum of 20. There is no evidence that sound ACN is traded with a specification of APHA 20. To the contrary, the evidence is that the regular spec of Vinmar is APHA 10, although 15 has also been seen as a spec. Secondly, consistent with the foregoing, the "Standard Specification for Acrylonitrile" of ASTM (Exhibit D) states at 3.1 "Acrylonitrile shall conform to the following chemical and physical requirements...Color...(APHA)...10. Max...". Thirdly, the market values or prices of sound ACN themselves, in the Far East and Asia (shown in Exhs. 84 and 85), for the times contemporaneous to the Vinmar sales, being clearly

I would calculate and award Vinmar damages for damage to its ACN as follows:

The October 2008 sale:

The first sale of 1,750 metric tons was agreed on October 14, 2008 at $1,500 per metric ton, and on October 23 a concession was made by Vinmar to reduce the price to $1,450 per ton. Exhibit 84 (PCI's report of the market values for "Asia/Far East Import___ $ per ton CFR") gives the market value of sound ACN as "October-1700-1950", i.e., the low as $1,700, and the high as $1,950. Exhibit 85 (ICIS's report of the sound market value for "ACRYLONITRILE in Asia Pacific SPOT CFR CHINA MAIN") gives the report dates, and high and lows for October 2008 as follows:

| [DATE] | LOW | HIGH |
|---|---|---|
| 7-Oct-08 | 1900 | 2000 |
| 14-Oct-08 | 1800 | 2000 |
| 21-Oct-08 | 1700 | 1900 |
| 28-Oct-08 | 1900 | 1900 |

I would arrive at a fair and reasonable sound market value to be used for calculating damages resulting from the first sale by splitting the difference between (a) the lowest low of the two reports for the month of October ($1,700), and (b) the lowest high of the two reports for the month of October ($1,900)." The result is a mid-market value of $1,800, and damages, as follow

$1,800 less $1,450 (sale price) = (damages per ton)$350 x 1,750 tons =

---

higher than the prices of the sales by Vinmar, is evidence that the cargo was sold significantly below market – which makes sense, with an off-spec APHA color of 20.
[9] There is, understandably, no report in either report of any low (salvage/distressed ) sale of $1,500 or $1,450. TT acknowledged in its main post-hearing brief, at p. 119, that:

> The sale price for this first sale was below the lower end of the market price range for ACN in the region for October.

$612,500 (for damages for the first sale).[11]

The December 2008 sale:

The second sale was agreed December 17, 2008 at $750 per metric ton. Exhibit 84 gives the sound market value of ACN as "December-850-1080". Exhibit 85 gives the report dates, and highs and lows for December as follow:

| [DATE] | LOW | HIGH |
|---|---|---|
| 2-Dec-08 | 800 | 900 |
| 9-Dec-08 | 800 | 900 |
| 16-Dec-08 | 800 | 900 |
| 23-Dec-08 | 800 | 900 |

Like above, I would arrive at a fair and reasonable sound market value to use for the calculation for the second sale by splitting the difference between (a) the lowest low of the two reports for the month of December ($800), and (b) the lowest high of the two reports for the month of December ($900).[1] This gives a mid-sound market value of $850. The result is a mid-market value of $850 less $750 (sale price) = (damages per ton) $100 x 1,650 tons = $165,000 (for damages from the second sale)

---

[10] The Award states, at p.12:
> Market data for early October 2008 indicated prices for sound ACN
> as low as low as $1700, [citing Exhibit BB] which approximated the
> $1720 per mt offer Vinmar first received for 1,000 mts...

However, I note that Exhibit BB's reference to $1,700 is a suggested price of $1,700 from the buying side; also, there is no indication in BB that any $1,700 suggestion was made in early October; the first mention of a low paid price of $1,700 is in Exh. 85 for October 21; $1,700 is the reported low for the month; and, again, there is no mention of any sound market value or price paid of $1,500 or $1450 in the entire month of October in Exhibit 84 or 85.

[11] Again, understandably, there is no report in either report of any low sale or salvage/distressed sale of $750.

Thus, I would award Vinmar/Zurich $612,500 plus $165,000 or $777,500 plus interest from December 17, 2008 for cargo damage.[12]

To be clear, I disagree with any suggestion that the cargo was sold at sound market value. Indeed, there is no evidence that the ACN was sold at SMV.


## IN PERSONAM LIABILITY OF EITZEN CHEMICAL, USA ("ECU") AND IN REM LIABILITY OF THE VESSEL

The Award that should have been made is one that is only against TT, and not against ECU or the Vessel in-rem..

