UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

ZURICH AMERICAN INSURANCE COMPANY, as
subrogee of Vinmar International Limited, Inc., and
VINMAR INTERNATIONAL LIMITED, INC.

Petitioners,

- and -

TEAM TANKERS A.S., EITZEN CHEMICAL USA,
*in persona*, and the M/V SITEAM EXPLORER, her
engines, tackle, apparel, etc., *in rem*,

Respondents.
_____

RECEIVED

2013 NOV 26 P 11: 37

U S DISTRICT COURT SDNY

13 Civ. 8404 (WHP)

PETITIONERS' MEMORANDUM
OF LAW IN SUPPORT OF THEIR
MOTION TO VACATE OR
MODIFY AN ARBITRATION
AWARD DATED 26 AUGUST 2013

Petitioners, Zurich American Insurance Company ("ZAIC") and Vinmar

International Limited, Inc. ("Vinmar"), through counsel, Kennedy Lillis Schmidt & English,

respectfully submit this Memorandum of Law in support of their Motion to Vacate or Modify the

26 August 2013 Final Award ("Award") issued by the majority of arbitrators appointed to an

arbitration panel constituted pursuant to an arbitration agreement in a 10 June 2008 Charter Party

("Charter Party") between Vinmar and Team Tankers, A.S. ("Team"). Petitions have filed that

Motion and this Memorandum pursuant to Sections 10 and 11 of the Federal Arbitration Act

("FAA"), 9 U.S.C. §10.

I.     THE PARTIES & THEIR CONTRACTS[1]

In June 2008, Vinmar decided to purchase acrylonitrile[2] ("ACN") meeting its

standard ACN quality specifications and ship it from Houston, Texas to Ulsan, South Korea to

_____

[1] Petitioners recognize that the basis of their application is a manifest disregard of law and not fact. However, Petitioners submit the following recitation of underlying facts, which are largely undisputed, will aid the Court's consideration of Petitioner's application. Where factual disputes exist, Petitioners will highlight those disputes.

[2] ACN is a clear, colorless liquid that contains both olefinic (carbon-carbon double bond) and nitrile (cyano) groups, which give the molecule its unique and varied reactivity, making it a versatile raw material. Majority Decision, p. 6.

sell to its Asia Pacific customers. Declaration of Thomas Wells ("Wells Decl.") ¶ 5; Exhibit 1 (Vinmar Sales Contract No. 7068807 (Redacted), dated 23 May 2008, and accompanying ACN Quality Specification; Vinmar Sales Contract No. 7076907 (Redacted), dated 19 March 2009, and accompanying ACN Quality Specification). To that end, Vinmar voyage chartered the Vessel from Team via the Charter Party on 10 June 2008 and purchased 3,500 metric tons of ACN from Texas-based manufacturer, Solutia, Inc. ("Solutia"), on 26 June 2008 on FOB Houston terms for $1,960/mt, or $6,860,000. Wells Decl. ¶¶ 6-8; Exhibit 2 (Recap Email, p. 2); Exhibit 3 (Asbatankvoy Charter Party); Exhibit 4 (Vinmar's 25 April 2000 Charter Party Terms); Exhibit 5 (Intertanko's Standard Tanker Voyage Chartering Questionnaire 1988 (V.2) for the SITEAM EXPLORER); Exhibit 6 (Solutia Invoice No. 391005707).

## II. THE ACN'S QUALITY STANDARD

Vinmar's quality specifications, which are standard for ACN sales in the industry,[3] called for (*inter alia*) the ACN's color to remain at or below 10 APHA, its nonvolatile matter ("NVM") to remain at or below 100 mg/kg, and its Methyl Ethyl of Hydroquinone[4]

---

[3] See, e.g., ASTM Standard, Exhibit D; Wells Decl. ¶ 5; Exhibit 1.

[4] While ACN is designed for its reactive versatility, that reactivity must be stabilized to facilitate its transport and handling in liquid form while preventing unintended polymerization (a highly exothermic reaction) pending ACN's final use in one of its various applications. ACN is normally stabilized against premature polymerization during storage, transport, and handling by adding 0.2 to 0.5 weight percent of water and 35-45 ppm of the inhibitor Methyl Hydroquinone ("MEHQ"). Water and MEHQ interrupt potential polymerization by consuming trace reactive intermediates before polymerization begins or becomes uncontrolled. Water inhibits ionic polymerization by trapping basic or acidic intermediates, and MEHQ inhibits free-radical polymerization by trapping free-radical intermediates. Majority Decision, p. 6.

MEHQ helps "prevent the polymerization of [ACN] in storage at . . . elevated temperatures" and helps "overcome certain disadvantages such as the dark color imparted by inhibitors previously used." U.S. Patent 2,683,163, Exhibit 124, Appendix 3. MEHQ "inhibit[s] the polymerization of [ACN] without the formation of a prominent color in the inhibited solution" such that "[ACN] may be stored for long periods of time even under adverse conditions." *Id.* In this way, MEHQ-inhibited ACN "may be subjected to higher temperatures such as those encountered in tropical storage," "over extended periods," with "negligible color formation." *Id.*

("MEHQ") content to remain in the range of 35-45 parts per million ("ppm"). Wells Decl. ¶ 5; Exhibit 1 (Vinmar Sales Contract No. 7068807 (Redacted), dated 23 May 2008, and accompanying ACN Quality Specification; Vinmar Sales Contract No. 7076907 (Redacted), dated 19 March 2009, and accompanying ACN Quality Specification).

### III.    LOADING IN HOUSTON & DISCHARGE IN ULSAN

As is customary in the petrochemical industry, a series of samples[5] of the ACN were pulled via independent marine surveyors at various stages of the ACN's transfer from loadport Shoretank 18-47 to Vessel Tanks 8P and 4BP (at Houston) and from the Vessel Tanks to the disport Shoretanks 910 and 1106 (at Ulsan). Wells Decl. ¶¶ 10-28; Exhibit 8 (Intertek Report of Analysis (Shoretank Prior #18-47) dated 25 June 2008); Exhibit 9 (Intertek Report of Analysis (Dockline Prior to Loading) dated 25 June 2008); Exhibit 10 (Intertek Time Log); Exhibit 11 (Intertek Visual Tank Inspection Report); Exhibit 12 (Intertek Report of Analysis (Vessel 1st Ft) dated 25 June 2008); Exhibit 13 (Intertek Certificate of Quantity, Vessel Ullage Report, Movement Summary Report); Exhibit 14 (Intertek Report of Analysis (Vessel Final Composite) dated 25 June 2008); Exhibit 15 (Intertek Sample Receipt); Exhibit 19 (Cargo Inhibitor Report – Acrylontrile, Exhibit 16; Vinmar Internal Email dated 29 September 2008, 12:46 pm (Pascu-Wells)); Those samples were either tested immediately or retained for future testing should quality issues later arise. *Id.*

### A.    *Contemporaneous Results on Loadport Samples*

---

[5] These samples included "replicate" samples, which are "another sample taken in the same way, at the same time, from the same material. When a liquid cargo is sampled on a ship . . . the sampling process is repeated a number of times, and each sample taken is referred to as a replicate." Vol. 7, p. 1171, ll. 11-22 (Minton).

