USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/30/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                    :
ZURICH AMERICAN                                     :        13cv8404
INSURANCE COMPANY, *et ano.*,                       :
                                                    :        MEMORANDUM & ORDER
                    Petitioners,                    :
                                                    :
        -against-                                   :
                                                    :
TEAM TANKERS A.S., *et al.*                         :
                                                    :
                    Respondents.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        Petitioners Zurich American Insurance Co. and Vinmar International Limited, Inc.

move to vacate an arbitration award.  Respondents Team Tankers A.S., Eitzen Chemical USA,

and the M/V Siteam Explorer move to dismiss one of the grounds on which Petitioners seek to

vacate the award, to confirm the award, and for their attorneys' fees and costs incurred with these

motions.  For the following reasons, the motion to vacate the award is denied, and the motion to

confirm it and for attorneys' fees and costs is granted.  Respondents' motion to dismiss is denied

because it is procedurally improper.

## BACKGROUND

I.   Facts

        On June 10, 2008, Vinmar chartered the M/V Siteam Explorer from Team

Tankers to transport 3,500 metric tons of acrylonitrile (ACN) from Houston, Texas to Ulsan,

South Korea, where Vinmar hoped to find a purchaser.  ACN is a liquid chemical that is a

versatile raw material.  It is odorless and, ideally, colorless.  However, it requires the addition of

-1-

Methyl Ethyl of Hydroquinone (MEHQ) to act as an inhibitor to prevent it from rapidly polymerizing. The manufacturer's report for this ACN stated the inhibitor was effective for temperatures up to 90°F and would last 90 days.

Vinmar's ACN quality standards require (1) a color measurement of 10 APHA or less, (2) nonvolatile matter (NVM) to remain at or below 100 mg/kg, and (3) its MEHQ content to remain between 35 and 45 parts per million (ppm). An independent surveyor took samples of the ACN before it was loaded aboard ship and at various stages of loading. The surveyor tested some of the samples immediately and retained others to be tested later if the need arose. The test results for all samples taken before and during the loading process showed the ACN was on specification.

The ship passed through tropical zones where the temperature approached, but did not reach, the 90°F limit of the inhibitor. On August 12, 2008, the ship arrived in Ulsan. Another independent surveyor drew samples from the ship's tanks before discharge and from the shore tanks after the ACN was unloaded. Again, the surveyor tested some samples and retained others. The test results showed the ACN remained on specification.

Unfortunately, the ACN market dropped precipitously while the ship was at sea. Vinmar stored the ACN in the Ulsan shore tanks for several weeks as it sought a buyer amidst falling prices. On September 26, 2013, 42 days after the ACN was unloaded from the vessel, Vinmar directed the independent surveyor to retest the ACN. This time the testing showed the ACN had yellowed to an unacceptable 13 APHA and its NVM had risen to an unacceptable 491 mg/kg. At this point, several retained samples were tested. Notably, a sample taken from the vessel's tanks before unloading, which was never exposed to the Ulsan shore tanks, had

yellowed to 10 APHA and its NVM had increased to 125 mg/kg.  And a sample pulled from the

shore tanks in Houston, which had never been exposed to the ship's tanks, was virtually

unchanged from when a similar sample was first tested in June 2008.  On September 30, 2008,

Vinmar informed the shipbroker that it held Team Tankers responsible for the ACN's

degradation, and the shipbroker put Team Tankers on notice of Vinmar's claim.

Meanwhile, Vinmar investigated methods for remediating the ACN, which

ultimately proved economically unviable.  On October 14, 2008, Vinmar accepted a bid to buy

the bulk of the ACN as-is for $1,500 per metric ton, but later gave a price concession dropping to

$1,450 per metric ton.  On December 17, 2008, it sold the remaining ACN for $750 per metric

ton.

II.    The Arbitration

The charter party requires disputes to be resolved by the Society of Maritime

Arbitrators, Inc. (SMA).  Petitioners appointed Louis P. Sheinbaum as an arbitrator, Respondents

appointed Anthony J. Siciliano, and on April 18, 2011, Sheinbaum and Siciliano selected Donald

J. Szostak as the panel chairman.  The panel held ten hearings, taking testimony from the

vessel's master, two Vinmar employees, two experts for Petitioners, and one expert for

Respondents.  It also received declarations and materials from the manufacturer of the ACN.  In

addition, the parties submitted extensive briefing.