There is no evidence or basis in the record to support the position that ECU (as a disponent owner of some sort) was a party to any contract with Vinmar, whether it be the Charter Party between TT and Vinmar, or the bill of lading covering the ACN, or any other contract. I am not aware of any evidence to support the position that TT entered into the Charter Party as agent of ECU. Also, there is no basis, fact or evidence to show that there was or should be any waiver (the intentional relinquishment of a known right) or any estoppel (there was no reasonable detrimental reliance herein) by or against ECU of the right to deny there is any basis herein for a finding against it of in personam liability.

Granting an extension of time under COGSA to a corporation or a vessel is not, without more, a waiver of the right to deny any in personam or in rem liability to that entity or vessel. Moreover, a review of Exhibits 1-10 submitted with the motion papers to dismiss this proceeding on the basis of a time bar dated November 14,

---

[12] In my view, Vinmar should not be awarded any part of its $94,144 claim for Oct. – Jan. storage; but should be awarded SGS survey fees of $17,615.

2011, and the other exhibits cited by Vinmar on the point, satisfies me that all parties granting the extensions of time (including the Vessel and its owner, Eitzen Chemical (Singapore) Pte. Ltd.), reserved all rights and defenses on behalf of all named parties and the Vessel.

The motion to dismiss based upon an alleged time bar was clearly without merit, but there is no rule of procedure or substance applicable to this arbitration proceeding that required ECU to make a motion to dismiss the in personam claim against ECU (or the in rem claim against the Vessel), or include such a motion in or with the time bar motion.

Further as to in rem liability, I do not read the early extensions of time exchanges between the named parties and/or Vessel and/or its owners to bring an in rem action, to wit, to arrest the Vessel, to mean that the owners or the disponent owners of the Vessel agreed or admitted (or waived any right to deny, or are estopped to deny) that there was or was to be any in rem jurisdiction of any court or this Panel to make an in rem award without an arrest being perfected. No in rem process (arrest) was ever issued by or on behalf of Zurich or Vinmar against the Vessel for the subject claim at anytime anywhere; and there was no agreement by anyone on behalf of the Vessel or by TT or ECU that any in rem claim or award could be made against the Vessel in any arbitration or court proceeding with or without an arrest.


ARBITRATOR FEES AND ATTORNEYS FEES

The Panel should have entered an Award providing that each side equally pay the fees of the arbitrators, and each side bear its own attorneys fees.

Louis P. Sheinbaum

New York, New York
August 26, 2013

```
------------------------------------------------------------ x
        In the Matter of the Arbitration              x
                                                      x
                  - between -                         x
                                                      x
        Zurich American Insurance Company             x
        as subrogee of Vinmar International           x
        Limited, Inc. and Vinmar International        x
        Limited, Inc., Claimants                      x
                                                      x
                    and                               x
                                                      x
        Team Tankers A/S, as Owner of the             x
        MT SITEAM EXPLORER,                           x
        Eitzen Chemical, USA, *in personam* and the   x
        MT Siteam Explorer, *in rem*,  Respondents    x
                                                      x
        Under an ASBATANKVOY Form of                  x
        Charter Party dated June 10, 2008             x
                                                      x
-----------------------------------------------------------X
```

**Before:**
Louis P. Sheinbaum
A. J. Siciliano
Donald J. Szostak  (Chairman)


### APPENDIX B

The panel's fees and expenses for rendering this award amount to $162,050.00,

which although allocated 75% to Claimants and 25% to Respondents remain the joint

and several responsibility of both parties.  Said fees are to be paid  from the $100,000

(total $2000,000) escrow account each party has established for this purpose with the

(total $2000,000) escrow account each party has established for this purpose with the

Society of Maritime Arbitrators, Inc. (SMA), as follows:

|  | Fee | Claimants Pay 75% | Respondents Pay 25% |
|---|---|---|---|
| Louis P. Sheinbaum | $59,750.00 | $44,812.25 | $14,937.75 |
| A.J. Siciliano | $47,500.00 | $35,625.00 | $11,825.00 |
| Donald J. Szostak | $54,800.00 | $41,100.00 | $13,700.00 |
|  | $162,050.00 | $121,537.25 | $40,462.75 |
| Less Escrow Deposit | | ($100,000.00) | ($100,000.00) |
| Claimants Shortfall | | $ 21,537.25 | |
| Respondents Surplus | | | $59,537.25 |

The above allocation exceeds the Claimants' escrow deposit by $21,537 25 which, pursuant to the parties' joint and severable obligation for payment of the arbitrators' fees, is to be paid by the SMA from the surplus remaining in Respondents' escrow account as follows·

| Louis P. Sheinbaum | $7,941.00 |
|---|---|
| A.J. Siciliano | $6,313 00 |
| Donald J Szostak | $7,283 25 |
| | $21,537 25 |

Due provision for Respondents to recover this shortfall from Claimants has been made in the main award.

Following payment of the fees from due the individual arbitrators, the SMA is to return any all balances and accrued interest remaining in the accounts to the respective depositor.

New York, New York
August 26, 2013