Over 24-25 June 2008, independent surveyor Intertek Caleb Brett ("Interek")
sampled and tested the ACN in Shore Tank 18-47 and the shoreline. Wells Decl. ¶ 10; Exhibit 8
(Intertek Report of Analysis (Shoretank Prior #18-47) dated 25 June 2008); Exhibit 9 (Intertek
Report of Analysis (Dockline Prior to Loading) dated 25 June 2008). Results from tests on a
shoretank sample showed the ACN's color was 5 APHA, its NVM content less than 10 mg/kg,
and its MEHQ content 36 ppm. *Id.* Results from tests on a shoreline sample showed the ACN's
color was 5 APHA (but did not report its NVM or MEHQ content). *Id.* On 30 June 2008,
loading commenced. Wells Decl. ¶ 13; Exhibit 10 (Intertek Time Log). Loading was interrupted
after Vessel Tanks 8P and 4BP had been filled approximately twelve inches so Intertek could
draw "first foot" samples. Wells Dec. ¶ 14; Exhibit 10 (Intertek Time Log); Exhibit 12 (Intertek
Report of Analysis (Vessel 1st Ft), dated 25 June 2008). Results from tests on a first-foot
samples showed the ACN's color was 4 APHA. *Id.* As such, loading resumed and was
completed. Wells Decl. ¶ 15; Exhibit 10 (Intertek Time Log). After completion of loading,
Intertek drew samples from both Vessel Tanks and created a Vessel Final Composite sample[6]
that it retained but did not test. Wells Decl. ¶ 17; Exhibit 14 (Intertek Report of Analysis (Vessel
Final Composite), dated 25 June 2008); Exhibit 19 (Vinmar Internal Email dated 29 September
2008, 12:46 pm (Pascu-Wells). Thereafter, the Vessel sailed for Ulsan. Wells Decl. ¶ 20.

B.    *Contemporaneous Results on Disport Samples*

The Vessel arrived at Ulsan on 12 August 2008. Wells Decl. ¶ 21; Exhibit 17
(SGS Discharge Inspection Report (Summary of Discharge Datas, p. 2; Time Log, p. 6). On 14
August 2008, independent surveyor SGS Korea Co., Ltd. ("SGS") drew samples of the ACN

---

[6] A "composite" sample is one proportionately blended from individual tank vessel or shoretank samples (when
more than one is used to store or ship the whole parcel), which is designed to represent the entire parcel stored or
shipped.

from the Vessel Tank before discharge. Wells Decl. ¶ 22; Exhibit 17, (Summary of Discharge Datas, p. 2; Time Log, p. 6; Certificate of Analysis, p. 7). Test results on a Pre-discharge sample showed the ACN's color was 3 APHA, its NVM less than 10 mg/kg, and its MEHQ content 37 ppm. *Id.* Over 15-16 August 2008, the ACN was discharged from the Vessel into Shore Tanks Nos. 910 and 1106 at the Ulsan Tank Terminal ("UTT"). Wells Decl. ¶ 24; Exhibit 17 (Summary of Discharge Datas, p. 2; Time Log, p. 6; Certificate of Analysis, p. 7). After discharge, SGS sampled and tested the ACN in Shore Tanks Nos. 910 and 1106. Wells Decl. ¶ 27; Exhibit 17 (Certificate of Analysis, p. 7). Results for both Tanks: Color 3 APHA, NVM less than 10 mg/kg, MEHQ 37 ppm. *Id.*

## IV. DISCOVERY OF THE CONTAMINATION & NOTICE TO TEAM TANKERS

On 25 September 2008, at Vinmar's instruction, SGS re-sampled and re-tested the ACN in store in Shore Tanks Nos. 910 and 1106 to check its condition and to ensure that its MEHQ content remained within specification. Wells Decl. ¶ 29; Exhibit 19 (Vinmar Internal Email dated 29 September 2008, 12:46 pm (Pascu-Wells)). Test results, received the next day, showed that the ACN continued to be properly inhibited at 40 ppm (Specification: 35-45 ppm). Wells Decl. ¶ 30; Exhibit 20 (SGS Test Report (24/09/2008); SGS Test Report (26/09/2008) (Current Shoretank Column)). However, the test on a composite sample from the two Tanks showed that the ACN's color had deteriorated from 3 APHA to 13 APHA (10 Max) and its NVM content from less than 10 mg/kg to 491 mg/kg (100 Max). *Id.*

Because of this deterioration, Vinmar asked SGS to test the retained pre-discharge Vessel composite sample. Wells Decl. ¶ 31. That sample had been segregated from the discharged ACN, retained in an innocuous glass bottle, and ***not exposed*** to the UTT Shore

Tanks. *Id.*; Exhibit 20 (SGS Test Report (24/09/2008); SGS Test Report (26/09/2008) (Before Discharge Shiptank Column)). Tests on that sample showed the ACN's color had similarly deteriorated from 3 APHA to 10 APHA and its NVM from less than 10 mg/kg to 125 mg/kg. *Id.*; Exhibit 21 (Vinmar-SGS Email dated 26 September 2008, 5:31 am (Pascu-Lee/Baik)).

Vinmar also asked SGS to test the retained post-discharge Shore Tank composite sample. Wells Decl. ¶ 32; Exhibit 21 (SGS Test Report (26/09/2008)). That sample had also been segregated in an innocuous glass bottle and ***only exposed*** to the UTT Shore Tanks during discharge operations. Wells Decl. ¶ 32. Tests on that sample showed that the ACN's color had similarly deteriorated from 3 APHA to 10 APHA and its NVM from less than 10 mg/kg to 167 mg/kg. *Id.*; Exhibit 20 (SGS Test Report (24/09/2008); SGS Test Report (26/09/2008) (After Discharge Shoretank Column)); Exhibit 21 (Vinmar-SGS Email dated 26 September 2008, 5:31 am (Pascu-Lee/Baik)).

Vinmar also asked Intertek to test the Vessel Final Composite sample drawn and retained at loadport. Wells Decl. ¶ 33. Test results, reported on 29 September 2008, showed that, after being fully loaded into Vessel Tanks 4BP and 8P, the ACN's color was 6.9 APHA, its NVM content less than 10 mg/kg, and its MEHQ content safely within the 35-45 ppm range at 39 ppm. *Id.*; Exhibit 14 (Intertek Report of Analysis (Vessel Final Composite) dated 29 September 2008); Exhibit 19 (Vinmar Internal Email dated 29 September 2008, 12:46 pm (Pascu-Wells)).