Petitioners attempted to prove the ACN was in good order when delivered to the

ship in Houston but contaminated when it arrived in Ulsan.  It argued the ACN was

contaminated by remnants in the ship's tanks of its previous cargo, a chemical called pygas.

Team Tankers argued that Vinmar had not shown the ACN was sound when loaded, that there

could only have been trivial amounts of pygas remaining in the ship's tanks, and that the ACN was not damaged aboard the vessel, as shown by test results of samples taken on arrival at Ulsan. It noted the discoloration was not discovered until testing six weeks after the ship arrived. Moreover, it contended the temperatures on the tropical journey had pushed the ACN's inhibitor to its limit, which in any event was only effective for 90 days. Therefore, Team Tankers argued, the yellowing was most likely caused by a combination of heat and the passage of time.

On August 26, 2013, the panel issued a 2-1 decision in favor of Team Tankers. All parties agreed the dispute was governed by the Carriage of Goods by Sea Act (COGSA), ch. 229, 49 Stat. 1207 (1936) (codified as amended as a note to 46 U.S.C. § 30701). The majority classified it as "a classic case of well-qualified experts interpreting the results of highly technical test evidence differently." Arbitration Award ("Award") at 6 (ECF No. 12-5). The majority found the ACN was in good order when loaded. Award at 7. But it concluded that "Claimants have not shown, by a preponderance of evidence or otherwise, that the alleged contamination took place while the cargo was in the custody of the Siteam Explorer. Nor have Claimants shown that the nature of the alleged damage is so unique that it could only have occurred while still aboard the Vessel." Award at 10. Because Claimants had not shown the ACN was damaged aboard the ship, the majority denied their claim.

The majority continued and found that even if Vinmar had shown the ACN was damaged aboard the ship, it still would not have held Team Tankers liable because Team Tankers "exercised the requisite statutory 'due diligence' to make the ship seaworthy." Award at 10. The majority cited a COGSA provision providing that "[n]either the carrier nor the ship shall be liable for loss or damage arising from unseaworthiness unless caused by want of due diligence

on the part of the carrier to make the ship seaworthy." COGSA § 4(1). The majority found

Team Tankers had properly cleaned the ship's tanks, which were approved by Vinmar's

inspectors. Award at 10-11. The majority was "satisfied that Respondents did exercise the 'due

diligence' required by the statute." Award at 12.

Finally, the majority concluded that even if Vinmar had prevailed in establishing

liability, it would not be entitled to damages. It noted that "damages are to be measured against

the plunging market for sound ACN." Award at 12. In early October 2008, prices for sound

ACN dipped as low as $1,700 per metric ton, but Vinmar still managed to secure an offer to sell

its ACN for $1,720 per metric ton, though this sale was lost as Respondents continued to explore

remediation options. Award at 12. Later that month, with ACN prices continuing to fall,

Vinmar sold most of its cargo for $1,450 per metric ton, but the majority found "no

contemporary evidence that [the buyer] sought or that Vinmar granted a reduced price due to the

cargo having an APHA factor greater than 10. In fact the contract of sale . . . does not describe

the cargo as distressed product." Award at 12. Similarly, for the second sale, the majority found

the sale price of $750 per metric ton "compares favorably to market data reports for mid-

December indicating prices for sound ACN as low as $800 per [metric ton] and suggests that

increased color did not factor into the price." Award at 12. The majority was "not persuaded

that either the first or second sale of the so-called 'distressed' cargo fetched prices below those

then prevailing for sound non-fiber grade ACN." Award at 12.

Dissenting, Sheinbaum noted that only samples that had been exposed to the ship

later showed any appreciable discoloration. Dissenting Opinion ("Dissent") at 5 (ECF No. 12-5).

This led him to conclude that "the cargo's propensity and condition to discolor as it did was

acquired while it was on the Vessel." Dissent at 5. Sheinbaum found this established a prima facie case, shifting the burden to Team Tankers to explain the cause of the damage. In Sheinbaum's view, Team Tankers did not carry that burden. Dissent at 7. He found the majority's discussion of unseaworthiness and due diligence "misplaced and inappropriate," as due diligence issues only arise if unseaworthiness is a cause of the cargo damage. Dissent at 12. Sheinbaum went on to calculate Petitioners' damages as $775,500 plus interest. Dissent at 14-18.

III.   Donald J. Szostak's Illness

Sometime in 2012, Szostak was diagnosed with an inoperable brain tumor. Szostak never informed the parties of his diagnosis. However, in April 2013 he informed other counsel in a separate proceeding of his illness and ultimately resigned from that panel. In January 2014, Szostak passed away.