Vinmar also asked Intertek to retest the loadport Shore Tank sample it had retained, which – when originally tested – had shown that, in Shore Tank 18-47, the ACN's color had been 5 APHA, its NVM content less than 10 mg/kg, and its MEHQ content 36 ppm. Wells

Decl. ¶ 34. Results on the re-tested sample showed that the ACN's color was 4 APHA, its NVM content less than 10 mg/kg, and its MEHQ content 38 ppm. *Id.*; Exhibit 22 (Intertek Report of Analysis (Shore Tank Prior #18-47 Recheck) dated 29 September 2008). Thus, despite the three months separating the two tests, the ACN effectively remained unchanged, stable, and within Vinmar's intended sale specifications. *Id.*

Because the retest of the loadport Shore Tank sample confirmed the ACN was stable and because the pre-discharge Vessel sample, which had ***never been exposed*** to the UTT Shore Tanks, deteriorated in a manner similar to the ACN in those Tanks, on 30 September 2008, Vinmar notified shipbroker Netco that it held Team Tankers responsible for the ACN's contamination. Wells Decl. ¶ 35. Netco relayed the message to Team Tankers the following day. *Id.*; Exhibit 23 (Vinmar-Netco Email dated 30 September 2008, 4:24 pm (Pascu-Miao/Smith), Netco-Vinmar Email dated 1 October 2008, 9:54 am (Miao-Pascu/Smith))).

V.    THE PARTIES' JOINT TESTING

As is customary in the petrochemical industry, Vinmar instructed Intertek to send the retained loadport samples to Ulsan so they could be jointly tested with Respondents' representative, Hyopsung Surveyors & Adjusters Corporation ("Hyopsung"). On 6 January 2009, the parties jointly tested two retained samples from the loadport Shore Tank, two from the loadport shoreline, two Vessel first-foot samples, one from the Vessel's manifold before loading, one from Tank 4BP after being loaded, and one from Tank 8P after being loaded. The test results follow:

| TEST NO. | SOURCE | SAMPLE 1 | SAMPLE 2 |
|---|---|---|---|
| 1 | Retained Shore Tank Sample | 6 APHA | 7 APHA |
| 2 | Shoreline Before Loading Samples | 7 APHA | 6 APHA |
| 3 | Vessel Tank 4BP First-Foot Sample | 6 APHA | Ø |
| 4 | Vessel Tank 8P First-Foot Sample | 5 APHA | Ø |
| 5 | Vessel's Manifold Before Loading | 5 APHA | Ø |
| 6 | Vessel Tank 4BP Final Post-Load Sample | 6 APHA | Ø |
| 7 | Vessel Tank 8P Final Post-Load Sample | 6 APHA | Ø |

See SGS Analysis Report dated 6 January 2009, Exhibit 59.

Vinmar also sought to test the retained disport samples with Hyopsung. However, Hyopsung refused to participate on the stated basis that those samples were tested at discharge and reportedly met specification. Despite Hyopsung's refusal to participate, SGS proceed with testing. The test results follow:

| TEST NO. | SOURCE | RESULT |
|---|---|---|
| 1 | Vessel Tank 4BP Before Discharge Sample | 11 APHA |
| 2 | Vessel Tank 8P Before Discharge Sample | 21 APHA |
| 3 | Vessel's Manifold at Start of Discharge Loading | 22 APHA |
| 4 | Shoreline to Shore Tank No. 910 | 16 APHA |
| 5 | Shoreline to Shore Tank No. 1106 | 17 APHA |
| 6 | Shore Tank No. 910 After Discharge | 17 APHA |
| 7 | Shore Tank No. 1106 After Discharge | 21 APHA |
| 8 | Shore Tank No. 910 on 6 January 2009 | 21 APHA |

See MTD Report 1, Attachment 5, Exhibit 60.

VI.     2012 RE-TEST OF SHORETANK & SHIP'S TANK
        COMPOSITE SAMPLES

During the arbitration proceedings, Petitioners' chemical expert, Minton Treharne & Davies ("MTD"), retested the color of a loadport Shoretank sample and a Post-Load Vessel Composite sample.  The Shoretank sample, drawn on 24 June 2008, showed that its color stilled remained within specification at 10 APHA (up from 5 APHA when tested on 6/24/2008) even three years and eight months after the sample was first drawn and tested.  The Post-Load Vessel Composite sample, created on 30 June 2008, showed that its color had increased to 15 APHA (up from 6.9 APHA when tested on 9/29/2008).  Exhibit 124, Exhibit 1.

VII.    SUMMARY OF SAMPLE RESULTS

The Dissent of Louis P. Sheinbaum, Esq. ("Dissent") summarized the foregoing results as follows:

THE COLOR RESULTS OF THE TESTS ON THE ACN SAMPLES

I.      Samples taken at the loadport:

a.      ACN samples from shoretank 18-47 at Houston, prior to
        the cargo being loaded on the Vessel at Houston:

| Date of Test | APHA Color |
|---|---|
| 6/24/08 | 5 |
| 9/28/08 | 4 |
| 1/6/09 | 6 |
| 1/6/09 | 7 |
| 1/17/12 | 10 |

b.      Dockline at Loading:

|  |  |  |
|--|--|--|
| | 6/24/08 | 5 |
| | 1/6/09 | 6 |
| | 1/6/09 | 7 |

c.     Manifold at start of loading Vessel:

|  |  |  |
|--|--|--|
| | 1/6/09 | 5 |

d.     Vessel first-foot:

|  |  |  |
|--|--|--|
| | 6/30/08 | 4 |
| | 1/6/09 (tank 4BP) | 6 |
| | 1/6/09 (tank 8P) | 5 |

e.     Vessel after loading:

|  |  |  |
|--|--|--|
| | 9/29/08 (composite) | 6.9 |
| | 1/6/09 (4BP) | 6 |
| | 1/6/09 (8P) | 6 |

II.    <u>Samples taken at disport at discharge Ulsan:</u>

| | | | |
|--|--|--|--|
| a. Vessel: | 8/12/08 (4BP & 8P) | 3 |
| | 9/29/08 (composite) | 10 |
| | 1/6/09 (4BP) | 11 |
| | 1/6/09 (8P) | 21* |
| | 1/6/09 (ship manifold at start disch.) | 22* |
| b. Shoreline | 1/6/09 (to shoretank 910) | 16 |
| | 1/6/09 (to shoretank 1106) | 17 |

c. Shoretanks:

| | | |
|--|--|--|
| | 8/14/08 (910 & 1106) | 3 |

| 8/29/08 | 10 |
| 1/6/09 (910) | 17 |
| 1/6/09 (1106) | 21* |

[*A sample was taken from shoretank 910 on 1/6/09 and tested. It showed an APHA color of 21, as did these samples that had been taken on 8/12/08.]

III.     Samples taken at disport on 9/25/08:

    a.  Shoretanks (composite)

| 9/25/08 | 13[FN1] |

FN1: [Arbitrator Sheinbaum] [did] not included in the above listing the results of about 20 samples and tests taken from the ACN in tanks 910 and 1106 between October and December of 2008 which showed APHA color of 14 to 17. [He also did not include the 2012 retest on Post-Load Vessel Composite sample.]

Dissent, p. 3-4.