DISCUSSION

Petitioners move to vacate the award for manifest disregard of the law. They also allege that Szostak's failure to disclose his brain tumor was misconduct and rendered him corrupt, requiring vacatur of the award under the Federal Arbitration Act (FAA). Respondents move to confirm the award and dismiss Petitioners' claim for vacatur for misconduct and corruption.

I.   Applicable Law

The FAA does not "independently confer subject matter jurisdiction on the federal courts." Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. DuPont, 565 F.3d 56, 63 (2d Cir. 2009). "'[T]here must be an independent basis of jurisdiction before a district

court may entertain petitions' to confirm or vacate an award under the FAA." Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co., 668 F.3d 60, 71 (2d Cir. 2010) (alteration in original) (quoting Durant, 565 F.3d at 63). The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention) applies to this case because it arises out of a commercial arbitration where at least one of the parties, Team Tankers A.S., is a foreign corporation. See 9 U.S.C. § 202. Federal courts have subject matter jurisdiction over petitions to confirm or vacate awards that are governed by the New York Convention. 9 U.S.C. § 203; Scandinavian, 668 F.3d at 71. Because the award was entered in the United States, the domestic provisions of the FAA also apply. See Scandinavian, 668 F.3d at 71; see also Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 18-23 (2d Cir. 1997) ("[T]he FAA and the [New York] Convention have 'overlapping coverage' to the extent that they do not conflict.").

## II.   Manifest Disregard of the Law

### a.   Legal Standard

"Manifest disregard of the law" is a "judicial gloss on the specific grounds for vacatur" found in the FAA. T.Co. Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir. 2010) (quoting Stolt-Nielsen SA v. AnimalFeeds Int'l Corp., 548 F.3d 85, 94-95 (2d Cir. 2008), rev'd on other grounds, 559 U.S. 662 (2010)). The continued existence of the manifest disregard of the law doctrine was put in question by the Supreme Court's decision in Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 584-85 (2008). The Court later declined to decide whether "manifest disregard" survived Hall Street. See Stolt-Nielsen S.A v. AnimalFeeds Int'l Corp., 559 U.S. 662, 672 n.3 (2010). The Second Circuit has recognized the

viability of the "manifest disregard" doctrine after Hall Street, see T.Co Metals, 592 F.3d at 339, as well as after Stolt-Nielsen. See Schwartz v. Merrill Lynch & Co., 665 F.3d 444, 451-52 (2d Cir. 2011); Jock v. Sterling Jewelers Inc., 646 F.3d 113, 121-22 (2d Cir. 2011). The doctrine applies to arbitration awards governed by the New York Convention if they were rendered in the United States. Yusuf Ahmed Algahanim & Sons, 126 F.3d at 20-23.

It is "a doctrine of last resort—its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003). As the Second Circuit has described it,

> [a]lthough the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law. The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir. 1986) (internal citations omitted).

An arbitral award may be vacated for manifest disregard of the law "only if 'a reviewing court . . . find[s] both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'" Wallace v. Buttar, 378 F.3d 182, 189 (2d Cir. 2004) (quoting Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 263 (2d Cir. 2003)) (omission and alteration in original).

An arbitrator is not expected to apply legal principles "with the sophistication of a highly skilled attorney." Wallace, 378 F.3d at 190. "[A]rbitrators often are chosen for reasons

other than their knowledge of applicable law." <u>Duferco</u>, 333 F.3d at 390. "[A]n arbitrator 'under the test of manifest disregard is ordinarily assumed to be a blank slate unless educated in the law by the parties.'" <u>Wallace</u>, 378 F.3d at 190 (quoting <u>Goldman v. Architectural Iron Co.</u>, 306 F.3d 1214, 1216 (2d Cir. 2002)).

   "Judicial inquiry under the 'manifest disregard' standard is therefore extremely limited." <u>Merrill Lynch</u>, 808 F.3d at 934. An arbitration award "should be enforced, despite a court's disagreement with it on the merits, if there is a <u>barely colorable</u> justification for the outcome reached." <u>Wallace</u>, 378 F.3d at 190 (emphasis in original) (quoting <u>Banco de Seguros</u>, 344 F.3d at 260).