## MANIFEST DISREGARD STANDARD OF REVIEW

An arbitration award must be vacated where: "(1) the law allegedly ignored was clear and explicitly applicable to the matter before the arbitrator; (2) . . . the law was improperly applied and that application led to an erroneous outcome; and (3) . . . the arbitrator possessed actual knowledge of the law and its applicability to the dispute." *Finkelstein v. UBS Global Asset Mgmt. (US) Inc.*, No. 11 CV 00356 (GBD), 2011 WL 3586437, *5 (S.D.N.Y. Aug. 9, 2011) (Daniels, J.) (citing *Stoltz-Nielsen SA v. Animal Feeds Int'l Corp.*, 548 F.3d 85, 93 (2dCir.2008), rev'd on other grounds, 130S.Ct. 1758 (2010)); *T.Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339-40 (2d Cir. 2010) (stating the same elements and holding that "manifest disregard remains a valid ground for vacating arbitration awards").

The Award must be vacated because all three requirements are met here. First, the parties and the Arbitrators expressly recognized that COGSA is clearly and explicitly applicable to this matter. Second, the Majority improperly applied COGSA's burdens of proof and it measure of damages, which led to the Majority's erroneous conclusion that Petitions (1) failed to prove Team's liability and (2) suffered no damages. Third, the Majority possessed actual knowledge of COGSA's burdens of proof and its measure of damages because it identified, cited, and purported to apply those burdens of proof and that measure of damages in its analysis.

## VI.   THE MAJORITY'S MISAPPLICATION OF COGSA

The Majority misapplied COGSA in three critical ways. First, it improperly used COGSA's sound-delivery presumption to hold that Petitioners were not entitled to benefit from COGSA's normal burden-shifting scheme and instead were obligated to show, by a preponderance of evidence, what caused the ACN's discoloration and that that cause was attributable to the Vessel to overcome the sound-delivery presumption. Second, it assumed Petitioners carried their *prima facie* burden under COGSA, but then held that Team was absolved by liability (despite not proving the cause of the loss) because Team exercised "due diligence" to make the Vessel seaworthy. Third, it failed to place Petitioners in the exact place they would have been had Team not damaged the cargo by failing to appropriately apply COGSA's measure of damages.

A.   *The Majority Held that Petitioners' Claim Was Barred by COGSA's Sound-Delivery Presumption because Vinmar Failed to Provide Notice of the Cargo Damage within Three Days of Discharge at Ulsan*

The Majority interpreted COGSA as follows:

(1) COGSA §3(6)[7] requires that a cargo owner ("shipper") provide a vessel owner ("owner") notice of concealed cargo damage within three days of discharge;

(2) If the shipper does not provide notice within three days, a presumption that the cargo was delivered in sound condition arises ("Sound Delivery Presumption");

(3) To overcome that Presumption, the shipper has to prove, by a preponderance of evidence, the cause of the cargo damage and attribute it to the acts or omissions of the vessel;[8]

(4) If the shipper cannot prove the cause of the cargo damage and attribute it to the acts or omissions of the vessel, it fails

---

[7] COGSA §3(6) provides:

Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent the notice must be given within three days of the delivery.

[8] The Majority explained:

[T]he several load port tests show[ed] the cargo to be "on spec" at [loading]. However, the cargo was also found to be "on-spec" at discharge and that finding precludes [Petitioners] benefiting from the usual presumptions of fault associated with a *prima facie* claims presentation [under COGSA]. . . . Since the cargo was not noted to have been discharged or "off spec" at the time of discharge and [Respondents] [were] not timely notified of any damage, it becomes [Petitioners'] burden to overcome the presumption of sound delivery and persuade the triers of fact that the cargo was in fact damaged while in the custody of the Vessel. Claimants have attempted to do so by pointing to additional tests on the retained load port samples carried out more than a year later. Although testing of those samples did indicate that some further color had developed, none experienced the same level of color deterioration as did the cargo carried by the Vessel and discharged into the UTT tanks. The majority considers those additional tests to be among the strongest evidence in support of Claimants' position, but they are not dispositive that the *cause* for increased color took place aboard the ship.

\*    \*    \*

Consequently, the majority finds that Claimants have not shown, by a preponderance of evidence or otherwise, that the alleged contamination took place while the cargo was in the custody of the Siteam Explorer. Nor have Claimants shown that the nature of the alleged damaged is so unique that it could only have occurred while still aboard the Vessel. Other plausible scenarios such as those suggested by Mr. Jones are possible, if not probable. It follows that Claimants have not overcome the COGSA statutory presumption of clean delivery imposed by their late notice of damage. Accordingly, the majority is obliged to deny the Claimants' claim in its entirety.

Majority Decision, pp 7-8 (Emphasis added).

to overcome the Sound Delivery Presumption and, therefore, is not entitled to the benefit of COGSA's burden-shifting regime.[9]

Applying the foregoing interpretation to the facts here, the Majority held that although Petitioners showed (1) that the ACN was loaded in good order, Majority Decision, p. 7; (2) that tests on loadport samples provided "strong[] evidence" that the ACN exposed to the Vessel discolored faster[10] and to a greater degree than the ACN exposed to the Vessel Tanks, *Id.* at 8; and (3) that pre-discharge samples were contaminated with "reactive species suspect to be associated with pygas and many others that could not be identified," *Id.*; Petitioners failed to overcome the Sound Delivery Presumption because they could not prove (a) that the ACN discolored because of the species found in pre-discharge samples, *Id.*; (b) that the estimated quantity of 33 gallons of pygas (alleged to have been source responsible for the presence of the species found in pre-discharge samples) could not have escaped detection aboard the Vessel, *Id.*

_____

[9] *See* Majority Decision, pp 8-10.

[10] In their Reply Brief, Petitioners calculated the respective rates at which non-Vessel-carried and Vessel-carried ACN discolored. Respondents' chemical expert, CWA claimed that the ACN discolored by way of a natural "aging process." Vol. 9, p. 1695, l. 24-p. 1697, l. 15 (Jones). Assuming CWA was correct, Petitioners calculated the relative rates of discoloration based on undisputed evidence: On 25 June 2008, Intertek tested an ACN sample from loadport Shoretank 18-47. Results on that sample showed the ACN had a color of 5 APHA. On 17 January 2012, MTD tested a retained ACN sample from Shoretank 18-47. Results on that sample showed that the ACN had a color of 10 APHA. Therefore, the ACN's color had increased 5 APHA (from 5 to 10) over 1,301 days (25 June 2008 - 17 January 2012). In other words, it had discolored at the rate of 0.0038 APHA/day (Change in APHA / No. of Days => (10 APHA - 5 APHA) / 1,301 days = 0.0038).