   Petitioners claim the panel majority manifestly disregarded the law by (1) requiring them to prove what caused the ACN's discoloration in order to make out a prima facie case, (2) finding that even if the ACN had been damaged aboard the ship, Team Tankers' due diligence in making the ship seaworthy would have absolved Respondents from liability, and (3) finding Petitioners suffered no damages as a result of the discoloration.

  b. <u>Prima Facie COGSA Case</u>

   Under COGSA, a shipper establishes a prima facie case for recovery by proving "the goods were damaged while in the carrier's custody." <u>Caemint Food Inc. v. Brasiliero</u>, 647 F.2d 347, 351-52 (2d Cir. 1981) (Friendly, J.) (quoting <u>Pan-Am. Hide Co. v. Nippon Yusen (Kabushiki), Kaisha</u>, 13 F.2d 871, 871 (S.D.N.Y. 1921) (L. Hand, J.)). A shipper must prove this by a preponderance of the evidence. <u>See Nissho-Iwai Co. v. M/T Stolt Lion</u>, 719 F.2d 34, 38 (2d Cir. 1983). That can be done in two ways: (1) by evidence the cargo was in good condition when delivered to the ship but damaged upon arrival (the "direct evidence" approach) or (2) by

showing that the characteristics of the damage justify the conclusion that the harm occurred

while in the carrier's custody (the "causation" approach). <u>Transatlantic Marine Claims Agency</u>

<u>Inc. v. M/V OOCL Inspiration</u>, 137 F.3d 94, 98-99 (2d Cir. 1998). Petitioners attempted to use

the first method—to show the ACN was in good order when delivered to the M/V Siteam but

damaged when it arrived in Ulsan. They were not required to prove the cause of the damage.

Nonetheless, to bolster their case Petitioners attempted to show the ACN was "contaminated" by

pygas that remained in the M/V Siteam's tanks from its previous voyage.

        COGSA provides that if the shipper does not give notice of cargo damage within

three days of delivery, the acceptance of the cargo "shall be prima facie evidence of the delivery

by the carrier of the goods as described in the bill of lading." COGSA § 3(6). Because

Petitioners did not give notice of the ACN's damage until six weeks after delivery, they had to

overcome this presumption to establish a prima facie case. The parties dispute what is required

to overcome the COGSA presumption. Petitioners claim the presumption is overcome if the

claimant "adduces <u>any</u> credible evidence tending to show that the cargo was damaged prior to

delivery." <u>Ferrostaal Corp. v. M.V. Singa Wilguard</u>, 838 F. Supp. 757, 767 (S.D.N.Y. 1993)

(emphasis added); <u>see also</u> <u>Pac. Emp'rs Ins. Co. v. M/V Gloria</u>, 767 F.2d 229, 238 (5th Cir.

1985) ("The presumption of good delivery . . . is conclusive only where there is no other

evidence on the disputed point." (internal quotation omitted)). Team Tankers contends

something more is required. <u>See, e.g.</u>, <u>Bally, Inc. v. M.V. Zim Am.</u>, 22 F.3d 65, 71 (2d Cir.

1994) (presumption falls "once the consignee comes forward with <u>sufficient evidence</u> that the

cargo was damaged or short prior to delivery" (emphasis added)).

The late notice presumption is a perplexing doctrine.  By creating a rebuttable presumption that the goods were delivered undamaged, it might be thought of as placing the burden on the shipper to come forward with evidence that the cargo was damaged while in the carrier's custody.  But that is always the shipper's burden, regardless of whether the late notice presumption applies.  See Caemint Food, 647 F.2d at 351; Nissho-Iwai Co., 719 F.2d at 38.  For the presumption to have any meaning, it must then raise the shipper's burden higher than it would otherwise be.  But even in cases where the presumption is in play, the shipper is still required to prove the goods arrived in damaged condition by a preponderance of the evidence.  See Ferrostaal Corp., 838 F. Supp. at 767 ("That [the shipper] has overcome the presumption of good delivery does not, of course, mean that [it] has necessarily prevailed on the ultimate issue by the preponderance of the evidence.").  Regardless of the presumption, it was Petitioners' burden to establish by a preponderance of the evidence that the ACN was damaged in Team Tankers' custody.  They were not, however, obligated to prove the cause of the damage.

     c.   The Majority's Alleged Manifest Disregard of COGSA's Prima Facie Case

Petitioners allege that the majority improperly held the late-notice presumption to require them to prove the cause of the ACN's discoloration.  The majority correctly stated that it was "Claimants' burden to overcome the presumption of sound delivery and persuade the triers of fact that the cargo was in fact damaged while in the custody of the Vessel"—not to prove what caused the damage.  Award at 7.