On 25 September 2008, after the ACN's deterioration was discovered, SGS tested a composite of retained ACN samples from Vessel Tanks 4BP and 8P. Results on that sample showed that the ACN had a color of 13 APHA. Therefore, the ACN's color had increased 8 APHA (from 5 to 13) in 92 days (24 June 2008 - 25 September 2008). In other words, it had discolored at the rate of 0.0869 APHA/day (Change in APHA / No. of Days => (13 APHA - 5 APHA) / 92 days = 0. 0869 APHA/day). [*NB*: This calculation ignores the fact that, at discharge on 16 August 2008, the ACN's color tested at 3 APHA such that the discoloration really occurred over a 40-day period. If this test were included, the rate of change of the Vessel-carried ACN would be 0.25 (10 APHA (13 APHA - 3 APHA) / 40 days (16 August 2008 - 25 September 2008). That is, the sample of Vessel-carried ACN would have "aged" *66 times* faster than the sample of the Shoretank ACN (0.0038 x 66 = 0.25)]. Even if it is assumed that the shoretank samples were stored at room temperature (20°C) while the bulk was maintained at a constant 30°C, the rate should have no more than doubled (because chemical reactions double every 10°C). See Reply, pp. 28-34.

at 9; and (c) that, by failing to procure a sample of the actual pygas previously carried by the Vessel, MTD's experiment that proved that standard pygas will discolor ACN in the exact manner as the subject ACN discolored here, did not suffice to show that previously carried pygas was the cause of the ACN's discoloration. *Id.* at 8-9. Therefore, Petitioners' claim failed before the Panel even had to consider COGSA's normal burden-shifting regime: "[Because] the cargo was . . . found to be "on-spec" for color at discharge . . . that finding precludes Claimants benefiting from the usual presumptions of fault associated with a 'prima facie' claim presentation." Majority Decision, p. 7.

> B. *The Majority Manifestly Disregarded COGSA by Impermissibly Using the Sound-Delivery Presumption to Preclude the Application of COGSA's Burden Shifting Regime*

While the Majority is correct that, under COGSA §3(6), a shipper must provide an owner with notice of cargo damage within three days of discharge or else the Sound Delivery Presumption will arise, that Presumption "is conclusive only where there is no other evidence on the disputed point." *Socony Mobil Oil Co., Inc. v. TexasCoastal & International, Inc.*, 559 F.2d 1008, 1012 (5th Cir.1977). "Any such presumption of good delivery falls . . . once the [claimant] adduces *any credible evidence* tending to show that the cargo was damaged prior to delivery." *Ferrostaal Corp. supra,* 838 F.Supp. 757, 767 (S.D.N.Y. 1993) (emphasis added) (ny credible evidence tending to show that the cargo was damaged prior to delivery. (citing *Pacific Employers Ins. Co. v. M/V Gloria,* 767 F.2d 229, 238 (5th Cir.1985)); see also *Bally, Inc. v. M.V. Zim America*, 22 F.3d 65, 71 (C.A.2 (N.Y.) 1994).

Here, the Majority expressly recognized, "Although testing of [retained load port] samples did indicate that some further color had developed, none experienced the same level of

color deterioration as did the cargo carried by the Vessel and discharged into the UTT tanks. The majority considers those additional tests to be ***among the strongest evidence in support of Claimants' position*** . . . ." Majority Decision, p. 8 (Emphasis added). Further, the Majority acknowledged that gas chromatography/mass spectrometry (GC/MS) analysis conducted on pre-discharge samples produced chromatograms that showed evidence "of reactive species suspect to be associated with pygas and many others that could not be identified."[11]

---

[11] This is a partial misstatement. In addition to showing reaction products formed by a suspected pygas-ACN reaction and other unidentified species, the chromatograms also showed a number of chemical species, including para-xylene, toluene, and various aromatic hydrocarbon species. CWA admitted as much during cross examination:

| | |
|---|---|
| Mr. Williams: | [The chromatograms] do show what is in a sample, though, don't they? |
| Mr. Jones: | At the time of analysis. It's an analysis of a sample that was injected at the time of the chromatogram, yes. What Mr. Frevola asked me was would those species be the same as when the sample was drawn 12 months previously. It's a general rule that a sample becomes less representative of the substrate from which it was taken as it becomes older. |
| Mr. Williams: | Would para-xylene have been formed in the sample, irrespective of the eventual testing date? |
| Mr. Jones: | No, it wouldn't have been formed, no. It might have been reduced in concentration by evaporation. |
| Mr. Williams: | So if anything, the chromatograms show a less severe picture of the contamination introduced aboard the SITEAM EXPLORER? |
| Mr. Jones: | That single species, but if you're talking of reacting species that are forming in the 12 months, it will give you an indication of those species that were not present at the time the sample was drawn. |
| Mr. Williams: | Right. But the para-xylene, the other -- the xylenes, all of the components -- I can read the list, but I'd rather not -- that MTD found had to come from somewhere, they didn't come from the ACN themselves, correct? |
| Mr. Jones: | Well, if I recall, [MTD] are saying some were formed by reaction of the -- |
| Mr. Williams: | Sorry. The identifiable ones, the ones where Jonathan [Bound of MTD] actually went to the different time markers and |

By recognizing that "strong[] evidence . . . support[ed] [Petitioners'] position," the Majority necessarily found "credible evidence tending to show that the cargo was damaged prior to delivery."[12] This is all a shipper has to show to overcome the Sound Delivery Presumption under COGSA. Therefore, the Majority manifestly disregard COGSA when it held that, because the ACN's color had not yet changed by the time it was discharged, "that finding precludes [Petitioners] benefiting from the usual presumptions of fault associated with a *prima facie* claims presentation [under COGSA]." Majority Decision, p. 7.

---

| | identified what he could on the chromatograms, that had to have come from a source material, that wasn't ACN? |
|---|---|
| Mr. Jones: | He was saying those were reaction products of pygas with acrylonitrile, if I recall correctly, and pygas with itself. |
| Mr. Williams: | There were some straight contamination products. There was a pickup of para-xylene, toluene, and what else? Do you recall? |
| Mr. Jones: | The aromatics. There were some hydrocarbon species I think he identified. |
| Mr. Williams: | Right. And those hydrocarbon species, that's part and parcel of what he identifies, or MTD identifies, as components of pygas? |
| Mr. Jones: | Yes. Some of the aromatic species were in the acrylonitrile to start with is what I recall, but yes, they were in pygas as well. |
| Mr. Williams: | Right. I think benzene, right? |
| Mr. Jones: | Benzene. |
| Mr. Williams: | That was the only one. *So everything else came from a separate source, and we basically identified that source as the SITEAM EXPLORER?* |
| Mr. Jones: | *Yes, yes.* |

Vol. 9, p. 1690, l. 14-p. 1694, l. 6 (Jones) (Emphasis added).

[12] Further, by stating that the tests on loadport samples were "*among* the strongest evidence in support of [Petitioners'] position," by necessary implication, the Majority recognized that there is other evidence in support of Petitioners' position that the ACN was damage on aboard the Vessel.