Early in the majority's legal discussion, it found that the cargo was "on spec" when delivered to the vessel in Houston—that is, it was delivered in good condition.  Award at 7.  It continued "[h]owever, the cargo was also found to be 'on spec' for color at discharge and that

finding precludes Claimants benefiting from the usual presumptions of fault associated with a
'prima facie' claim presentation." Petitioners infer from that statement that they were required to
prove the cause of the ACN's damage. But read in context, the majority appeared to find that the
ACN arrived in good order, foreclosing Petitioners from establishing a prima facie case under
the direct evidence approach.

      Petitioners attempted to show that even though the ACN met specifications upon
arrival, it was already damaged at that time because it had acquired a propensity to yellow. The
majority noted that although testing of samples retained from the time of loading that never
touched the ship's tanks "indicate[d] that some further color had developed, none experienced
the same level of color deterioration as did the cargo carried by the Vessel and discharged into
the [Ulsan shore] tanks." Award at 8. The majority found

> those additional tests to be among the strongest evidence in support of Claimants'
> position, but they are not dispositive that the cause for increased color took place
> aboard the ship. Clearly the conditions under which those samples were retained
> did not replicate those actually experienced by the cargo carried by the Siteam
> Explorer. Here, the ACN was subjected to a "stressful voyage" that in terms of
> duration and temperature brought the cargo to the edge of its stated stability.
> Moreover, the uncontested testimony of [Respondents' expert] was that given
> sufficient time, "all acrylonitrile" will yellow.

Award at 8 (emphasis added). Here, the majority rejected Petitioners' "strongest evidence" that
the ACN was damaged upon arrival in South Korea.

      Though it was not their primary argument, Petitioners might still have established
a prima facie case under the causation approach by proving the discoloration was caused by the
alleged remnants of pygas in the ship's tanks. Reviewing Petitioners' proof that the
discoloration was caused by pygas, the majority found that

> [a]fter years of testing the pre-discharge "composite" and "replicate" samples with progressively more sophisticated equipment, Claimants' experts did not actually find remnants of pygas. Rather, the gas chromatograms only produced images of reactive species suspected to be associated with pygas and many others that could not be identified. Claimants' experts, however, did agree that those suspect species were not themselves colored nor color forming.

Award at 8.

In addition, the majority found reason to believe the ACN was damaged in the Ulsan shore tanks. They found it "important to note that Claimants' only complaint is that six weeks after its discharge the cargo was found to exceed Vinmar's color specification." Award at 7. The majority concluded "that the inhibitor functioned as intended while the cargo was in the custody of the Vessel. It was only after the cargo had been discharged and remained in the [Ulsan] shore tanks for some time that the MEHQ was noted to have increased to 40/41 ppm." Award at 10. The majority also credited Team Tankers' expert's testimony that after the ACN was unloaded in Ulsan, it showed "strong evidence that the MEHQ inhibitor had briefly stopped working and that polymerization had occurred in the shore tanks." Award at 10 (emphasis added).

In sum, the ACN was "on spec" when it arrived in Ulsan, Petitioners' "strongest evidence" did not establish the damage took place aboard ship, the ACN showed no remnants of pygas, and there was evidence the ACN polymerized in the Ulsan shore tanks where it sat for six weeks after delivery. From this, the majority concluded that "Claimants have not shown, by a preponderance of evidence or otherwise, that the alleged contamination took place while the cargo was in the custody of the Siteam Explorer. . . . Nor have Claimants shown that the nature of the alleged damage is so unique that it could only have occurred while still aboard the Vessel." Award at 10. This second sentence would have made little sense if the majority was

-13-

requiring Petitioners to prove the cause of the ACN's damage, as Petitioners now claim. Instead, in these two sentences, the majority concluded that the Petitioners did not meet their burden of making a prima facie case under either the direct evidence approach or the causation approach. Hence, the majority did not misapply COGSA.

An award will be confirmed "if a justifiable ground for the decision can be inferred from the facts of the case." Duferco, 333 F.3d at 390 (citing Sobel v. Hertz, Warner & Co., 469 F.2d 1211, 1216 (2d Cir. 1972)). There is certainly a "barely colorable justification for the outcome reached," which is all that is required. Wallace, 378 F.3d at 190 (emphasis removed). Even if the majority had required Petitioners to prove the cause of the discoloration, that still would not be grounds for vacating the award. "[C]ourts may vacate awards only for an overt disregard of the law and not merely for an erroneous interpretation." Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993). Requiring proof of the cause of the damage would merely have been an erroneous interpretation of COGSA.