C. *Because Petitions Overcame the Sound Delivery Presumption, Petitioners Were Entitled to the Benefit of COGSA's Burden Shifting Regime, under which They Carried Their* Prima Facie *Burden*

COGSA imposes on Team, as carrier, a non-delegable duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." COGSA, Section 3.2. As universally recognized by COGSA precedent, Petitioners may establish a *prima facie* case for recovery under COGSA for breach of those duties by proving "that cargo was [1] loaded in **undamaged** condition, and [2] discharged in **contaminated** condition." *Socony Mobil Oil Co., Inc. v. Texas Coastal & Intern., Inc.*, 559 F.2d 1008, 1010 (C.A. Fla. 1977) (Numbering added); see also *Vana Trading Co., Inc. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d Cir. 1977), *cert. denied*, 434 U.S. 892 (1977); *Ferrostaal, Inc. v. M/V Tupungato*, 230 Fed.Appx. 11, 13, 2007 WL 1113108 (2d. Cir. 2007).[13]

Critically, to carry their initial burden, Petitioners did not have to prove what caused the contamination or that Team was at fault therefor. *Nissho-Iwai v. M/T Stolt Lion*, 617 F.2d 907, 912 (2d. Cir. 1980) ((explaining that "to make out its prima facie case . . . [the shipper]

---

[13] A COGSA claimant may also carry its *prime facie* burden as follows:

> The second way a plaintiff may discharge its burden of making out a prima facie case under COGSA is to show that the characteristics of the damage suffered by the goods justify the conclusion that the harm occurred while the goods were in the defendant's custody. As we have made clear, "the consignee's burden does not mean that it must always introduce direct evidence that the cargo was in good condition when shipped. It may additionally meet its burden by showing, as was also done here, from the condition of the cargo as delivered or otherwise, that the damage was caused by the carrier's negligence and not by any inherent vice in the cargo."

> This second avenue is available because not infrequently a plaintiff who is unable to provide specific evidence as to the condition of the goods at delivery or outturn, can nonetheless show, by the nature of the damage, that the injury complained of happened to the cargo while it was in the carrier's custody.

*Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 98-102 (C.A.2 1998) (Citations omitted).

was not required to prove that [the carrier] was at fault or to explain how the damage might have occurred." "[A]ttempt[s] to explain how the carrier might have contaminated the [cargo] with [a contaminant] [is] 'gratuitous.'" *Id.*).

Here, despite its holding, the Majority found (1) that "the several load port tests show[ed] that the cargo [was] 'on spec' at [loading], Majority Decision, p. 7; (2) that the MEHQ inhibitor function properly over the duration of the ACN's carriage; *Id.* at 9-10; (3) that a comparison between tests on the loadport shoretank samples and the pre- and post-discharge samples showed that the Vessel-carried ACN had a greater propensity to discolor, *Id.* at 8; and (4) that pre-discharge samples contained "reactive species suspect to be associated with pygas and many others that could not be identified."[14] *Id.* This is enough to show both that the ACN was loaded in good order and contaminated during its carriage. Therefore, the Majority manifestly disregarded COGSA when it held, "Claimants have not shown, by a preponderance of evidence or otherwise, that the alleged contamination took place while the cargo was in the custody of the Siteam Explorer." Majority Decision, p. 10. Petitioners did precisely that by showing that the ACN was loaded in good condition and discharged in contaminated condition, the latter point having been expressly admitted by Respondent's chemical expert, CWA. See Footnote 11.

       D.     *Because Petitions Carried Their* Prima Facie *Burden, the Burden Shifted to Respondents, and They Failed to Carry It Because – as the Majority Recognized – They Did Not Prove the Cause of the Contamination – Regardless of Whether Respondents Exercised "Due Diligence"*

---

[14] Further, in its "due diligence" discussion, the Majority rejected Claimants' "suggestion" "that the mere presence of residues from a prior cargo renders a 'unseaworthy' and, therefore, any ill affect [sic] suffered by that cargo is to be made good by the 'carrier' or vessel owner." Decision, p. 11. This statement tends to confirm that the Majority recognized that the ACN picked up residues from prior cargos carried aboard the Vessel such that Petitioners proved a shipboard contamination.

Because Petitioners carried their *prima facie* burden, under COGSA, a presumption of carrier liability should have arisen and the burden shifted to Team to prove (1) what caused the ACN's contamination and (2) that that cause did not related to its negligence or was otherwise excused because it qualified as one of COGSA's "excepted causes," § 1304(2)(a)-(q). *EAC Timberlane v. Pisces, Ltd.*, 580 F.Supp. 99, 115 (D.C. Puerto Rico 1983). This is a high burden under which the carrier – not the shipper – is required to prove the actual cause of contamination or damage:

> The burden of carriers, once a prima facie case of cargo loss is made, seems to have the characteristics of the persuasive type of burden. The carrier's burden has been portrayed as one requiring that it clear doubts as to the reasons for the loss and its relation with those causes. If after all the evidence is presented the carrier leaves doubts as to the cause of the damage, they must be resolved against it. . . . '[T]he shipowner, in order to bring himself within a permitted exception . . . must show that the loss was due to an excepted cause and not to breach of his duty to furnish a seaworthy vessel . . . . And in that case, since the burden is on the shipowner, he does not sustain it and the shipper must prevail if, upon the whole evidence, it remains doubtful whether the loss is within the exception.' If the evidence is left in equipoise and it is equally probable that the damage was caused either by an excepted cause or by the carrier's fault, then the burden has not been satisfied.

*Id.* at 114-115 (Citation omitted). See also, *Atlantic Mut. Ins. Co., Inc. v. CSX Lines, L.L.C.*, 432 F.3d 428, 434 (C.A.2 (N.Y.) 2005).

In other words, "COGSA's framework thus *places the risk of non-explanation for mysterious maritime damage squarely on [the] defendant[-carrier]* . . . . Once the shipper establishes a prima facie case, under 'the policy of the law' *the carrier must 'explain what took place or suffer the consequences.' '[T]he law casts upon [the carrier] the burden of the loss which he cannot explain* or, explaining, bring within the exceptional case in which he is relieved

from liability.'" *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 98-99 (C.A.2 1998) (Internal citations omitted) (Emphasis added).

Here, the Majority's holding requires a conclusion that Respondents ***could not have*** sustained their burden: "[N]either [Petitioners' nor Respondents'] expert could do more than offer his informed speculation as to what may have caused the ACN to go ever so slightly yellow." Majority Decision, p. 6. That is, the Majority expressly concluded that this was a "maritime mystery," for which Team must be held liable under COGSA. This finding ends the COGSA burden-shifting analysis. As such, the Majority's discussion of Respondents' purported due diligence was both premature and unnecessary.[15] Because Petitioners carried their COGSA *prima facie* burden and Respondents' failed to carrier theirs, the Majority was obligated to hold Respondents liable. Having held otherwise, the Majority manifestly disregarded COGSA such that the Award must be vacated.

      E. *Under COGSA, Petitioners Are Entitled to Recover the Amount Necessary to Put Them in the Exact Position They Would Have Been in Had There Been No Breach, Namely the Difference between the ACN's Sound Market Value on the Date it Was*

---

[15] It was also wrong:

> Owner's contention that it is relieved from liability because of Charterer's inspector's acceptance of the vessel's tanks . . . in accordance with Asbatankvoy Clause 18 . . . is misplaced. It is well-established that acceptance of the vessel's tanks by the charterer's inspector does not relieve the owner of its non-delegable duty to tender cargo-worthy tanks. And for sound reason. The charterer's inspector is unable to crawl through [a] vessel's extensive piping, pumps and other cargo handling equipment in order to ensure that they have been properly drained, heated, cleaned and purged of prior cargoes. He must necessarily rely in large part on representations from the vessel's Chief Officer . . . that her cargo handling and carrying tanks and appurtenances have been properly prepared in all respects to receive her cargo. This was not done and we so hold in this instance [that the carrier failed to exercise due diligence as required].