Further, Petitioners would have had to show the arbitrators consciously disregarded the law—that "the arbitrator[s] knew of the relevant principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." Westerbeke Corp. v. Daihatsue Motor Co., 394 F.3d 200, 217 (2d Cir. 2002). Even if this Court were to adopt Petitioners' interpretation of the majority's decision—that it required them to prove the cause of the cargo damage—there is no indication the majority knew that was not the law but chose to hold petitioners to a different standard. Petitioners point to the "correct" statements of law in the dissenting opinion to show that the majority must have known and disregarded the law. But a dissent shows disagreement on an

issue of law or fact, not the majority's conscious disregard of the "correct" law. And here, on this issue of whether Petitioners made a prima facie case, the dissent disagrees with the majority on the conclusions to be drawn from the evidence, not on the applicable law.

Petitioners have not met their extraordinary burden of showing that the majority manifestly disregarded the law in finding that the Petitioners did not establish a prima facie case. There is therefore no need to consider Petitioners' arguments with respect to the majority's discussion of Team Tankers' "due diligence" or its damages conclusions.

III.    9 U.S.C. § 10(a)(2) & (3)

After learning of Szostak's illness in January 2014, Petitioners amended their petition to include arguments for vacating the award under the enumerated grounds for vacatur in the 9 U.S.C. § 10(a), arguing Szostak's failure to disclose his condition constituted corruption and misconduct. See Am. Pet. (ECF No. 20). The FAA provides four grounds for vacating awards, § 10(a)(1)-(4). Petitioners only opposed Respondents' motion to dismiss with respect to § 10(a)(2) & (3) and make no argument regarding § 10(a)(1) or (4).

Respondents moved under Rule 12(b)(6) to dismiss the second "cause of action" in the petition. Proceedings under the FAA are governed by the Federal Rules of Civil Procedure only to the extent the FAA does not provide for other procedures. Fed. R. Civ. P. 81(a)(6)(B); ISC Holding AG v. Nobel Biocare Finance AG, 688 F.3d 98, 109-10 (2d Cir. 2012). The FAA provides that applications to vacate or confirm arbitration awards "shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided." 9 U.S.C. § 6. Because a party seeking to vacate an arbitration award must do so by motion, Rule 12(b)'s pleading requirements do not apply. Productos Mercantiles

E Industriales, S.A. v. Faberge USA, Inc., 23 F.3d 41, 46 (2d Cir. 1994) (citing O.R. Sec., Inc. v.

Prof'l Planning Assocs., Inc., 857 F.2d 742, 748 (11th Cir. 1988)); see also ISC Holding AG v.

Nobel Biocare Finance AG, 688 F.3d 98, 112 (2d Cir. 2012); D.H. Blair & Co. v. Gottdiener,

462 F.3d 95, 108 (2d Cir. 2006).  However, the fact that the parties nominally briefed these

issues under Rule 12(b)(6) does not prevent this Court from considering the propriety of vacating

the award under § 10(a).  This Court may treat the petition as a motion to vacate the award under

§ 10(a), and the parties adequately briefed the issues presented under §§ 10(a)(2) & (3) in

connection with the "motion to dismiss."  See Productos Mercantiles, 23 F.3d at 46; O.R. Sec.,

857 F.3d at 746.

       § 10(a)(2) permits a court to vacate an arbitration award "where there was evident

partiality or corruption in the arbitrators, or either of them."  § 10(a)(3) permits vacatur "where

the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient

cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any

other misbehavior by which the rights of any party have been prejudiced."  To vacate under

§ 10(a)(3), "the misconduct must amount to a denial of fundamental fairness of the arbitration

proceedings."  Roche v. Local 32B-32J Serv. Emps. Int'l Union, 755 F. Supp. 622, 624

(S.D.N.Y. 1991).

       Petitioners argue Szostak's failure to disclose his medical condition constituted

corruption under § 10(a)(2) and misconduct under § 10(a)(3).  Their principal argument is that

Szostak's failure to disclose violated the SMA rules or ethics code.  SMA Rule 9 requires

arbitrators "[p]rior to the first hearing or initial submissions . . . to disclose any circumstance

which could impair their ability to render an unbiased award based solely upon an objective and

impartial consideration of the evidence presented to the Panel." The SMA Code of Ethics requires each member of the organization to "observe the highest standards of personal and professional conduct, free from impropriety or the appearance of impropriety. . . . In the conduct of an arbitration, each member shall exercise care to remain absolutely impartial and always abide by principles of honesty and fair dealing." Petitioners contend that because "[m]alignant primary brain tumors cause profound changes in cognitive function," Pets.' Opp. Mem. at 4 (quoting Christina A. Meyers & Anne E. Kayl, "Neurocognitive Function," in Cancer in the Nervous System 557, 557 (Victor A. Levin ed., 2d ed. 2002)), SMA Rule 9 and the Code of Ethics required Szostak to disclose that he suffered from a brain tumor.