*MAERSK GAS CARRIERS*, SMA No. 4021, 2007 WL 6035931.

*Discovered Contaminated and the Amounts Recouped via*
*Vinmar's Salvage Sales*

1.      *Vinmar's Mitigation Efforts Were Reasonable*

Petitioners entitlement to their damages must be understood in context. Immediately after discovering the ACN was damaged (26 September 2008), Vinmar sough the advice and assistance of SGS to determine the viability of remediating the ACN by any available method. SGS proposed alternate remedial measures, the cheapest of which appeared to be active-carbon filtration, and began running trials on samples of the ACN to determine the viability of that process. SGS's initial experiments with active carbon yielded mixed results. As such, Vinmar continued to monitor the Asia Pacific market price for ACN and continued to contact regional ACN end-users to determine which might be in the market to purchase the subject parcel. It also began to examine the practical hurdles it would face if active-carbon filtration proved viable, principally finding the additionally required storage space.

By 7 October 2008, after Vinmar's Mr. Pascu arrived in Ulsan to oversee its mitigation efforts, Vinmar knew that active-carbon filtration showed some potential to return the ACN's color to specification but that – even if confirmed – practical impediments weighted against pursing that option. Because the UTT Shore Tanks were not connected and because additional tankage was unavailable at that facility, Vinmar would not be able to employ the method there. Further, no other Korean storage facility could accommodate the subject parcel. As such, to pursue remediation, Vinmar would have to clear the ACN through Korean customs, load, and ship it to a storage facility outside of Korea and only then initiate the process of filtration. Based on limited information, Vinmar estimated that this process would conservatively cost between $275,000 and $400,000 but would take more than a month (after tankage could be found) to be completed. But because all signs suggested that the price for ACN

would continue to fall, by 10 October 2008, Vinmar had determined selling the ACN "as is" to be its best available option. As such, Vinmar accepted a bid of $1,500 for 1,750 mt +/- 5% Ex UTT Tank No. 1106 from Continental on 14 September 2008. From this sale, Vinmar disposed of over half of the damaged ACN and procured $2,578,229 in proceeds to mitigate its loss (Vinmar was forced to a price concession to cement the deal; ultimately, Continental purchase 1,778.089 mt of the damaged ACN for $1,450/mt).

As Vinmar was closing its first sale, Zurich informed Vinmar that it had retained MTD to review the circumstances of the ACN's deterioration and advise on remediation options for the remaining 1,680 mt of damaged ACN. On 20 October 2008, Zurich expressly acknowledge that the actions Vinmar took with respect to the 1,750 mt sold to Continental were clearly taken in good faith to mitigate its loss. At the same time, Zurich provided Vinmar with MTD's initial survey of remediation options. MTD estimated that an "all in" price for remediation via filtration or re-distillation would approach $600,000, far more than Vinmar's own estimation. To Vinmar, MTD's report reinforced its decision to sell the cargo rather than remediate because Vinmar continued to anticipate that ACN prices would drop by the time it could perform the steps required to remediate the damaged ACN and that the price drop would likely outpace any gains it might reap by remediation. Therefore, Vinmar continued to search for a customer willing to purchase the remaining ACN.

While Vinmar looked for customers, it also assisted with MTD's investigation into whether remediation might still be economically viable for the remaining, unsold ACN. On 14 November 2008, MTD refined its original cost estimate for adsorptive filtration advising Vinmar that the process would cost €25/mt, excluding equipment transport and set up and waste disposal, but that employ that method would require additional testing as well as reasonable

facilities and site access. Although MTD revised its original cost estimate for filtration downward, the option still did not seem reasonable because Vinmar had already confirmed that the UTT tank and pipeline arrangement made filtration there impossible and because the additional tests required would further delay Vinmar's ability to get the ACN to market before its price fell even further. As such, on 17 December 2008, Vinmar sold the remaining 1,685.623 mt of damaged ACN to Golden Resources Petrochemicals Co., Ltd. for $750/mt CIF Jinshanwei, China. From this sale, Vinmar procured $1,264,217.25 to further mitigate its loss.

The Majority concluded that "it was reasonable for Vinmar to sell rather than attempt to remediate the cargo," Majority Decision, p. 12, which is confirmed when the pricing date from the region is considered. The following graphs represent ACN prices (based on CFR pricing in the Asia Pacific) from PCI Acrylonitrile Ltd. and ICIS for May 2008 to January 2009, Exhibits 84 and 85, respectively.

**ACN Prices May 2008 – January 2009 (PCI Acrylonitrile Ltd.)**





**ACN Prices May 2008 – January 2009 (ICIS)**

2. *Because Vinmar's Remidation Efforts Were Reasonable, Petitioners Are Entitled to Be Put Back in the Exact Position They Would Have Been In Had the ACN Not Been Contaminated*

Despite the fact that both Petitioners and Respondents recognized that, under COGSA, "[t]he correct measure of damages . . . is the amount necessary to put the injured parties in the exact position they would have been in had there been no breach," *Seguros Banvenez, S.A. v. S/S OLIVER DRESCHER,* 761 F.2d 855, 860-61 (1985), by calculating the difference between the fair market value of the ACN at Ulans in the condition in which it should have arrived ("sound market value" or "SMV") and the fair market value in the condition in which it actually arrived ("damaged market value" or "DMV"), *Weirton Steel Co. v. Isbrandtsen-Moller Co.*, 126 F.2d 593, 594 (2d Cir.1942), the Majority rejected this well-settled measure of damages: "[W]e do not agree that the measure of loss sought from Respondents is either Vinmar's costs or the

market price when the 'damage' was first discovered, less the 'salvage' sale proceeds." Instead, the Majority claimed that "[n]either the first or second sale of the so-called 'distressed' cargo fetched prices below those then prevailing for sound non-fiber grade ACN."[16] However, this holding does not comport with the pricing information the Majority *itself* cited.

For Vinmar's October salvage sale, the Majority recognized that there was (at least) a $250/mt differential between the lowest October price for sound ACN ($1,700) and the price at which Vinmar sold the first 1750 mt parcel of damaged ACN ($1,450). This amounts to a ***$437,500 loss***, which is clear more than de minimis and can hardly be said to be attributable to the falling market (as the $1700/mt price was itself a "fallen" price). The same holds true for Vinmar's December sale. There, the Majority recognized that there was $50/mt differential between the lowest December price for sound ACN and the price at which Vinmar sold the second 1650 mt parcel of damaged ACN. This amounts to a further loss of ***$82,500***. If this does not constitute a manifest disregard of COGSA's well-recognized measure of damages, it – at minimum – constitutes "an evident material miscalculation" of Petitioners' damages, which is an express ground for vacating or modifying an award under FAA § 11. Therefore, Petitioners are, at minimum, entitled to recover $520,000 (($250 x 1750/mt) + ($50 x 1650/mt)) (plus their direct additional expenses discussed below) considering the fact that they have proven Respondents' liability.