It is highly questionable whether the SMA rules require disclosure of a medical condition that might affect cognition but does not impair objectivity or cause bias or impartiality. Regardless, a violation of arbitration rules or ethics codes is not a ground for vacating an arbitration award. "[A]rbitration rules and code[s] do not have the force of law. . . . The [FAA] specifies limited grounds for setting aside an arbitration award." Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 680-81 (7th Cir. 1983); see also ANR Coal Co. v. Cogentrix of N.C., Inc., 173 F.3d 493, 499 (4th Cir. 1999). The FAA "makes the grounds for setting aside an arbitrator's award . . . narrower than the grounds for disqualification in the arbitration rules and code." Merit, 714 F.3d at 681. Therefore, arbitration rules and ethics codes "are not the proper starting point for an inquiry into an award's validity under section 10 of the [FAA]." Merit, 714 F.3d at 681; see also ANR Coal, 173 F.3d at 499.

Petitioners nonetheless attempt to give arbitration rules and ethics codes the force of law by arguing "[a]rbitration is a creature of contract," and here the parties "agreed that

arbitration would be conducted in accordance with the Rules of the Society of Maritime Arbitrators." Pets.' Opp. Mem. at 1 (ECF No. 28).  But parties may not contractually expand a court's authority to vacate an arbitration award beyond the grounds provided in § 10 of the FAA. Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 585-87 (2008).

Leaving aside the SMA rules and ethics code, the question under § 10(a)(2) is whether Szostak acted "corruptly" in failing to disclose his brain tumor.  Black's Law Dictionary defines "corruption" as "[d]epravity, perversion, or taint; an impairment of integrity, virtue, or moral principle," especially, "the impairment of a public official's duties by bribery," or "[t]he act of doing something with an intent to give some advantage inconsistent with official duty and the rights of others; a fiduciary's or official's use of a station or office to procure some benefit either personally or for someone else, contrary to the rights of others."  Black's Law Dictionary (9th ed. 2009).  Petitioners argue it was "corrupt" for Szostak "to bill his time while allowing the parties to labor under the mistaken impression that none of his subjectivities could interfere with his objective consideration of the evidence." Pets.' Opp. Mem. at 14.  Even assuming, arguendo, the legitimacy of Petitioners' premise that tumors necessarily impair brain function, at most Szostak served as an arbitrator when he had reason to doubt he could adequately discharge his responsibilities.  That is not corruption.

Alternatively, Petitioners claim the "original" definition of "corrupt" was "changed from a sound condition to an unsound condition." Pets.' Opp. Mem. at 13 n.5 (citing Webster's New Twentieth Century Dictionary (2d ed. 1979)).  Under this definition, they claim "a reasonable person would conclude the Chairman was 'corrupt.'" Pets.' Opp. Mem. at 13 n.5.

While an oncologist might characterize a malignant tumor as "corrupting" healthy tissue in a brain, no one would regard that human being as a corrupt person.

With respect to § 10(a)(3), petitioners contend Szostak's failure to disclose his condition constituted "misbehavior" that prejudiced them. Petitioners argue they "agreed to have all disputes heard by a Panel of three arbitrators of unquestionably sound mind." Pets.' Opp. Mem. at 15. But this again improperly seeks to incorporate private arbitration agreements and rules into the FAA. Under the FAA, an arbitrator is under no duty to disclose medical conditions. There is no guarantee that an arbitrator is free from conditions which might affect his abilities. Any number of matters—brain tumors, substance issues, marital problems, lack of sleep—might affect an arbitrator's concentration or faculties. Parties are entitled to unbiased and uncorrupted arbitrators, see 9 U.S.C. § 10(a)(2), not perfect arbitrators.