However, Petitioners respectfully submit that, in order for them to be put back "in the exact position they would have been in had there been no breach" requires that the ACN's

---

[16] In support of this contention, the Majority wholly ignored Vinmar's testimony that these were salvage sales and the fact that both salvage sale contracts included altered quality specifications for both color (increased to 20 APHA) and NVM (increased to 150mg/kg). See Dissent, p. 15, fn. 8.

sound market price be based on the price Vinmar could have sold it for in September 2008 when the ACN's contamination was discovered on 26 September 2008.

According to pricing data provided by PCI Acrylonitrile Ltd., the fair market value of sound ACN, based on CFR pricing in the Asia Pacific, ranged as follows for September to October 2008:

| MONTH | LOW | HIGH |
|---|---|---|
| September | $2030/mt | $2300/mt |
| October | $1700/mt | $1950/mt |

See PCI Acrylonitrile Ltd. ACN Price Information in Vinmar-Zurich 3/10/2009 Email, Exhibit 84. According to pricing data provided by ICIS, the fair market value of sound ACN, based on CFR pricing in the Asia Pacific, ranged over September to October 2008 as follows:

| DATE | LOW | HIGH |
|---|---|---|
| 2 September 2008 | $2000/mt | $2100/mt |
| 9 September 2008 | $2000/mt | $2100/mt |
| 19 September 2008 | $1950/mt | $2050/mt |
| 23 September 2008 | $1950/mt | $2050/mt |
| 7 October 2008 | $1900/mt | $2000/mt |
| 14 October 2008 | $1800/mt | $2000/mt |
| 21 October 2008 | $1700/mt | $1900/mt |
| 28 October 2008 | $1700/mt | $1900/mt |

See ICIS ACN Price Information, Exhibit 85.

According to this market information, the lowest September price for ACN was $1950/mt. That is, had the ACN not been discovered discolored, Vinmar could have sold it for

at least $6,785,013 ($1,950 x 3,479.494 mt) in September, which establishes the ACN's SMV. Ultimately, Vinmar was able to sell the damaged ACN for $3,842,446, which establishes its DMV. Therefore, Petitioners are entitled to recover $2,942,567 ($6,785,013 SMV - $3,842,446 DMV) for the ACN's damage. Because this amount exceeds the limited recovery to which Petitioners are entitled under COGSA's $500/customary freight unit[17] limit on carrier liability, Petitioners submit they are entitled to that full recovery of $1,739,747 ($500/mt limit of liability x 3,479.494 mt).

And this is true even if SMV is determined by the lowest *October* price for on-specification ACN, $1,700/mt. If that were the case, Claimants would still be entitled to their full COGSA recovery: $5,915,140 SMV ($1,700/mt x 3,479.494 mt) - $3,842,446 DMV = $2,072,694 > $1,739,747 COGSA Limited Recovery.[18]

On top of this, Claimants are entitled to their direct additional expenses. *See e.g. Interstate Steel Corp. v. S.S. Crystal Gem*, 317 F.Supp. 112, 121 (S.D.N.Y. 1970); *Macsteel Intern. USA Corp. v. M/V IBN ABDOUN*, 218 F.Supp.2d 480, 486 (S.D.N.Y. 2002). Because of the contamination, Vinmar was required to store the ACN in Shore Tanks Nos. 910 and 1106 from October through January 2010. UTT charged Vinmar $94,144 for tank rental during that

---

[17] Here, the customary freight unit is the metric ton.

[18] In the alternative, "[a] number of courts, including the Second Circuit, have accepted the practical assumption that the invoice cost plus freight represents an appropriate surrogate for the fair market value of the goods in the port of delivery '*when the fair market value is uncertain or not proved.*' Alternatively, courts have looked to invoice price, freight and insurance as a proper alternative measure of the fair market value of the goods." *New York Marine Managers, Inc. v. M/V "TOPOR-1"*, 1991 WL 29158, 6 (S.D.N.Y. 1991) (Emphasis added) (Citations omitted). Here, Vinmar purchased the ACN for $1,960/mt FOB Houston, shipped 3,479.494 mt of ACN aboard the SITEAM EXPLORER, and paid Team Tankers's parent company, Eitzen Group, $327,927 in pro rata freight for transport of the ACN from Houston, Texas to Ulsan, South Korea. See Solutia Purchase Contract, Exhibit 6; Bill of Lading No. HOU4, Exhibit 7; 10 June 2008 Eitzen Group Freight Invoice, Exhibit 89. Thus, under this alternative method, the ACN's SMV totals $7,147,735 ($1,960 x 3,479.494 mt of ACN + $327,927 in pro rata freight), its DMV totals $3,842,446, and Petitioners would be entitled to $3,305,289 ($7,147,735 (SMV) - $3,842,446 (DMV)), which again exceeds their maximum recovery under COGSA.

period. Exhibits 87-88, Pascu Decl. at Exhibit 4. Therefore, Petitioners are entitled to be reimbursed that amount. To advise on the cause and origin of the ACN's contamination, ZAIC retained MTD. Petitioners are entitled to be reimbursed for MTD's fees. At disport, Vinmar retained SGS to sample and test the ACN after the discovery of the contamination. SGS's services totaled $17,615. Petitioners are entitled to be reimbursed that $17,615. Exhibit 34. To prosecute this claim, Petitioners retained the services of their legal counsel. Petitioners are entitled to those expenses. To advise on the cause and origin of the ACN's contamination, Petitioners retained MTD. MTD's services invoiced to Claimants to date exceed $119,094. Petitioners are entitled to be reimbursed those costs. At disport, Vinmar retained SGS to sample and test the ACN after the discovery of the contamination. SGS's services totaled $17,615. Claimants are entitled to be reimbursed that $17,615. See SGS October - December 2008 Invoices, Exhibit 34. And to prosecute this claim, Claimants have retained the services of their legal counsel and are entitled to recover their reasonable attorneys' fees incurred in the arbitration.

## CONCLUSION

Since COGSA came into effect 77 years ago, its burden-shifting regime has developed into the universally recognized and unquestioned method for resolving cargo-damage disputes (when COGSA is applicable by its own force or by invocation by parties to charter parties). The Parties and Panel recognized that COGSA applied to this dispute. Despite this, the Majority erected an unrecognized hurdle in Petitioners' path to making their *prima facie* case under COGSA and then – presuming that case made – ignored the well-recognized mandate that Respondents had to explain the cause of the ACN's contamination or "suffer the consequences." Because Respondents failed to do so, Petitioners proved Respondents liable for Petitioners'

damages, which – when calculated under COGSA's guiding damages principle – total $1,739,747 plus Petitioners' direct additional expenses incurred because of Respondents' breach of their duties as carriers under COGSA.

Respectfully submitted,

Dated: 26 November 2013
New York, New York

KENNEDY LILLIS SCHMIDT & ENGLISH

By: _____
John T. Lillis Jr., Esq.
75 Maiden Lane – Suite 402
New York, New York  10038-4816
Tel:  212-430-0800
Fax: 212-430-0810
Attorneys for Petitioners, Zurich American
Insurance Company and Vinmar International
Limited, Inc.