Setting aside the award under § 10(a)(3) would also be improper because there is no suggestion Petitioners were prejudiced by Szostak's failure to disclose. Petitioners concede that over the course of the arbitration, including ten formal hearings, they saw nothing that made them question Szostak's competence. Apr. 23, 2014 Tr. 41:6-14. And arbitrator Anthony J. Siciliano reached the same conclusion as the allegedly impaired Szostak. Petitioners claim that had they known of Szostak's tumor, they would have objected and asked him to step down. Decl. of John T. Lillis Jr., Esq. ¶ 3 (ECF No. 27). This after-the-fact claim as to what they would have done does not show that Petitioners suffered actual prejudice. Moreover, based on this Court's reading of SMA Rule 9 and the Code of Ethics, Petitioners would have had no basis for compelling Szostak to resign, so they were not prejudiced. Petitioners have not shown they were denied "fundamental fairness" as required by § 10(a)(3). Roche, 755 F. Supp. at 624.

The Second Circuit has long noted it has "not been quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information. . . . There is an obvious possibility . . . that 'a suspicious or disgruntled party can seize' upon an undisclosed relationship 'as a pretext for invalidating the award.'" In re Arbitration Between Andros Compania Maratima, S.A. & Marc Rich & Co., 579 F.3d 691, 700 (2d Cir. 1978) (quoting Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 151 (1968)). Though the court of appeals was discussing bias, the same concerns apply to vacating awards for corruption or misconduct. They apply especially to attempts to stretch the language of 9 U.S.C. § 10(a) as far as Petitioners do here. This motion seeks to transform a personal tragedy into a second chance for parties disappointed with the outcome of their arbitration. The "twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation," would not be served by vacating the award here. Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust, 729 F.3d 99, 103 (2d Cir. 2013).

IV.   Confirmation of the Award

Under the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11." Hall St., 552 U.S. at 582 (quoting 9 U.S.C. § 9). And under the New York Convention, "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207; see also Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co., 668 F.3d 60, 78 (2d Cir. 2010). Petitioners have not indicated any grounds for vacating the award other than those rejected above. Respondents' motion to confirm is granted.

V.   Fees and Expenses

Respondents move under the parties' contract and 28 U.S.C. § 1927 for their fees and expenses incurred in these motions.  In addition, at a pre-motion conference on January 16, 2014, this Court informed Petitioners that it believed the motion to vacate the award because of Szostak's failure to disclose his medical condition was baseless.  This Court permitted Petitioners to amend their petition but cautioned it would sanction them $1,000 if the motion did not have a substantial basis in the law.

The parties used a standard "Asbatankvoy" charter party form.  It provides that "[d]amages for breach of this Charter shall include all provable damages, and all costs of suit and attorneys fees incurred in any action hereunder."  Charter Party Part II, Clause 23 (attached as Ex. 2(b) to Decl. of Michael J. Frevola (ECF No. 10)).  Petitioners argue that by its terms, this clause applies only to actions for breach of the charter and not to actions to vacate or confirm arbitration awards.  However, this exact provision has been interpreted several times to allow for fees in any action arising under the charter, including actions to vacate or confirm awards.  See Page Int'l Ltd. v. Adam Mar. Corp., 53 F. Supp. 591, 599 (S.D.N.Y. 1999); In re Arbitration Between Carina Int'l Shipping Corp. & Adam Mar. Corp., 961 F. Supp. 559, 569 (S.D.N.Y. 1997); Elite Inc. v. Texaco Panama Inc., 777 F. Supp. 289, 292 (S.D.N.Y. 1991); Trans-Asiatic Oil Ltd. v. UCO Marine Int'l Ltd., 618 F. Supp. 132, 137 (S.D.N.Y. 1985).  Given that the charter party allows Respondents to recover their attorneys' fees in opposing Petitioners' motion to vacate and in moving to confirm, there is no need to consider whether fees would be recoverable under 28 U.S.C. § 1927.  Given the fact that this Court now invites Respondents' application for attorneys' fees and costs, this Court declines to sanction Petitioners.

-21-

CONCLUSION

For the foregoing reasons, Petitioners' motion to vacate the arbitration award is denied and Respondents' motion to confirm the award is granted.  Respondents' motion for attorneys' fees and costs incurred in connection with these motions is also granted.  Respondents are directed to submit documentation of their fees and costs by July 11, 2014.  Petitioners may interpose any objection to their reasonableness by July 18.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 14 & 23.

Dated: June 30, 2014
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

John T. Lillis, Jr., Esq.
Kennedy Lillis Schmidt & English
75 Maiden Lane
New York, NY 10038
*Attorney for Petitioners*

Francis R. Denig, Esq.
Michael J. Frevola, Esq.
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
*Attorneys for Respondents*